IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD C. SMITH, | : | |
| Plaintiff | : | |
| | : | Civil Action – Law |
| | : | (Electronically filed) |
| vs. | : | |
| | : | |
| PRIMECARE MEDICAL, INC., CARL A. | : | |
| HOFFMAN, JR., D.O., THERESA M. | : | |
| HOFFMAN, JOSHUA D. LOCK, | : | |
| MARCY HOFFMAN-SCHLEGEL, | : | |
| FRANK KOMYKOSKI, and | : | |
| KNIGHTS OF VON DUKE, LTD., | : | Jury Trial Demanded |
| Defendants | : | |

# COMPLAINT

NOW COMES Plaintiff, Richard C. Smith, by and through his counsel, Clark & Krevsky, LLC, who files the following Complaint:

## PARTIES

1.     Plaintiff Richard C. Smith is an adult resident of the Commonwealth having an address at 366 Equus Drive, Camp Hill, York County, PA, 17011.

2.     Defendant PrimeCare Medical, Inc. is a Pennsylvania Corporation having an address at 3940 Locust Lane, Harrisburg, Dauphin County, PA, 17109.

3.      Defendant Knights of Von Duke, Ltd. is a Corporation of the British Virgin Islands having an address at 3940 Locust Lane, Harrisburg, Dauphin County, PA, 17109.

4.      Defendant Carl A. Hoffman, Jr., D.O. is an adult resident of the Commonwealth having an address 3940 Locust Lane, Harrisburg, Dauphin County, PA, 17109; for all relevant times of this Complaint, Defendant Carl Hoffman was PCM's President and Chief Medical Officer.

5.      Defendant Joshua Lock is an adult resident of the Commonwealth having an address 3940 Locust Lane, Harrisburg, Dauphin County, PA, 17109; for all relevant times of this Complaint, Lock was PCM's Vice President of Legal Affairs and Personnel.

6.      Defendant Theresa Hoffman is an adult resident of the Commonwealth having an address 3940 Locust Lane, Harrisburg, Dauphin County, PA, 17109; Defendant Theresa Hoffman is the wife of Defendant Carl Hoffman for all relevant times of this Complaint, Defendant Theresa Hoffman was PCM's Executive Vice President.

7.      Defendant Marcy Hoffman-Schlegel is an adult resident of the Commonwealth having an address 3940 Locust Lane, Harrisburg, Dauphin County, PA, 17109; Defendant Hoffman-Schlegel is the daughter of Defendant Carl

Hoffman and step-daughter of Defendant Theresa Hoffman, and for all relevant times of this Complaint, Hoffman-Schlegel was PCM's Junior Vice President of Human Resources-Personnel.

8.      Defendant Frank Komykoski is an adult resident of the Commonwealth having an address 3940 Locust Lane, Harrisburg, Dauphin County, PA, 17109; for all relevant times of this Complaint, Defendant Komykoski was PCM's Vice President of Operations.

## INTRODUCTION

9.      Smith brings this action against his former employer, its principal, certain executives of his former employer, and an entity related or affiliated with the employer and/or its principal, for claims arising under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq.; the Pennsylvania Whistleblower Law, Act of 1986; Pennsylvania Wage Payment and Collection Law, Act of July 7, 1961, P.L. 637 No. 329, 43 P.S. § 260.3; and other common law claims, all of which relate to Smith's employment, its termination and/or actions occurring thereafter.

10.     Smith was formerly employed by PCM, beginning on or about March 30, 1990, and ending at approximately 12:00 PM on March 14, 2008, when Smith handed written notice to Defendant Carl Hoffman advising that Smith regarded

PCM as having constructively discharged Smith as of said date; Smith's title at that time was Vice-President for Operations.

## JURISDICTION AND VENUE

11.     This Honorable Court has jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1332 and 28 U.S.C. § 1367.

12.     Venue is proper in this court under 28 U.S.C. § 1391(b)(2).

## BACKGROUND OF PCM AND DEFENDANT CARL HOFFMAN

13.     On information and belief, PCM is formerly known as Pennsylvania Institutional Health Services, Inc. ("PIHS"); references herein to PCM include references to said corporation under its prior name.

14.     On information and belief, Defendant Carl Hoffman is a principal of PCM and is its principal shareholder; Defendant Hoffman is also a physician licensed in the Commonwealth of Pennsylvania by the State Board of Osteopathic Medicine, and in the State of West Virginia by the West Virginia Board of Osteopathy.

15.     PCM is principally engaged in providing contract health care services to correctional institutions; on information and belief, PCM currently provides such services under contracts with approximately 21 counties or county prison

boards throughout the Commonwealth of Pennsylvania, 2 privately-operated

juvenile correctional facilities in the Commonwealth of Pennsylvania, one prison

in the State of New Hampshire, one prison in the State of Maryland, approximately

11 correctional facilities under the jurisdiction of the West Virginia Regional Jail

and Correctional Facility Authority and approximately 11 facilities under the

jurisdiction of the West Virginia Division of Juvenile Services.

## DISRUPTION AT PCM DURING THE FIRST YEARS OF SMITH'S EMPLOYMENT

16.     Nearly from the beginning of Smith's employment at PCM in 1990,

the corporation and Defendant Carl Hoffman experienced disruptive events.

17.     On information and belief, prior to Smith's employment with PCM,

PCM was under contract to provide contract physician services for the

Pennsylvania Department of Corrections ("DOC") at five DOC facilities, including

State Correctional Institution at Camp Hill ("SCIC"), SCI-Dallas, SCI-Waymart,

SCI-Muncy and SCI-Smithfield.

18.     In or about 1989, SCIC experienced an inmate riot, after which DOC

caused a review of prison services, including but not limited to the sufficiency of

physician services at SCIC.

19.    In or about 1990, the Pennsylvania Office of Inspector General ("OIG") investigated PCM's alleged failure to provide contractually required physician services and on-site physician specialist services at SCIC; on information and belief, the OIG concluded (the "OIG Investigation") that PCM failed to provide services as contractually required.

20.    On information and belief, in or about June 1992, a patient-inmate receiving care from PCM staff died at the SCIC infirmary.

21.    After the inmate's death, Defendant Carl Hoffman entered the SCIC infirmary and altered the deceased inmate's medical record by making a back-dated entry.

22.    On information and belief, in or about July 1992, DOC wrote to Defendant Carl Hoffman advising him that a DOC internal investigation "raises very grave concerns about the adequacy of medical care provided to" the deceased inmate and announcing a ban of Defendant Hoffman and another PCM physician from the grounds of any DOC correctional facility.

23.    On information and belief, after the events described in paragraphs 19 through 22, DOC gave PCM notice of DOC's cancellation of its contract(s) with PCM.

24.    Defendant Carl Hoffman's alteration of the deceased inmate's medical record, among other allegations, led to an investigation of Defendant Hoffman by the Pennsylvania State Board of Osteopathic Medicine (the "State Board").

