# EXHIBIT D

# DEPOSITION TRANSCRIPT
# DR. CARL HOFFMAN

*(Relevant Pages Only)*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

EXHIBIT

D

RICHARD C. SMITH,                    :
                PLAINTIFF            :
                                     :
        VS                           :   NO. 1:08-CV-1397
                                     :
PRIMECARE MEDICAL, INC., CARL        :
A. HOFFMAN, JR., D.O., THERESA       :
M. HOFFMAN, JOSHUA D. LOCK,          :
MARCY HOFFMAN-SCHLEGAL, FRANK        :
KOMYKOSKI and KNIGHTS OF VON         :
DUKE, LTD.,                          :
                DEFENDANTS           :


DEPOSITION OF:   CARL A. HOFFMAN, JR.

TAKEN BY:        PLAINTIFF

BEFORE:          TERESA K. BEAR, REPORTER
                 NOTARY PUBLIC

DATE:            JUNE 12, 2009, 8:30 A.M.

PLACE:           CLARK & KREVSKY
                 20 ERFORD ROAD
                 SUITE 300A
                 CAMP HILL, PENNSYLVANIA

4

```
1                      STIPULATION
2              It is hereby stipulated by and between
3    counsel for the respective parties that sealing,
4    certification and filing are waived; and that all
5    objections except as to the form of the question are
6    reserved to the time of trial.
7
8              CARL A. HOFFMAN, JR., called as a
9    witness, being sworn, testified as follows:
10
11   BY MR. CLARK:
12       Q        Would you state your name for the
13   record, please.
14       A        Dr. Carl A. Hoffman, Jr., D.O., C.C.H.P.
15       Q        What's the C.C.H.P. mean?
16       A        Certified correctional healthcare
17   provider.
18       Q        And the D.O. means you're a doctor of
19   osteopathy?
20       A        Doctor of osteopathic medicine.
21       Q        And your position?
22       A        I am the president and corporate medical
23   director of PrimeCare Medical, Inc.
24       Q        And how long have you served in that
25   capacity?
```

1      A        Since I formed the company in 1986.

2      Q        The company has operations in what

3  states?

4      A        Pennsylvania, West Virginia, Maryland and

5  New Hampshire.

6      Q        You're the sole shareholder?

7      A        Yes, I am.

8      Q        And as the corporate medical director do

9  you direct medical operations of the company in all

10  four states?

11      A        Yes, I do.

12      Q        You've been present for some of the

13  depositions in this case?

14      A        Yes, I have.

15      Q        From having deposed your wife, Theresa;

16  your daughter, Marcy; your legal counsel, Mr. Lock;

17  and your vice-president of operations, Mr. Komykoski,

18  I would draw the impression that all decisions of any

19  magnitude in the company are final only if you say so.

20  Would you agree with that?

21      A        I rely exclusively on my vice-presidents

22  for recommendations.  I rely on my junior

23  vice-presidents also for recommendations.  I also rely

24  on my directors and my regional managers for

25  recommendations.

1   returned to work, I was concerned where the

2   corporation was going and I had to make a business

3   decision for the corporation.  But valuing Mr. Smith's

4   friendship and his direction, that's when I set down

5   with him and tried to negotiate a very fair and

6   equitable retirement package but also keep him as a

7   consultant to the corporation that we could rely on

8   him when we needed him to participate in the

9   corporation's decisions and future growth.

10       Q        What did you say to Mr. Smith when he was

11   offered a position in Knights of Von Duke?

12       A        When I offered him a position in Knights

13   of Von Duke?

14       Q        Yes.

15       A        I offered him a percentage of ownership

16   in the Knights of Von Duke and I offered him and the

17   other vice-president at that time, William Anderson,

18   the same percentage of ownership and I said that I

19   would float the loan for them to be able to buy in to

20   this corporation.

21       Q        Did you say to him why you were offering

22   him this opportunity?

23       A        I valued his position as vice-president,

24   as I valued Mr. Anderson's position as vice-president.

25       Q        Had Mr. Smith done a superlative job

1      A        Yes.

2      Q        About two-thirds of the way down do you

3  see a line for psychiatrist?

4      A        Yes.

5      Q        And the full time -- the FTE, meaning

6  full-time equivalent, for that position is .3?