25.    The State Board issued an Adjudication and Order on or about February 18, 1999 wherein the State Board:

a.    Adopted a written finding that Defendant Carl Hoffman made "a misleading, deceptive, untrue or fraudulent entry into the medical record of the deceased inmate;"

b.    Noted that Defendant Hoffman "did not testify credibly regarding the entry;"

c.    Noted that Defendant Hoffman made an entry that "leads a reader to believe the entry was made [two days before the entry] was made."

d.    Noted that Defendant Hoffman made an entry that "leads a reader to believe that Dr. Powell [a PCM physician] was the source of information for the entry, but he was not."

e.    Noted that said Dr. Powell "did not make any notes about [the deceased inmate], did not remember him and did not speak to [Defendant Carl Hoffman or another PCM physician] until almost two weeks after [the inmate's] death."

7

  f. Noted that Defendant Hoffman made an entry "that would suggest the [deceased inmate] received even more attentive care than he actually received."

26. The State Board Adjudication adopted a written reprimand to Defendant Carl Hoffman and assessed him with a $1,000 civil penalty; the adjudication became a final order of the State Board.

27. On information and belief, in or about 1993, DOC attempted to suspend and/or debar PCM from bidding on contracts with DOC.

28. On information and belief, in or about 1993, PCM changed its name from Pennsylvania Institutional Health Services, Inc., to PrimeCare Medical, Inc.

29. On information and belief, PCM and DOC resolved claims between them, the terms of which included an agreement by PCM not to bid on any state contracts for a fixed period of time thereafter.

30. In or about 1994, Defendant Carl Hoffman terminated the employment of John M. Branyan, a Vice-President from the corporation's early days as PIHS; on information and belief, Hoffman disclosed to Smith that he also contemplated pursuing legal charges against Branyan for his alleged financial improprieties to the corporation, but elected not to pursue the same after Branyan

threatened to expose the fact that Hoffman failed to disclose all his assets in the course of Hoffman's divorce from his first wife.

## SMITH TAKES LEADERSHIP OVER PCM OPERATIONS AND ADHERES TO ETHICAL GUIDELINES ON CONTRACTS WITH PUBLIC BODIES

31.     In or about 1993, Smith, already an employee of PCM, was appointed PCM's Director of Operations.

32.     In or about 1996, Smith was promoted to PCM's Vice President of Operations.

33.     From Smith's knowledge of the OIG Investigation of PCM and his knowledge of the State Board Adjudication, Smith was at all times acutely aware of past instances where PCM had engaged in misleading, deceptive, untrue or fraudulent behavior in providing services to public bodies, and Smith was vigilant to ensure that PCM not engage in a repeat of such behavior.

34.     As Vice-President of Operations, Smith emphasized that PCM adhere strictly to its contracts with public bodies, even to the extent of paying medical staff such extra compensation as necessary to ensure that facilities were staffed as contractually required.

35.     Smith, as Vice-President of Operations, ran the day to day operations of PCM in Pennsylvania, New Hampshire, Maine and New York until in or about 2005.

36.     From 1996 to 2005, Smith's efforts as Vice-President of Operations repaired PCM's reputation, improved its performance, and increased the number of contracts PCM entered into with other public bodies.

**SMITH'S SUCCESS FOR THE COMPANY RESULTS IN AWARD TO SMITH OF KNIGHTS OF VON DUKE, LTD. STOCK**

37.     Knights of Von Duke, Ltd. ("Knights"), an offshore (British Virgin Islands) insurance company was formed in 1999.

38.     On information and belief, Defendant Carl Hoffman is a principal of Knights and is its majority shareholder.

39.     In or about 1999, Defendant Carl Hoffman advised Smith that he was providing Smith a Five Percent (5%) share of an equity capital stock in Knights in consideration for Smith's performance on behalf of PCM.

40.     To confirm the bona fides of Defendant Carl Hoffman's grant of an equity interest in Knights, Defendant Carl Hoffman gave Smith a document containing minutes of the annual meeting of said corporation, dated October 7. 1999; a true and correct copy of said letter is attached as Exhibit 1.

**HOFFMAN BEGINS HIRING CRONIES AND LESSER-QUALIFIED PERSONS FOR POSITIONS OF RESPONSIBILTY AFFECTING CONTRACTS WITH PUBLIC BODIES**

41.     Beginning in the 1990s, PCM, through Defendant Carl Hoffman, began to hire Defendant Hoffman's cronies or other persons with minimal or inadequate qualifications and began to assign said persons to positions of responsibility with PCM.

42.     In or about 1999, PCM hired John Kerr for the corporate office after Kerr assisted PCM's counsel in resolving matters with the DOC following the OIG Investigation:

   a.  At the time of his hire, Kerr was disbarred from the practice of law after his 1983 conviction of 139 specific charges including bribery in official and political matters, violation of the Pennsylvania Conflict of Interest Act, criminal attempt to obstruct administration of law or other governmental function, obstructing administration of law or governmental function, demanding property to secure employment, and criminal conspiracy;

   b.  Kerr's convictions, which included felony offenses, arose from his involvement in a job-selling scandal while employed as Executive Deputy Auditor General, and led to his incarceration at a state

11

correctional facility;

c.  On information and belief, Kerr engaged in risk management for
PCM;

d.  On information and belief, PCM's employment of Kerr, a convicted
felon, was a factor in PCM's loss of a contract to provide correctional
health services to Lackawanna County, PA;

e.  In or about 2005, PCM terminated Kerr after a disagreement with
Defendant Joshua Lock over Kerr's assignment of legal work to one
or more law firms other than the firm where Lock was Of Counsel.

43.    In or about 2004, PCM, through Defendant Carl Hoffman, hired
Hoffman's wife, Theresa M. Hoffman as Executive Vice President, even though
Ms. Hoffman's highest educational level completed was high school, and she had
no medical or corrections experience.

44.    In or about 2005, PCM hired Todd Haskins for the corporate office; at
the time, Haskins was a registered nurse staffing PCM's operation at Northampton
County Prison in Easton, Pennsylvania; Haskins was appointed by Defendant Carl
Hoffman as a regional manager for Eastern and Central Pennsylvania, and
ultimately appointed Vice President for Clinical Operations.

45.     In or about 2005, PCM hired Eric VonKiehl, M.D., to work with Defendant Carl Hoffman as Assistant Corporate Medical Director.

46.     Until the appointment of Haskins and VonKiehl, Smith ran the day-to-day operations of the company in Pennsylvania, New Hampshire, Maine and New York.

47.     After elevating Haskins and VonKiehl, Defendant Carl Hoffman gradually assumed the final word in operational matters, including all decisions that formerly were made by Smith, including decisions on overtime, staff raises, staffing, contract pricing, hiring, firing, and filling positions.