7      A        Yes.

8      Q        And the hours per week is 12.0?

9      A        Yes.

10     Q        As you see this document now, do you

11  recall that there was a change where the hours for the

12  psychiatrists were increased from 12 in the 1997 to

13  2003 contract to 20 hours per week in the 2004 to 2008

14  contract?

15     A        Yes.

16     Q        Do you now recall why there was an

17  increase in the psychiatrist's hours from 12 to 20?

18     A        I would surmise that it was requested by

19  the Dauphin County Prison.

20     Q        When PrimeCare bids a contract such as

21  the Dauphin County contract, does PrimeCare prepare a

22  bid in accordance with the number of hours required

23  for each service provider?

24     A        I believe so.

25     Q        Does PrimeCare take into account the

```
1        A        And I encouraged him to do it.  I
2    understood him being out.
3        Q        And you knew that it would involve an
4    inpatient medical stay?
5        A        Indeed I did.
6        Q        And you knew this in advance of him going
7    for his surgery?
8        A        Yes, I did.
9        Q        You were the person he reported to at
10   that time?
11       A        That's correct.
12       Q        As the person he reported to, did you
13   advise him of his rights under the Family Medical
14   Leave Act at or about the time he left for his
15   surgery?
16       A        No, sir, I didn't.  And let me tell you
17   why I didn't, because I considered him a true friend
18   and I considered his employment valuable and thus I
19   continued to pay him full salary and full benefits for
20   his entire leave of absence, at which time he told me
21   he thought he'd be back in two weeks, maybe four
22   weeks.
23                He developed postop complications.  I was
24   apprised of those postop complications and I continued
25   to wish him well and I continued to pay him full
```

1   salary and full benefits.

2      Q       Is that your answer?

3      A       That is my answer.

4      Q       Whose responsibility at PrimeCare was it

5   to inform Rick of his rights under the Family Medical

6   Leave Act?

7      A       We sat in a vice-presidents' meeting with

8   Marcy Hoffman-Schlegal present and she asked me about

9   the FMLA.  And I asked her do we have to go into FMLA

10  if I am ensuring him his income and all of his rights,

11  all of his benefits, and she said I'm not sure, but I

12  don't think we do because you are continuing to pay

13  him as an act of good faith and friendship and thus I

14  went forward paying him full salary, full benefits as

15  an act of good faith and friendship.  I would like to

16  note it's never been done for any other employee since

17  or before that occurred.

18     Q       When you asked your daughter Marcy, did

19  you seek any other guidance on that question?

20     A       Mr. Lock was present, as were all the

21  other vice-presidents, and it was an open discussion

22  and everybody was pleased that I took that action.  My

23  wife was present too.

24     Q       Did you seek legal guidance on that

25  action?

82

```
 1          Q         But one of the requirements you wanted

 2   Rick Smith to follow was be a hundred percent?

 3          A         Indeed.  I will answer that yes.

 4          Q         And you didn't see Rick -- at the time of

 5   this wedding you didn't view Rick as being a hundred

 6   percent at that point in time, correct?

 7          A         I did not make a clinical judgment as to

 8   his status.  I only inquired as to his status.

 9          Q         Okay.

10          A         It's not my responsibility, nor would I

11   as a friend make a clinical judgment of his status

12   seeing him in a social situation.

13          Q         But as a practicing physician you could

14   casually observe that he was -- could you casually

15   observe that he was a hundred percent?

16          A         I could casually observe, as I stated

17   before, that he was having difficulty walking.  He was

18   telling us he's having trouble with his hands and his

19   fingers.  He mentioned that in the conversation.

20          Q         Anything else?

21          A         That's all I recall right now.  I'm sure

22   there was more things said, but I don't recall

23   specifically.

24          Q         In December of 2007 you had a meeting

25   with Rick Smith?
```

```
1          A         Yes.

2          Q         Tell me how that meeting came about.

3          A         I believe I asked him to come into -- I

4    think it was one of the board rooms to sit down and

5    discuss his role with the company.

6          Q         What prompted the meeting?

7          A         Again, I was concerned for Rick and his

8    well-being and I thought it would be the absolute

9    wrong thing for him to do to step back into PrimeCare

10   under the pressure and the responsibilities that that

11   entailed.  I was concerned for his well-being.

12                   And prior to that, as he slowly

13   transitioned the responsibility of operations over to

14   Frank Komykoski, he kind of became a consultant, if

15   you will, if I can use that term, a consultant, in the

16   office on various occasions and was not directly

17   responsible for the overall direction of operations.

18                   And I thought this would be the right

19   time in his life to allow him to semiretire and

20   continue as a consultant for PrimeCare Medical.  And I

21   outlined what I thought a consultant would do for

22   PrimeCare Medical, and that is be available by phone,

23   be available to come to meetings, be available to

24   visit institutions, if he could physically do that,

25   and also have lunch with me on a weekly basis or twice
```