48.     In or about 2005, Hoffman hired Frank Komykoski, whom Hoffman knew from coaching the high school ice hockey team of Komykoski's son; Komykoski, who was then recently retired from the Navy and had an undergraduate degree in vocational education, had no medical or corrections experience.

49.     After hiring Komykoski, Defendant Carl Hoffman directed Smith to train Komykoski in operations, give greater decision-making authority to younger staff, and back out of operations.

50.    Defendant Carl Hoffman stated to Smith that Komykoski would assume the responsibility for day to day operations and receive a promotion upon completion of his M.B.A.

51.    In or about 2005, Hoffman hired Marc Palovitz, a high school graduate with no experience in healthcare, corrections or criminal justice; Palovitz was married to Hoffman's wife's former sister-in-law.

**SMITH GIVES DEFENDANTS NOTICE OF WHISTLEBLOWING PRIOR TO JANUARY 28, 2008**

52.    As the aforementioned persons assumed greater responsibility for PCM's operations, Smith observed lapses in PCM practices that caused Smith, in good faith, to alert Defendant Carl Hoffman that these lapses placed PCM at risk of committing waste and/or wrongdoing in its contracts with public bodies.

53.    Smith, who was aware of the OIG Investigation and the State Board Adjudication involving wrongdoing by PCM and/or Defendant Carl Hoffman, made his reports to protect PCM and ensure that PCM adhered to its contractual obligations.

54.    In and before May 2007, Smith warned Defendant Carl Hoffman that PCM was not providing services at contractually-required levels, and that as a

result PCM wrongfully received revenue for contractually-mandated services that it did not provide.

55.    In and before May 2007, Smith warned Defendant Carl Hoffman that PCM was leaving staff positions vacant and thereby under-filling contractually-required staffing minimums in public contracts, and that as a result PCM wrongfully received revenue for contractually-mandated services that it did not provide.

56.    Practices such as those described in paragraphs 54 and 55 contributed to increased revenue received by PCM from the affected public entity.

a. PCM's gross margin in the fiscal year ending 2005 from Dauphin County Prison, a facility where PCM engaged in the practices described, were $674,147, or 25% of the revenue received from Dauphin County;

b. PCM's gross margin in the fiscal year ending 2006 from Dauphin County Prison, a facility where PCM engaged in the practices described, were $917,769 or 30% of the revenue received from Dauphin County;

    c.   PCM's gross margin in the fiscal year ending 2005 from Berks County Prison, a facility where PCM engaged in the practices described, were $846,960 or 21% of the revenue received from Berks County;

    d.   PCM's gross margin in the fiscal year ending 2006 from Berks County Prison, a facility where PCM engaged in the practices described, were $1,023,822 or 25% of the revenue received from Berks County;

    e.   PCM's gross margin in the fiscal year ending 2006 from the facilities it served in West Virginia was $3,716,000, or 23% of the revenue received from the West Virginia authorities served.

57.    On or before May 2007, Smith recommended to Defendant Carl Hoffman that PCM make filling staff deficiencies a top priority, but Hoffman rejected his recommendations.

58.    On or before May 2007, Smith recommended to Defendant Carl Hoffman that PCM provide services at the contractually-required levels, but Hoffman rejected his recommendations.

59.    In or before May 2007, when Smith learned that Defendant Carl Hoffman included physician on-call time as part of the hours that PCM physicians were contractually required to be on-site in PCM's contracts with public bodies in West Virginia, Smith specifically reminded Hoffman that a similar practice caused

problems to Hoffman and PCM in 1990 and urged Hoffman that the practice would be rejected in West Virginia as well; Hoffman ignored Smith's advice.

60.     On or before May 2007, Smith advised Defendants Carl Hoffman and Lock that Haskins, who is a registered nurse but not a medical doctor or an osteopathic doctor, exercises authority, contrary to law and accreditation standards, to override medical decisions, including but not limited to:

     a.  Denying physician requests for consultations;

     b.  Denying physician referrals to a physician specialist;

     c.  Denying physician prescriptions of diagnostic procedures; and

     d.  Denying physician prescriptions of off-formulary medications.

61.     On or before May 2007, Smith advised Defendants Carl Hoffman and Lock that Haskins, as a registered nurse, cannot override a physician's orders and that when Haskins does so, PCM is thereby violating Mandatory Accreditation Standards of the National Commission on Correctional Health Care (NCCHC), such as in the following circumstances:

     a.  Haskins is called before any inmate may be sent out to the hospital or offsite for any reason, even if the transfer is ordered by a physician;

b. Haskins has issued an order that one or more specific drugs are not to be used for a patient, even if prescribed by a physician or other health care professional having prescription authority.

62.    On or before May 2007, Smith recommended that Defendant Carl Hoffman not utilize Haskins in the manner described in Paragraphs 60 and 61, but Hoffman rejected his recommendations.

63.    On or before May 2007, Smith advised Defendant Carl Hoffman that PCM's billings to public bodies of certain costs for treatment of infectious diseases were improper:

a. In or about 2005, PCM included new language in its contracts to cover potentially extraordinary pharmaceutical and other medical costs in the event that a treatment protocol for infectious diseases were newly approved in the life of the contract; the provision was known as the "ID CAP."

b. Prior to the ID CAP, PCM absorbed pharmaceutical and other medical costs as part of its overhead and did not separately invoice the same to public bodies whom it contracted;

c. PCM urged the public bodies with whom it contracted to agree to the ID CAP under the premise that the ID CAP would cover PCM's costs

in the event that new or experimental treatment for such infectious diseases as AIDS or Hepatitis C, etc., resulted in extraordinary expense to PCM.

d. In or about 2005, after addition of the ID CAP language, Haskins and Defendant Carl Hoffman began liberally construing the ID CAP to bill medical costs back to the public bodies.

e. In Berks County, PCM billed expenses under the ID CAP using the liberal construction devised by Haskins and Defendant Carl Hoffman , until the Berks County deputy warden complained to Smith that PCM was misusing the ID CAP to unnecessarily bill medical costs to Berks County:

   i. Smith advised Haskins and Defendant Carl Hoffman  that the deputy warden's interpretation was correct, as they were aware, and that Hoffman's and Haskins application of the ID CAP was overbroad and improperly billed some medical expenses to Berks County;

   ii. Haskins and Defendant Carl Hoffman  thereafter revised PCM's practice of billing expenses to Berks County and did so consistent with the interpretation of Smith and the deputy

warden, until the deputy warden left the employ of Berks County;

    iii.   After the deputy warden left the employ of Berks County, PCM resumed billing such expenses to Berks County under the ID CAP, over Smith's objections;

    iv.   After the deputy warden left the employ of Berks County, PCM hired him as an employee.

    v.   On information and belief, PCM resumed billing Berks County for ID CAP expenses under the liberal construction devised by Haskins and Defendant Carl Hoffman.

  f.  On information and belief, PCM is purporting to bill under the ID CAP to other counties using the liberal construction devised by Haskins and Defendant Carl Hoffman.