1    a week basis to discuss PrimeCare Medical operations

2    and to discuss PrimeCare Medical in general.   And I

3    thought this would be an opportune time of his life to

4    make this transition.

5         Q        How did you present this to him?

6         A        Just the way I told you.

7         Q        What was his pay going to be?

8         A        I don't specifically recall the exact

9    dollar numbers right now.

10        Q        Did you make a promise of pay?

11        A        Yes, I made a very handsome and I made a

12   very honest effort to try and compensate him for the

13   years of service that he gave me.   A fair and

14   equitable offer would be my exact terminology.

15        Q        Was there a guaranteed term for this

16   agreement?

17        A        A guaranteed --

18        Q        Term.

19        A        Oh, term.

20        Q        Duration.

21        A        I'm sorry, I didn't hear --

22        Q        I'm sorry.

23        A        I suggested several terms and I said to

24   him that, you know, we've been friends for years, I

25   would like to handle this as a gentleman's agreement

1    and I would like to negotiate with you and try and

2    work this settlement offer out.

3           Q        Was there a guaranteed duration of this

4    agreement?

5           A        As I recall, we were in the process of

6    trying to renew the West Virginia contract and I said

7    that, first of all, I would guarantee this on a yearly

8    basis and then maybe as we discuss further it would be

9    more than a yearly basis.  So there were different

10   terms of this offer being discussed back and forth

11   between Rick and I.

12          Q        How long did this meeting last?

13          A        Hour, hour and a half, maybe two at the

14   most.

15          Q        Well, what was the evolution of the

16   discussion for the duration of this agreement?

17          A        I don't know specifically if we ever

18   agreed on the duration of this agreement.

19          Q        Well, okay.  But what was the evolution

20   of the discussion?  Who proposed what, who countered

21   what?

22          A        I don't exactly remember, but I will give

23   you to the best of my recollection.  I think I said on

24   a yearly basis -- now, we talked about maybe a

25   three-year guarantee and -- I'm not sure if we talked

1    about a five-year guarantee and somewhere along the

2    line there might have been discussion on a 10-year

3    guarantee.

4        Q        Who proposed the three-year guarantee?

5        A        I have no recollection.

6        Q        Who proposed the five-year guarantee?

7        A        I don't recall.

8        Q        Who proposed the 10-year guarantee?

9        A        I don't recall.

10       Q        Were all of those potential terms

11   discussed in this one meeting?

12       A        I don't know if it was discussed in this

13   one meeting or consequent meetings from that.

14       Q        What was resolved at this meeting?

15       A        That we would meet again and continue to

16   discuss these issues.  There were issues that he

17   presented that he wanted me to clarify and I assured

18   him that I would move forward and try to clarify them.

19       Q        Was there agreement reached on any point?

20       A        Not that I specifically recall.

21       Q        In this meeting did you say in words or

22   substance, Rick, you have a right to return to the

23   same or an equivalent position under the Family

24   Medical Leave Act?

25       A        I don't recall.

1    Q        I don't want to know what was discussed
2  with your lawyer.  Go ahead.  I'm not asking you what
3  was discussed with your lawyer, but go ahead.
4           MR. CROCENZI:  The reason is is
5  attorney/client privilege and you don't have to
6  divulge what was discussed between you and your legal
7  counsel.  You can testify about what action you took.
8  BY MR. CLARK:
9    Q        Yes, and that's what I want to know.
10   A        I consulted my lawyer and I think at that
11 time we prepared a written settlement agreement to be
12 forwarded to Mr. Smith.
13   Q        Did you review it before it was forwarded
14 to Mr. Smith?
15   A        I believe I did.
16   Q        Do you recall the specific terms that
17 were presented to Mr. Smith?
18   A        No, I do not.
19   Q        Was he being offered employment?
20   A        I don't recall the terms.
21   Q        Do you recall any terms?
22   A        No.
23   Q        When it was presented to Mr. Smith, what
24 was your expectation?
25   A        That maybe we could sit down again and