64.    In or before May 2007, Smith advised Defendant Hoffman that PCM was illegally requiring inmates to sign a Release of Financial Responsibility Form (ROFR Form) to avoid payment for services rendered to treat pre-existing conditions; on information and belief, this practice was noted in an audit by the NCCHC at the Broome County Sheriff's Office in Binghamton, New York, and led to the loss of PCM's contract with Broome County.

65.     In and before December 2007, Smith had advised PCM's general counsel Lock about issues with legal consequence, such as when Smith became aware that Defendant Carl Hoffman and other present or former PCM employees were eavesdropping, via the internal telephone system, on staff conversations without the staff's knowledge; in such instances Lock intervened to stop said actions.

66.     In or before December 2007, Smith advised Lock as to matters described in paragraphs 55, 56, 59, 60, 61, 62, 63, and 64, above, but Lock informed Smith even though he agreed with Smith he could not intervene in these matters because he was having personal financial difficulties and that Defendant Carl Hoffman was providing loans and/or other funds to Lock to address his personal financial difficulties and that Lock's financial obligations to Hoffman rendered Lock unable to support Smith, even as to issues of waste and wrongdoing.

## SMITH TAKES LEAVE FOR A SERIOUS HEALTH CONDITION

67.     On May 10, 2007, Smith underwent gastric bypass surgery.

68.     Smith advised PCM in advance of his surgery and expected to require approximately three weeks leave to recover, the first two weeks of which PCM approved by a leave slip/request.

69.     At no time prior to Smith's surgery did PCM advise Smith of his rights to take leave under the FMLA.

70.     Smith's surgery and post-surgery care resulted in complications that caused injuries to his lung, his left shoulder, the nerves controlling fingers on his left hand, and wounds to both feet.

71.     Smith spent two days following his surgery in intensive care and was discharged to inpatient physical therapy and then discharged to his home, from which he received treatment from an outpatient Wound Clinic, Pinnacle Health's Frederickson Center, for approximately four months.

72.     Defendant Carl Hoffman visited Smith at home shortly after his release from the hospital, and stated to Smith, "I'm paying your full salary. You don't have to use leave. I want you to stay off work until you are 100%. Don't worry about your job. You know you will always have your job as I've always promised you."

73.     At no time following Smith's surgery did PCM advise Smith of his rights or obligations under the FMLA.

**DEFENDANTS REBUFF SMITH'S ATTEMPTS TO RETURN TO WORK FROM HIS LEAVE**

74.     Beginning with his discharge from surgery or about May 20, 2007, Smith and Defendant Carl Hoffman spoke approximately every two (2) weeks.

75.     On information and belief, beginning in or about July 2007, Smith was able and available to resume the essential duties of his previous position.

76.     Beginning in or about July, 2007, Smith advised Defendant Carl Hoffman that he was able and available to resume the essential functions of his previous position. Hoffman asked Smith if he was "100%," to which Smith responded no, but stated his belief that he could perform his position and that returning to work would benefit his recovery; throughout this period, Hoffman reiterated that Smith not worry about work and that Hoffman wanted Smith to be "100%" before Smith returned. Smith constantly requested that Defendant Carl Hoffman or Defendant Joshua Lock contact his physician, Peter M. Brier, M.D. to confirm Smith's health status.

77.     From June 2007 thereafter, when Smith inquired about returning to his previous job, Hoffman consistently stated that Smith could not return until he "was 100%."

78.     Smith discussed with Defendant Carl Hoffman that PCM carried both short- and long-term disability insurance on Smith and that Smith could make a claim for benefits under said policy; Hoffman instead insisted that Smith not make

a claim under said policies and remain off and not return to work until Smith "was 100%."In or about August, 2007, Smith and Defendant Carl Hoffman spoke at the wedding reception of a PCM colleague; Smith again stated that he was ready and able to return to work, but Hoffman again replied that Smith had to be "100%" before he could return.

79.    In or about October, 2007, Smith and Defendant Carl Hoffman spoke at the wedding reception of another PCM colleague; Smith yet again stated that he was ready and able to return to work, but Defendant Hoffman again replied that Smith had to be "100%" before he could return.

80.    On multiple occasions, Smith asked Defendant Carl Hoffman to contact his physician for verification that Smith was ready and able to return to his duties, but Hoffman declined and insisted that Smith be "100%" before he could return.

81.    In or about October, 2007, Smith and his wife spoke with Defendant Theresa Hoffman at the same wedding reception; both Smith and his wife specifically advised Defendant Theresa Hoffman of Smith's need to return to work and that Smith was ready to resume the duties of his former position.

**DEFENDANTS ATTEMPT TO RESTRICT SMITH'S RETURN FROM HIS SERIOUS HEALTH CONDITION**

82.     On or about December 7, 2007, Smith met at PCM's office to prepare for a deposition and met privately with Defendant Carl Hoffman to discuss Smith's return to work; Hoffman proposed in that meeting to employ Smith as a "consultant," move Smith out of the PCM offices, remove Smith from PCM's health care plan, and fix Smith's salary at $130,000 annually for a period of eight (8) years, subject thereafter to reduction but not to an amount less than $100,000 annually.

83.     During their discussions on December 7, 2007, Defendant Carl Hoffman was unwilling to reduce the discussions to writing.

84.     After the December 7 meeting with Defendant Carl Hoffman, Smith prepared a document memorializing the December 7 discussions.

85.     On or about December 10, 2007, Defendant Carl Hoffman met with Smith, where Smith handed Hoffman the document memorializing their December 7 discussion; Hoffman reacted to the letter by accusing Smith of not trusting him.

86.     On or about December 19, 2007, Defendant Carl Hoffman dispatched Defendant Lock to meet with Smith at a restaurant in New Cumberland, PA, wherein Lock handed Smith a document titled "Agreement" that included, among other items:

a. The purported elimination of "Smith's position as Vice President of Operations as part of [PCM's] efforts to restructure its Operations Department to remain competitive and profitable;"

b. The purported reference to Smith as "an at-will employee;

c. The purported switch of Smith's title to "Operations Consultant effective January 21, 2008;

d. The purported reduction of Smith's base annual salary from $130,000 to $100,000;

e. The purported removal of Smith and his family from PCM's health insurance plan on February 1, 2008;

f. The purported inclusion of Smith's unconditional release and discharge of certain claims against PCM.

87.    On or about January 7, 2008, Smith, through his lawyer, rejected the Agreement, citing in part that its consideration was inadequate and that the release and discharge of claims was overbroad in light of the fact that Smith would be waiving substantial rights under state and federal anti-discrimination laws, the FMLA and the Pennsylvania Whistleblower Law, among others.

88.    On or about January 14, 2008, Defendants issued a letter addressed to Smith but delivered to his counsel advising Smith that he may return immediately

to work in his position as Vice President of Operations for PrimeCare Medical, Inc., upon submission of a note from his physician.