110

```
1    job descriptions were, but I was very upset, I was

2    very angry and I wanted to take a cool-off period and

3    wait until I see what they were before we moved

4    forward, but at that point I told him he does not

5    represent PrimeCare Medical in any way, shape or form

6    from that minute on.

7         Q       So after you received the waste and

8    wrongdoing letter, you didn't want him contacting

9    wardens?

10        A       I didn't want him doing anything that

11   represented PrimeCare Medical, Inc., anything.

12        Q       Did you want him sitting in his office?

13        A       He was back to work.  He provided me with

14   a return to work slip from his attending physician

15   that said he is physically able to come back to work

16   and I continued to accord him the luxury of being a

17   vice-president of operations sitting in his office at

18   PrimeCare Medical, Inc.

19        Q       What does the luxury of being a

20   vice-president of operations entail?

21        A       We have 700 employees.  I will guarantee

22   you that each and every one of them would love, would

23   love to be a vice-president at PrimeCare Medical, Inc.

24        Q       Okay, but I want to know what's the

25   luxury of being a vice-president of operations at
```

1      A         I don't specifically recall.

2      Q         He was reporting to you, correct?

3      A         Yes.

4      Q         And you don't remember any work

5 assignments he had at that period of time?

6      A         I don't specifically recall specific work

7 assignments.

8      Q         Generally what would you expect him to

9 have been doing during that period of time after the

10 waste and wrongdoing letter but before his last day?

11     A         Nothing.

12     Q         Why?

13     A         I didn't trust him.

14     Q         Did you give anybody direction to avoid

15 giving Mr. Smith work assignments?

16     A         Nobody could give Mr. Smith work

17 assignments, only I could.  He reported directly to

18 me.

19     Q         After the waste and wrongdoing letter,

20 what would it have taken for you to give Mr. Smith a

21 work assignment?

22     A         After the waste and wrongdoing letter, it

23 was recommended that we do an independent

24 investigation of the letter, at which time we hired an

25 independent investigator to, again, independently

1    investigate all the allegations in the letter.

2              We also met with our accountant and had

3    him independently investigate all of the financial

4    allegations in the letter.  And we wanted to afford

5    Mr. Smith the opportunity to talk to the investigator

6    to present his side of the investigation so it would

7    be impartial and independent, at which time Mr. Smith

8    walked off the job.

9              MR. CROCENZI:  Frank, could we take a

10   break?

11             MR. CLARK:  Sure.

12             MR. CROCENZI:  We've been going for an

13   hour and a half.

14             MR. CLARK:  What time is it?

15             MR. CROCENZI:  It's almost 20 after.

16             MR. CLARK:  Almost 20 after what?

17             MR. CROCENZI:  Eleven.

18             MR. CLARK:  Okay.

19             MR. CROCENZI:  Thanks.

20             MR. CLARK:  Sure.

21             (Break taken at 11:18 a.m. until 11:36 a.m.)

22   BY MR. CLARK:

23       Q        Do you recall Mr. Smith's last day at

24   PrimeCare?

25       A        I vaguely recall it, yes.

166

```
1    COUNTY OF CUMBERLAND            :
                                     :  SS
2    COMMONWEALTH OF PENNSYLVANIA    :

3              I, Teresa K. Bear, Reporter-Notary

4    Public, authorized to administer oaths within and for

5    the Commonwealth of Pennsylvania and take depositions

6    in the trial of causes, do hereby certify that the

7    foregoing is the testimony of CARL A. HOFFMAN, JR.

8              I further certify that before the taking

9    of said deposition, the witness was duly sworn; that

10   the questions and answers were taken down

11   stenographically by the said Teresa K. Bear, a

12   Reporter-Notary Public, approved and agreed to, and

13   afterwards reduced to typewriting under the direction

14   of the said Reporter.

15             I further certify that the proceedings

16   and evidence are contained fully and accurately to the

17   best of my ability in the notes taken by me on the

18   within deposition, and that this copy is a correct

19   transcript of the same.

20             In testimony whereof, I have hereunto

21   subscribed my hand this 19th day of June 2009.

22

23   _____
                Teresa K. Bear, Reporter
24                   Notary Public
                My commission expires
25                on April 25, 2011
```

GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577