89.     On or before January 24, 2008, Smith provided PCM with a letter from his physician; although the letter states Smith "was cleared to return to work on September 20, 2007." Smith was in fact able and available to return to work prior to September 20, 2007.

     a.  Smith's physician noted that he had offered to talk to Defendant Carl Hoffman about Smith's return to work but never received a call from Defendant Hoffman.

     b.  Smith communicated to Defendant Carl Hoffman that his physician had offered to discuss Smith's return to work with Defendant Hoffman.

90.     On or about January 24, 2008, PCM instructed Smith to return to PCM on Monday, January 28, 2008.

## SMITH RETURNS TO WORK AT PCM, BUT NOT TO HIS FORMER POSITION

91.     On January 28, 2008, Smith re-entered the PCM office to return to work; at approximately 8 AM, Smith was met by Defendants Theresa Hoffman and Lock who issued the following instructions:

a. Lock directed that Smith, who pre-leave occupied a large office near the offices of other Vice-Presidents, was now moved to a smaller office near the front door away from the other Vice-Presidents.

b. Lock directed that Smith, who both pre-leave and currently possessed a state-approved placard to use handicap-reserved parking, was now prohibited from using handicapped parking spaces at PCM's office.

c. Lock directed that Smith, who pre-leave had broad access to telephone or otherwise communicate with any employees or PCM clients, was now prohibited from calling out of the corporate office or talking with anyone until it was decided what his duties would be.

d. Lock directed that Smith, who pre-leave had broad access to PCM's computer network (including, e.g., reports, documents and email), was now prohibited from access to any part of the PCM computer network except for the corporate staff schedule; Smith learned that all data entries Smith created prior to his leave for his personal contacts, e-mails and personal folders were now deleted and all paper files that Smith had created relating to waste and wrongdoing at PCM facilities were now missing from Smith's office.

e. Lock directed that Smith, who pre-leave (as Vice President of Operations) was granted complete discretion to possess reports and

other documents regarding PCM business, was now prohibited from

having in any company records or documents in his possession.

f.   Lock ordered Smith to write down all his job duties prior to his leave

and submit the same for review; Lock told Smith that a decision

would be made as to what his job duties would be going forward.

g.   Lock directed that Smith, who pre-leave had a full time administrative

assistant assigned to him, was no longer assigned clerical support and

that Smith was to give anything to be typed to Lock, who would

decide whether it should be typed and by whom it would be typed.

h.   Lock informed Smith, who pre-leave was assigned a key fob

programmed for entry to the PCM offices 24-hours per day/ 7

days per week, that his key fob was now programmed only for the

hours of 7:45 AM to 4:45 PM, Monday through Friday.

i.   Lock directed that Smith was strictly required to punch in or out on a

time clock, even though not all Vice-Presidents of PCM were so

required.

j.   Lock required that Smith submit a letter from his

physician identifying any narcotic medications, its dosage and

duration, even though this was not a requirement of any drug

screening policy then in effect by PCM.

k.  Lock stated that Smith's issue had been a personal issue between
Smith and Defendant Carl Hoffman until Smith's attorney mentioned
Smith's whistleblower status.

l.  Lock also stated that Smith's relationship with Defendant Carl
Hoffman had deteriorated because Smith gave Hoffman a document
memorializing the December 7, 2007, conversation between Hoffman
and Smith; Lock emphasized that Hoffman is eccentric and didn't like
such matters to be put in writing.

m.  Lock informed Smith that PCM was now a "hostile work
environment" due to Smith's whisleblower claims, telling Smith that
the differences between Smith and Defendant Carl Hoffman would
have been worked out until Smith mentioned whistleblowing, that
Smith's whistleblower claim threatened the very existence of the
company and the jobs of 600 to 700 employees, and that while
Defendant Carl Hoffman and his wife were financially set other
employees of the corporation were not.

**SMITH GIVES DEFENDANTS WRITTEN NOTICE IN GOOD FAITH OF
WASTE AND WRONGDOING**

93. During the meeting of January 28, 2008, Smith delivered letters to Defendants Lock and Teresa Hoffman detailing waste and wrongdoing in PCM contracts with public bodies; a true and correct copy of said letter is attached as Exhibit 2.

94. On March 13, 2008, Smith delivered another letter to Defendant Carl Hoffman detailing more waste and wrongdoing in PCM contracts with public bodies; a true and correct copy of said letter is attached as Exhibit 3.

95. As to PCM's contract with Berks County, Smith alleged the following:

    a. That PCM was obligated to provide a minimum number of hours per week of psychiatric coverage to Berks County Prison ("BCP"), and failed to provide the full complement of psychiatric services required under its contract.

    b. That the Replacement YCP Psychiatrist whom PCM assigned to cover some of its obligation at YCP was a psychiatrist who PCM assigned to the Berks County Prison (BCP).

    c. That PCM, by shifting hours worked by the Replacement YCP Psychiatrist from BCP to YCP, also left a gap of minimum psychiatric coverage at BCP.

    d. That PCM should have provided the remaining minimum coverage

not filled by the Replacement YCP Psychiatrist by engaging a *locum tenens* psychiatrist, but instead left the coverage uncovered, in violation of PCM's contractual obligation to Berks County.

96. Notwithstanding the items described in paragraph 95 above, PCM has received and accepted revenue from Berks County as if PCM fully performed said contract.

97. As to PCM's contract with Dauphin County, Smith alleged:

   a. That PCM was leaving positions vacant and thereby under-filling contractually-required staffing minimums in county contracts, thereby gaining revenue for contractually-mandated services that were not provided.

   b. That PCM was not providing Dauphin County with contractually obligated on-site coverage by a psychiatrist, which in 2006 alone resulted in PCM revenue of approximately $104,000 for services not provided; in one of Smith's discussions with Defendant Carl Hoffman about this deficiency, Hoffman stated, "Wink, wink, I'll talk to the warden about it."

   c. That PCM left required nursing positions vacant, as well as left a required Nurse Supervisor position vacant, even though these items

are specifically required by the Dauphin County contract.

d.  That Smith sought approval from Defendant Carl Hoffman to provide required psychiatric hours at Dauphin County; Hoffman, who personally supervises and manages the Dauphin County contract, repeatedly denied said requests.

e.  On information and belief, on January 29, 2008, the day after Smith gave Defendants the above letter, PCM summoned persons to a meeting to announce that the contractually-required additional hours of psychiatric coverage were now going to be provided at Dauphin County Prison.

f.  Although the meeting referred to above included several PCM mental health professionals, PCM's Director of Mental Health was not invited to the meeting even though he was present in the PCM offices at that time; the same director happened to be married to the deputy warden at Dauphin County Prison, and said deputy warden had questioned on multiple occasions why said hours had not been provided.

98. Not withstanding the items described in paragraph 97 above, PCM has received and accepted revenue from Dauphin County as if PCM fully performed said contract.

99. As to PCM's contract with Lancaster County, Smith alleged:

    a.   That PCM was knowingly implementing shortcuts at Lancaster County by using midlevel practitioners (physician assistants and nurse practitioners) as a way to improve profits at the risk of jeopardizing patient care and compromising healthcare operations at the prison.

    b.   That PCM's contract, which requires on-site physician services, was run on-site by an inexperienced physician assistant (not a medical doctor), whose supervisor, PCM's Assistant Corporate Medical Director, was rarely on-site to supervise the Physician Assistant; this action violates Pennsylvania's Medical Practice Act and violates contractual provisions in PCM's contract with Lancaster County.

    c.   That PCM used midlevel practitioners at Lancaster County instead of contractually-required professional services from an M.D. or D.O., but failed to offer credit to the affected agencies for the reduced overhead of the substituted providers.

100.   Notwithstanding the items described in paragraph 99 above, PCM has received and accepted revenue from Lancaster County as if PCM fully performed said contract.

101.   As to PCM's contracts with the West Virginia Division of Juvenile

Services ("WVDJS") and West Virginia Regional Jail Authority ("WVRJA"),

Smith alleged:

a.  That after Smith learned that PCM was cited in 2006 by the WVDJS
    for its failure to provide contractually required on-site services for
    physicians, Smith directed PCM corporate staff to research staffing
    levels at WVDJS and WVRJA facilities.

b.  That Smith found massive staffing deficiencies, with some jails in
    West Virginia having no physician on site for a period of nearly
    two (2) months;

c.  Smith found that the PCM Regional Jails medical director in West
    Virginia caused or permitted the creation of time records purporting
    to claim his on site presence at multiple facilities that were
    impossible to accomplish logistically, Smith asserted that the records
    were clearly false but was told by Defendant Hoffman to drop the
    subject;

d.  That PCM was failing to provide the number of on-site hours required
    by a physician at WVDJS and WVRJA facilities;

e.  That some WVDJS and WVRJA facilities were operating above the
    population capacity cited in PCM's contracts, triggering additional per

diem payment to PCM, on the premise that higher population would result in additional health care services and increase PCM's expenses and/or costs; PCM, however, failed to fulfill its contractual obligations for even base services to WVDJS and WVRJA (i.e., those due if population were at or under capacity), much less provide the additional services required due to overcapacity population, even though it accepted the additional payment(s) as though PCM were providing additional services.

102.    Notwithstanding the items described in paragraph 101 above, PCM has received and accepted revenue from WVDJS and/or WVJRA as if PCM fully performed said contract.

103.    As to PCM's contract with York County, Smith alleged the following:

a.  That PCM was obligated to provide a minimum number of hours per week of psychiatric coverage to York County Prison ("YCP"), and failed to provide the full complement of psychiatric services required under its contract.

b.  That in or about October 2007, the PCM psychiatrist assigned to YCP terminated employment.

c.  That in the absence of the terminated psychiatrist, another

psychiatrist (the "Replacement YCP Psychiatrist") was shifted to provide some hours at YCP, but was not covering all hours required of a psychiatrist under the contract.

d.   That Replacement YCP Psychiatrist's hours were less than the minimum number of hours required under PCM minimum contractual coverage with YCP.

e.   That PCM should have provided the remaining minimum coverage not filled by the Replacement YCP Psychiatrist by engaging a *locum tenens* psychiatrist, but instead left the coverage uncovered, in violation of PCM's contractual obligation to York County.

f.   That the YCP population serviced under PCM's contract with York County includes persons in the county's custody pursuant to one or more contracts with the U.S. Marshall's Service and U.S. Immigrations and Customs Enforcement (ICE); thus, by committing waste and wrongdoing in PCM's contract with York County, PCM put York County at risk of defaulting on the county's obligations to ICE.

104.   Notwithstanding the items described in paragraph 103 above, PCM has received and accepted revenue from York County as if PCM fully performed said

contract.

105.   Smith recommended to Defendant Carl Hoffman that PCM engage an independent audit of one or more contracts with public bodies and that appropriate corrective action be taken of any deficiencies identified, but Hoffman rejected his recommendations.

## DEFENDANTS MARGINALIZE SMITH IN HIS POSITION, SMITH GIVES CONSTRUCTIVE DISCHARGE LETTER

106.   On or about January 28, 2008, learned that PCM purported to carry Smith on PCM's leave records as having a negative leave balance for the period of time Smith was off, notwithstanding Defendant Carl Hoffman's requirement that Smith remain away from his PCM employment until he "was 100%."

107.   On and after January 28, 2008, Defendants kept Smith removed from the authority of his position as Vice-President of Operations.

108.   On January 28, 2008, Defendant Lock directed Smith to sign two documents, including an acknowledgement of receipt of revised PCM policies and an acknowledgment authorizing PCM to take any negative leave balance and deduct it from an employee's last pay if the employee separates for any reason; Smith refused to sign either document.

109.    On February 6, 2008, Smith gave Defendant Carl Hoffman a handwritten memo protesting that he was improperly denied access to the handicapped parking space at PCM offices.

110.    On February 11, 2008, Defendant Hoffman-Schlegel, purporting to respond to Smith's February 6 letter regarding his access to the handicapped parking space, asked Smith to give written notice of any accommodations he required to perform his job. On February 15, 2008, Defendant Lock sent Smith an email advising that until "issues regarding [Smith's] trustfulness are resolved, [Smith's] access to confidential company information will be restricted.

111.    On or about February 20, 2008, Defendant Carl Hoffman provided a memo to Smith purporting to define his job duties; said memo eliminated duties and responsibilities that Smith formerly performed prior to his leave.

112.    On February 20, 2008, Defendant Carl Hoffman delivered a memo to Smith advising that a review of his job duties would be "deferred until completion of the internal investigation into the allegations in your January 28, 2008 letter."

113.    On February 22, 2008, Smith replied in writing to Defendant Hoffman-Schlegel confirming his ability to perform the essential functions of his position without accommodation, but requiring accommodation for non-essential functions of his position. A true and correct copy of said letter is attached as

Exhibit 4.

114.     On or about February 20, 2008, Defendant Carl Hoffman directed Smith to provide him with an itinerary of Smith's expected duties in the week of February 25, 2008.

115.     On February 25, 2008, Smith submitted an itinerary of his proposed actions for that week, which included meetings with six (6) wardens of facilities that PCM served.

116.     On or about February 25, 2008, Defendant Carl Hoffman verbally advised Smith that he was prohibited from meeting with any warden.

117.     On February 25, 2008, Defendant Hoffman-Schlegel gave Smith a "written reprimand;" a true and correct copy of said letter is attached as Exhibit 5.

118.     On February 27, 2008, Defendant Carl Hoffman gave Smith a memo advising that Smith was "not permitted to visit Wardens, not permitted to call Wardens (or any other Jail/Prison / Juvenile Facility's employees) of any and all PrimeCare Medical, Inc. contracts [sic] unless explicitly directed by me in writing;" a true and correct copy of said letter is attached as Exhibit 6.

119.     On or about February 27, 2008 and March 13, 2008, Smith again requested to Defendant Carl Hoffman that he be restored to the position and authority of his position of Vice President of Operations; Hoffman again refused

the request.

120.    On March 14, 2008, Smith met with Defendant Carl Hoffman and advised that PCM had refused to return him to his position, that Defendants had made terms and conditions of employment intolerable, and that Smith regarded himself as having been constructively discharged as of that day; a true and correct copy of said letter is attached as Exhibit 7.

## DEFENDANTS DEFAME SMITH BY PUBLISHING EMAIL WITH FALSE INFORMATION TENDING TO PLACE SMITH IN NEGATIVE LIGHT

121.    After his constructive discharge on March 14, 2008, Smith made transparent his intentions to provide consulting services to public bodies engaged in correctional health services.

122.    Defendants Carl Hoffman and Komykoski knew or should have known that Smith was communicating with representatives of correctional institutions for the purpose of marketing Smith's services to public bodies.

123.    On or about May 7. 2008, Smith learned that Defendant Komykoski published an email to numerous email addresses, including the addresses of representatives of various correctional institutions; a true and correct copy of said letter is attached as Exhibit 8.

124.    Defendant Komykoski knew or had reason to know Smith would have

and/or maintain business relations with persons to whom he addressed said email.

125.    On information and belief, Defendant Komykoski published his email at the direction of Defendants PCM, Carl Hoffman, Theresa Hoffman and Joshua Lock.

## FIRST COUNT

### Richard C. Smith v. PrimeCare Medical, Inc.; Carl A. Hoffman, Jr., D.O.; Theresa Hoffman; Marcy Hoffman-Schlegel; and Joshua D. Lock
### (FMLA Interference and/or Retaliation)

126.    Smith incorporates each and every allegation of Paragraphs 1 through 125 of the Complaint as if set forth herein.

127.    Each of the Named Defendants is an "employer" within the meaning of the FMLA.

128.    Smith had a "serious health condition" within the meaning of the FMLA.

129.    Smith is an eligible employee within the meaning of the FMLA.

130.    Smith gave Named Defendants notice of his need for leave for his serious health condition.

131.    Smith's need for leave commencing on or about May 10, 2007, was

a protected absence pursuant to the FMLA and regulations promulgated thereunder.

132.   Named Defendants did not request that Smith provide certification as required by FMLA.

133.   Named Defendants did not give Smith notice of a deadline to return to work

134.   Beginning in or about July 2007, Smith repeatedly advised Named Defendants that he was ready to return to work and his requests to return to work were rejected by Named Defendants.

135.   Named Defendants rejected Smith's requests on the basis that Named Defendants required that Smith "be 100%" before Smith could return to work, meaning that Smith had to be completely recovered rather than recovered sufficient to perform the essential duties of his position.

136.   Smith qualified for FMLA leave and would have structured his leave in such a manner as to preserve his reinstatement rights.

137.   Named Defendants were required to communicate with Smith regarding his rights under the FMLA, providing individualized notice to employees regarding his FMLA rights and obligations.

138.   Named Defendants never explained to Smith the differences between its leave policy and the FMLA.

139.    Named Defendants interfered with Smith's right to reinstatement under the FMLA by failing to notify him adequately as to his rights under the FMLA.

140.    Smith was never informed that he had a right to take his leave under the FMLA such that he would ensure his right of reinstatement to the same or equivalent position.

141.    Named Defendants failed to place Smith in the same or equivalent position upon his return from leave.

142.    Named Defendants barred Smith from returning to his same or equivalent position.

143.    On March 14, 2008, Named Defendants constructively discharged Smith from employment.

144.    Named Defendants willfully violated 29 U.S.C. §2615(a)(1) in that they interfered with, restrained, and/or denied the exercise or attempt of exercise of Smith's rights under the FMLA.

145.    In addition and/or in the alternative, Named Defendants willfully violated 29 U.S.C. §2615(a)(2) in that they discharged, discriminated, and/or retaliated against Smith as a result of his use of FMLA leave or attempt to use FMLA leave.

146.    In addition and/or in the alternative, Named Defendants violated

the FMLA and the regulations promulgated thereunder by failing to restore Smith to the same or equivalent position following his leave of absence, in violation of FMLA.

147.    In addition and/or in the alternative, on information and belief, Named Defendants violated FMLA and regulations promulgated thereunder by failing to make, keep, and/or preserve records pertaining to compliance with the FMLA.

148.    Named Defendants' acts and omissions, and conduct as more fully described above resulting in the termination of Smith's employment were knowing and willful.

149.    Named Defendants' acts and omissions, and conduct as more fully described above as complained of by Smith were performed in bad faith and without a reasonable basis, thereby rendering Named Defendants liable for liquidated damages pursuant to FMLA.

150.    As a result of Named Defendants' violations of the FMLA, as more fully described above, Smith is entitled to back pay and wages, together with interest thereon, pursuant to FMLA.

151.    As a result of Named Defendants' violations of the FMLA, as more fully described above, Smith is entitled to be reinstated to his position or to front pay and benefits pursuant to FMLA.

152.    Smith is further entitled to recover his attorney fees, expert witness fees, and other costs related to the instant matter pursuant to FMLA.

**WHEREFORE**, Smith requests this Honorable Court to enter judgment in his favor and against, jointly and severally, Named Defendants PrimeCare Medical, Inc., Carl A. Hoffman, Jr., D.O., Theresa Hoffman, Marcy Hoffman-Schlegel, and Joshua D. Lock together with interest, costs and reasonable attorney fees and such other relief that this Court deems just.

## SECOND COUNT

**Richard C. Smith v. PrimeCare Medical, Inc.; Carl A.
Hoffman, Jr., D.O.; Theresa Hoffman; Marcy
Hoffman-Schlegel; and Joshua D. Lock**
**(Pennsylvania Whistleblower Law)**

153.    Smith incorporates each and every allegation of Paragraphs 1 through 152 of the Complaint as if set forth herein.

154.    Smith is a whistleblower within the meaning of the Whistleblower Law.

155.    Each of the Named Defendants is an employer within the meaning of the Whistleblower Law.

156.    Named Defendants' actions against Smith violated Section 3 of the Whistleblower Law, 43 P.S. §1423.

46

157.   Named Defendants are liable to Smith for all damages, and other remedies including costs, reasonable attorneys' fees and all other remedies and enforcement available to Smith under Sections 4 and 5 of the Whistleblower Law, 43 P.S. §1424-1425.

158.  Named Defendants should be subjected by the Court to all penalties, civil fines and suspensions as provided under Section 6 of the Whistleblower Law, 43 P.S. §1426.

**WHEREFORE**, Smith requests this Honorable Court to enter judgment in his favor and against, jointly and severally, Named Defendants PrimeCare Medical, Inc., Carl A. Hoffman, Jr., D.O., Theresa Hoffman, Marcy Hoffman-Schlegel, and Joshua D. Lock together with interest, costs and reasonable attorney fees and such other relief that this Court deems just.

## THIRD COUNT

### Richard C. Smith v. PrimeCare Medical, Inc.
### (Wrongful Termination)

159.   Smith incorporates each and every allegation of Paragraphs 1 through 158 of the Complaint as if set forth herein.

160.  PCM constructively discharged Smith on March 14, 2008.

161.   PCM constructively discharged Smith due to his reports of waste and wrongdoing regarding public funds.

162.   The Whistleblower Law represents public policy of Commonwealth that persons who report waste or wrongdoing regarding public funds should not be penalized by losing their jobs.

163.   The Whistleblower Law is a statute that prohibits discharge for reporting waste or wrongdoing regarding public funds.

164.   Smith's constructive discharge is therefore a wrongful termination by PCM.

165.   Smith has suffered damages as a result of the wrongful termination, for which PCM is liable.

**WHEREFORE**, Smith requests this Honorable Court to enter judgment in his favor and against Named Defendant PrimeCare Medical, Inc. together with interest, costs and reasonable attorney fees and such other relief that this Court deems just.

## <u>FOURTH COUNT</u>

**Richard C. Smith v. PrimeCare Medical, Inc. and
Carl A. Hoffman, M.D.**

**(Breach of contract)**

166.   Smith incorporates each and every allegation of Paragraphs 1 through 165 of the Complaint as if set forth herein.

167.   Named Defendants awarded Smith 5000 shares of stock of Knights of Von Duke, Ltd., as consideration for Smiths services on behalf of Defendant PCM.

168.   Smith accepted said award of stock from Named Defendants as consideration for his services on behalf of Defendant PCM.

169.   The award of stock is a contract between Smith and Named Defendants.

170.   Named Defendants have failed to deliver said shares of stock to Smith and are therefore in breach of said contract.

171.   Named Defendants are liable to Smith for delivery of said shares of stock, or alternatively, the value of said shares of stock.

**WHEREFORE**, Smith requests this Honorable Court to enter judgment in his favor and against, jointly and severally, Named Defendants PrimeCare Medical, Inc. and Carl A. Hoffman, M.D. together with interest, costs and reasonable attorney fees and such other relief that this Court deems just.

## <u>FIFTH COUNT</u>

**Richard C. Smith v. PrimeCare Medical, Inc.; Knights of Von Duke, Ltd.; Carl A. Hoffman, Jr., D.O.;**

**Theresa Hoffman; Marcy Hoffman-Schlegel; and
Joshua D. Lock
(Pennsylvania Wage Payment and Collection Law)**

172.   Smith incorporates each and every allegation of Paragraphs 1 through 171 of the Complaint as if set forth herein.

173.   Named Defendants is an "employer" of Smith within the meaning of the Wage Payment and Collection Law.

174.   The award of stock constitutes "fringe benefits" within the meaning of the WPCL and is therefore considered "wages" within the meaning of said law.

175.   Named Defendants, by failing to deliver the award of stock or its value to Smith, have failed to pay wages to Smith in violation of the WPCL, for which they are liable to Smith.

176.   Named Defendants' failure to pay wages to Smith is in bad faith, making Named Defendants liable to Smith for liquidated damages as provided by the WPCL.

177.   Named Defendants are liable to Smith for attorney fees and costs as provided by the WPCL.

**WHEREFORE**, Smith requests this Honorable Court to enter judgment in his favor and against, jointly and severally, Named Defendants PrimeCare

Medical, Inc., Knights of Von Duke, Ltd., Carl A. Hoffman, Jr., D.O., Theresa

Hoffman, Marcy Hoffman-Schlegel, and Joshua D. Lock together with interest,

costs and reasonable attorney fees and such other relief that this Court deems just.

## SIXTH COUNT

### Richard C. Smith v. PrimeCare Medical, Inc.; Carl A. Hoffman, Jr., D.O.; Theresa Hoffman; and Knights of Von Duke, Ltd.
### (Accounting)

178.   Smith incorporates each and every allegation of Paragraphs 1 through

177 of the Complaint as if set forth herein.

179.   The award of equity stock in or about 1999 by Defendant Carl

Hoffman to Smith established a valid contract, express or implied, between Smith

and Named Defendants.

180.   On information and belief, for all relevant time, Knights is a going

concern.

181.   On information and belief, in one or more years since 1999, Knights

has distributed net earnings to its shareholders.

182.   No such distribution has been distributed to Smith.

183.   On information and belief, the stock awarded to Smith has intrinsic

value.

184.   The relationship created by the contract imposed a legal obligation upon Named Defendants to account to Smith for the monies received by Knights and/or Named Defendants.

185.   Smith is unable, by reason of Named Defendants' failure to account, to state the exact amount due Smith.

186.   Named Defendants breached or are in dereliction of their duties to Smith.

187.   Smith is entitled to an accounting in equity of Knight's annual earnings for the years 1999 through present.

**WHEREFORE**, Smith requests this Honorable Court to enter judgment in his favor and against, jointly and severally, Named Defendants PrimeCare Medical, Inc., Carl A. Hoffman, Jr., D.O., Theresa Hoffman, and Knights of Von Duke, Ltd together with interest, costs and reasonable attorney fees and such other relief that this Court deems just.

<u>**SEVENTH COUNT**</u>

**Richard C. Smith v. PrimeCare Medical, Inc.; Carl A. Hoffman, Jr., D.O.; Frank Komykoski.**

**(Defamation)**

188.   Smith incorporates each and every allegation of Paragraphs 1 through 187 of the Complaint as if set forth herein.

189.   Named Defendants without privilege, published a false statement about Smith to third parties.

190.   Named Defendants published said false statement knowing that said third parties who would deal with Smith would understand its defamatory meaning.

191.   Named Defendants' actions resulted in special harm to Smith.

192.   Named Defendants are liable to Smith for damages.

**WHEREFORE**, Smith requests this Honorable Court to enter judgment in his favor and against, jointly and severally, Named Defendants PrimeCare Medical, Inc., Carl A. Hoffman, Jr., D.O., and Frank Komykoski together with interest, costs and reasonable attorney fees and such other relief that this Court deems just.

## DEMAND FOR TRIAL BY JURY

Smith demands a trial by jury as to all issues in this matter so triable.

Respectfully Submitted,

CLARK & KREVSKY, LLC

By:   <u>s/ Frank P. Clark</u>

Frank P. Clark
P.O. Box 1254
Camp Hill, PA 17001-1254
(717) 731-8600
Attorney I.D. No. 35443
Attorney for Plaintiff

Dated:<u> July 25, 2008</u>