# EXHIBIT E

# DEPOSITION TRANSCRIPT
# RICHARD SMITH

## *(Relevant Pages Only)*



EXHIBIT

_E_

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD C. SMITH,          : CIVIL ACTION - LAW
                                :
               Plaintiff :
                                : No. 1:08-cv-1397
     v.                        :
                                :
PRIMECARE MEDICAL, INC.,    : Chief Judge Kane
CARL A. HOFFMAN, JR., D.O.,  :
THERESA M. HOFFMAN,          :
JOSHUA D. LOCK,               :
MARCY HOFFMAN-SCHLEGEL,      :
FRANK KOMYKOSKI, and         :
KNIGHTS OF VON DUKE, LTD.,   :
                                :
               Defendants : JURY TRIAL DEMANDED

---

Oral Deposition of

RICHARD C. SMITH

---

DATE:    Tuesday, May 5, 2009

TIME:    10:11 a.m.

PLACE:   Goldberg Katzman
          320 Market Street
          Harrisburg, Pennsylvania

TAKEN BY:  Defendants

APEX REPORTING SERVICE
By:  Sharon L. Dougherty
P. O. Box 6265
Harrisburg, PA 17112-0265
717.545.3553

ORIGINAL

1    Knights of Von Duke, Limited had offered you some stock.   Do

2    you remember those allegations in your Complaint?

3          A      Yes.

4          Q      Let me show you what I will mark as the first

5    exhibit to your deposition.

6                 (Deposition Exhibit No. 1,
                  Shareholders' Agreement,
7                 produced and marked for
                  identification.)

8

9    BY MR. CROCENZI:

10         Q      Do you recognize Exhibit 1?

11         A      I believe so.

12         Q      If you need more time to review, please do so.

13         A      I see I signed it.

14         Q      You testified that is your signature on page 11

15   of this Exhibit?

16         A      Yes, it is.

17         Q      This was the initial Shareholders' Agreement

18   regarding the shareholders of the Knights of Von Duke; is that

19   correct?

20         A      Yes.

21         Q      On page 13 there is an Exhibit B, a Promissory

22   Note.  Do you see that Exhibit?

23         A      Yes, I do.

24         Q      Is that your signature at the bottom of the

25   Promissory Note?

7

1    A      It is.

2    Q      Did you sign that on August 18th, 1999?

3    A      Yes.

4    Q      Do you recall signing this Promissory Note as

5  part of the Shareholders' Agreement?

6    A      Yes.

7    Q      The Promissory Note indicates that you were being

8  loaned $15,000 from Carl A. Hoffman for the purchase of the

9  stock in the Knights of Von Duke.  You had two years from the

10  date to pay back Mr. Hoffman; is that correct?

11    A      That is what this says.  That is not what

12  Dr. Hoffman said.

13    Q      What did Dr. Hoffman tell you that is different

14  than what is contained in this Promissory Note?

15    A      Dr. Hoffman said that I was being given the

16  shares of stock, and that it was a bonus for a job well done

17  in the Corporation.

18    Q      When did he tell you this?

19    A      Before the whole company was put together, and

20  right before the actual company was legally formed and all

21  that.  I don't remember the exact date but ...

22    Q      Did you question him when he asked you to sign

23  the Promissory Note that I have now placed in front of you as

24  Exhibit 1 which is obviously different than what he told you

25  earlier?

1      A      The best I can recollect is I looked at him and
2   said, what is this, and he said just sign it.  It's a
3   formality.

4      Q      When did you have that conversation with him?

5      A      When it was signed.

6      Q      Who else was present when this discussion
7   occurred between you and Mr. Hoffman?

8      A      I don't recall anybody else being present.

9      Q      Did you make any payments pursuant to the
10  Promissory Note to Dr. Hoffman?

11     A      No, I did not.

12             (Deposition Exhibit No. 2,
               1/11/02 Letter, produced and
13             marked for identification.)

14  BY MR. CROCENZI:

15     Q      I am showing you Exhibit 2, Mr. Smith.  Do you
16  remember receiving this letter from Dr. Hoffman to you on or
17  about January 11th, 2002?

18     A      I do.

19     Q      Did you question Dr. Hoffman when you received
20  this letter indicating the shares were now going to be
21  transferred to Dr. Hoffman?

22     A      Did I question it?

23     Q      Yes.

24     A      I did.

25     Q      What did you ask him?

1    A    I said, I don't understand.  He said, don't worry

2  about it.  As I always told you, you know, it's a formality

3  and your family will always be taken care of.  Don't worry

4  about a thing.  My word is good.

5    Q    What did you --

6    A    So I took that at face value.

7    Q    Did you believe that you still owned the shares

8  of stock in the Knights of Von Duke, Limited?

9    A    I did because it had been a bonus for a job well

10  done.

11    Q    Did you actually receive any shares of stock, a

12  piece of paper for the share?

13    A    Not that I can recall.

14        (Deposition Exhibit No. 3,
          Share Certificate, produced
15        and marked for identification.)

16  BY MR. CROCENZI:

17    Q    I am showing you Exhibit 3, Mr. Smith.  Have you

18  ever seen this document before?

19    A    Not that I can recall, and had I, I would point

20  out that it's not correct anyway.

21    Q    What is not correct about it?

22    A    My name is not Richard L. Smith.  It's Richard C.

23  Smith.

24    Q    On the second page it's a Share Transfer form.

25  Have you ever seen page 2 of this document?

13

1       A       I did.

2               (Deposition Exhibit No. 4,
                Release of Financial
3               Responsibility, produced
                and marked for identification.)

4

5   BY MR. CROCENZI:

6       Q       Let me show you Exhibit 4, Mr. Smith.  Do you

7   recognize Exhibit 4, Mr. Smith?

8       A       Just bear with me one second.

9       Q       Sure.

10      A       I do recognize this.

11      Q       What is it?

12      A       This is the policy regarding the Release of

13  Financial Responsibility.

14      Q       Policy of PrimeCare Medical?

15      A       Yes.

16      Q       At the top there are approval signatures.  Is

17  that your signature, the second one down?

18      A       It is.

19      Q       This policy states that inmates were to sign the

20  Release of Financial Responsibility form; is that correct?

21      A       It does, and this was changed as a result of my

22  previous discussion regarding the Broome County Sheriff's

23  Department.

24      Q       Is this the revised version?

25      A       No, this is not the revised version.

1    went to the warden, and that practice was stopped a long time

2    ago and the bills go directly to the warden or superintendent

3    or administrator of the facility.  What they do from there, I

4    can't answer.

5         Q     Other than Mr. Nickels, have you ever had any

6    discussions with any warden, administrator, superintendent,

7    county official regarding PrimeCare's billings under the ID

8    CAP?

9         A     You mean since I left or while I was there?

10         Q     No.  When you were an employee.  Did you tell any

11    county official or prison official that you believed that the

12    billings under the ID CAP were improper?

13         A     No.

14         Q     Was the ID CAP issue a topic that was part of any

15    accreditation process?

16         A     No, not to my knowledge.  No.

17         Q     Prior to January 28th, 2008, when was the last

18    time you spoke with Dr. Hoffman regarding your concern that he

19    was improperly billing the facilities under the ID CAP?

20         A     I had fairly regular discussions with him because

21    of my position up until the time I left PrimeCare for my

22    surgery.

23         Q     Uh-huh.

24         A     And it was almost always a topic of mine with

25    him.

1      Q       Did he ever tell you that you were a pain in his

2 neck?

3      A       No, he didn't.

4      Q       Prior to you taking your leave in May of 2007,

5 did Dr. Hoffman ever threaten you with any kind of anything

6 because of you being a pain in his neck on these issues we

7 just talked about?

8      A       No.

9      Q       Did anybody at PrimeCare ever threaten you with

10 any kind of reprisals or retribution regarding the kind of

11 things that we just talked about prior to your leave?

12             MR. CLARK:   Prior to what?

13 BY MR. CROCENZI:

14      Q       Prior to your leave.

15      A       No.

16      Q       In Paragraph 55 of your Complaint you allege that

17 Dr. Hoffman and PrimeCare left staff positions vacant and

18 underfilled contractually required staffing minimums in public

19 contracts PrimeCare had with various counties and prisons.

20             When did you first raise this as a concern to

21 Dr. Hoffman?

22      A       That pretty much was always an issue between him

23 and I.  Although, I will say up until the approximate time

24 that Todd Haskins came into the Corporate Office, I had more

25 control over nursing in particular, you know, keeping the

1  minimum contracts were not met?

2       A        Myself and Dr. Hoffman?

3       Q        Yes.

4       A        Yes.

5       Q        When was the last time you told him --

6       A        A better explanation would be that I told him

7  that the -- if they are going to continue to leave positions

8  vacant, that there should be a discussion between the company

9  and the county.  If the county says it's okay, okay.  At least

10 it's not deceitful or behind their back or anything.

11      Q        But my question was, did you ever recommend to

12 Dr. Hoffman that the counties be reimbursed for months in

13 which the minimum staffing requirements were not met?

14      A        I did.

15      Q        When was the last time you recommended --

16      A        Every time I talked about staffing I talked about

17 that issue with him.

18      Q        Do you know whether Dr. Hoffman or any management

19 personnel at PrimeCare spoke with the counties regarding

20 staffing shortages that you allege?

21      A        No.

22      Q        Did you ever personally speak with any county

23 representative or warden regarding the staffing shortages?  As

24 you just said, somebody should go and at least tell them so

25 it's not deceptive.  Did you ever go to one of these officials

1   that you told Dr. Hoffman about?

2        A       I don't.

3        Q       Did Dr. Hoffman ever threaten you, threaten to

4   terminate you, or do anything to you in your job at PrimeCare

5   because you brought these concerns of West Virginia to his

6   attention?

7        A       No, other than what he eventually did to me.

8        Q       How about the understaffing issues that we talked

9   about before the break, did Dr. Hoffman ever threaten you,

10  threat your employment, your status, your benefits, your pay,

11  or anything like that because you brought concerns to him

12  regularly about understaffing the facilities?

13       A       No, not -- nothing other than what was done to

14  me.

15       Q       You are talking about after January 28th, 2008?

16       A       (Nods.)

17       Q       Is that a yes?

18       A       Yes.  I'm sorry.

19               (Deposition Exhibit No. 5,
                 1/28/08 Letter, produced and
20               marked for identification.)

21  BY MR. CROCENZI:

22       Q       Mr. Smith, I am showing you Exhibit 5.  Do you

23  recognize Exhibit 5?

24       A       I do.

25       Q       What is it, sir?

APEX Reporting Service

1       A       It is a waste and wrongdoing letter that I gave

2  to Josh Lock and Theresa Hoffman the day I returned to work.

3       Q       Which was when?

4       A       I believe it was January 28th, 2008.

5       Q       Between your first day of leave, which was

6  May 10th, 2007, and when you returned to work on January 28th,

7  2008, did you speak with Dr. Hoffman about any of the issues

8  that we have discussed so far during your deposition that you

9  believe were waste or wrongdoing or illegal or deceptive?

10      A       No.  We talked about my health.

11      Q       Did you speak with anybody at PrimeCare during

12  that time frame from May 10th '07 to January 28th, 2008

13  regarding any of the issues we have already discussed in your

14  deposition regarding waste and wrongdoing?

15      A       From May '07 until '08.

16      Q       Yes.

17      A       Mr. Lock.

18      Q       When did you discuss any of these issues during

19  that time frame with Mr. Lock?

20      A       Fairly regularly.

21      Q       Did you meet with him personally or did you speak

22  with him over the phone during that time?

23      A       Over the phone.  I don't remember exact dates,

24  but a lot over the phone.  Occasionally in person.

25      Q       What did you discuss with Mr. Lock between

68

```
 1          A       Yes, I believe that is correct.

 2          Q       Did he follow up with that request in another

 3     email dated February 7th, '08?

 4          A       Yes, I believe so.

 5          Q       Did you respond to him on February 7th, '08 with

 6     a letter copied to him?  It was a letter to Dr. Hoffman but

 7     copied to Mr. Lock providing your explanation for why you were

 8     not providing any further details.

 9          A       Yes.

10          Q       Then finally did you receive a response from

11     Mr. Lock on 2/15/08 regarding your letter of 2/7/08?

12          A       The question was, did I receive this --

13          Q       Yes.

14          A       February 15th --

15          Q       Yes.

16          A       Yes.

17          Q       Before we get any further into what happened

18     after January 28th, 2008, tell me what happened when you

19     arrived at PrimeCare on January 28th, 2008.  Take me through

20     the sequence of events that morning.

21          A       I arrived just prior to 8:00, which is when I was

22     told to be there, and was assigned my new office, and met with

23     Josh Lock and Theresa Hoffman.

24          Q       What was discussed during the meeting that took

25     place with Mrs. Hoffman and Mr. Lock?
```

1        A        The fact that this was my office -- and this is

2  the best I can recall -- that this was my new office.  That I

3  wasn't to talk to anyone.  I didn't have access to company

4  records, reports, anything until, you know, they decided what

5  my new duties would be.

6        Q        Did you say anything?

7        A        Yes.  I said, why am I in this office?  Why am I

8  not returning to work as I was the day I left?

9        Q        What did either Mrs. Hoffman or Mr. Lock tell you

10 in response?

11       A        That this was how it was, and then there was a

12 discussion -- Mr. Lock told me I wasn't allowed to park in my

13 handicap parking spot any longer, and I said I had a handicap

14 plaquered, and he said you don't need it, you are not parking

15 there.

16              Then he demanded a doctor's slip from my

17 physician as to whether I was taking any controlled

18 substances, narcotics, prescription medication.

19       Q        What did you tell Mr. Lock if anything when he

20 told you you were not allowed to park in the handicapped spot?

21       A        I told him I had a duly authorized handicap

22 plaquered and that I should park there.  He said, well, you

23 are not parking there.

24       Q        Was there anything else discussed between the

25 three of you during this meeting?

1     A      Theresa Hoffman went through this whole tirade
2   about, why am I doing all this.  I was the highest paid
3   employee, you know, on and on and on and on, and I just looked
4   at her and said, I don't understand.  What does that have to
5   do with anything that is going on here?
6     Q      What was Theresa Hoffman talking about?
7     A      I don't know.  I mean --
8     Q      Well, when you said -- you testified that Theresa
9   Hoffman told you, why are you doing this.  Do you know what
10  she was referring to when she said "this"?
11    A      I don't know.  I mean, the only thing I can
12  gather is that I didn't do -- leave the company like her and
13  Dr. Hoffman wanted me to do.  You know -- I don't know.  You
14  will have to ask her.
15    Q      Did you say anything in response to Mrs. Hoffman?
16    A      Yes.  I asked, why is this all being done to me.
17    Q      Did she have any response to that?
18    A      Her response was, you were the highest paid
19  employee here.  Why are you doing this.  None of it made too
20  much sense.
21    Q      Where did the meeting take place?
22    A      In my newly assigned office.
23    Q      When did you hand the 1/28/08 letter to Mr. Lock
24  which is marked as Exhibit 5?
25    A      During that meeting.

1    Q       At what point during the meeting?  The beginning?

2    The middle?  The end?

3    A       I don't recall exactly.  Like middle.  I don't

4    recall.

5    Q       Did you say anything to either one of them when

6    you handed the letter to them?

7    A       I said Dr. Hoffman is not here.  This is for him,

8    and they both said, we will make sure he gets it.

9    Q       Was it in a sealed envelope or was it open like I

10   have it here as an Exhibit?

11   A       I believe it was in an envelope.

12   Q       Did they open it and read it in your presence

13   during this meeting?

14   A       They opened it and did read it.

15   Q       Did they say anything to you after they were done

16   reading it?

17   A       Before they opened the letter, Mr. Lock went

18   through this whole tirade about, this was a personal issue

19   between you and Dr. Hoffman.  He told you, don't put anything

20   in writing.  You committed it to writing.  You know, and --

21   Q       You are talking about negotiations regarding the

22   severance or your retirement from the company?

23   A       Yes.

24   Q       Go ahead.

25   A       And now your attorney mentioned waste and

1              (Deposition Exhibit No. 15,
               3/13/08 Letter, produced and
2              marked for identification.)

3    BY MR. CROCENZI:

4         Q       I have placed in front of you Exhibit 15,

5    Mr. Smith.  Is this a letter you wrote to Dr. Hoffman on

6    March 13th, 2008?

7         A       Yes.

8         Q       Did you hand deliver this to Dr. Hoffman on

9    3/13/08?

10        A       I don't recall.

11        Q       You mentioned in this report that you found more

12   waste and wrongdoing, and then you go into detail explaining

13   your allegations of waste and wrongdoing.

14               Is it true that you did not bring these issues

15   contained in your March 13th letter to Dr. Hoffman,

16   Dr. Hoffman's attention until you provided him with this

17   letter?

18        A       Yes, that's correct.

19        Q       This would have been the first time he heard

20   about these things from you?

21        A       I believe so, yes.

22               (Deposition Exhibit No. 16,
                 3/14/08 Letter, produced and
23               marked for identification.)

24   BY MR. CROCENZI:

25        Q       I am showing you Exhibit 16.  Is this a letter

1      Q      Did you hand deliver the letter of 3/14/08 to

2   Dr. Hoffman?

3      A      Yes.

4      Q      Can you describe that meeting where you hand

5   delivered the letter to him?  What happened?

6      A      He came in my office.  I handed him the letter

7   and said, I believe I have been constructively discharged, and

8   it was massive confusion.  Theresa Hoffman was in the hall.

9   Frank Komykoski was in the hall.  Theresa Hoffman was

10  screaming at Dr. Hoffman, you can't talk to him alone.  That

11  is what the attorneys advised you to do.

12             Komykoski tried coming into the office, and

13  literally Dr. Hoffman threw Theresa Hoffman and Frank

14  Komykoski -- pushed them out of the office and closed the

15  door.

16     Q      Then what happened?

17     A      He sat down and wanted to talk, and I said, there

18  is not too much to talk about, and he said that he wanted to

19  have lunch with me and I said, fine, and I left.

20     Q      What time of day was this?

21     A      I honestly don't remember.

22     Q      Morning?  At the end of the day?

23     A      I don't remember.

24     Q      Did he have work for you the next day,

25  March 15th, '08?  Work was available for you; is that correct?

1     A       Well, I don't understand what you mean.

2     Q       You were expected to be at PrimeCare to work the

3  next day, March 15th, '08 --

4     A       No.  I was constructively discharged.

5     Q       No.  My question to you was, did PrimeCare expect

6  you to show up for work on March 15th, '08?

7     A        I don't know.  I handed this to Dr. Hoffman and

8  said that I was constructively discharged.  You would have to

9  ask Dr. Hoffman.

10    Q       Then you left the building.

11    A       Yes.

12    Q       Did anybody at PrimeCare tell you that you were

13  terminated, fired, that there was nothing for you to do and

14  don't show up as of March 14th, '08?

15    A       There was nothing for me to do but sit at a desk.

16    Q       Did anybody at PrimeCare tell you you are fired,

17  you are terminated, don't show up here for work?

18    A       No.  By their actions they did, but was that

19  verbally told to me?  No.

20    Q       Have you stepped back foot in PrimeCare offices

21  since you left on March 14th, '08?

22    A       No.

23    Q       You took your personal belongings with you when

24  you walked out of the office on March 14th?

25    A       The ones that were -- yes -- that were left.

1   she would simply -- her and her husband talked about it, and

2   she would just walk away.

3        Q        When she said she agreed with you about waste and

4   wrongdoing, was her agreement only about the West Virginia

5   issues that we talked about earlier or other aspects of the

6   company?

7        A        West Virginia issues.

8                 (Deposition Exhibit No. 18,
                  Authorization, produced and
9                 marked for identification.)

10  BY MR. CROCENZI:

11       Q        Do you recognize Exhibit 18, Mr. Smith?

12       A        Yes.

13       Q        Did you sign this on February 23rd, 2007?

14       A        Yes.

15       Q        Did you have any leave available to you when you

16  left for your surgery on May 10th, 2007?

17       A        I don't remember.

18       Q        Do you remember whether you were still in

19  negative leave balance as of May 10th, 2007?

20       A        I don't remember.

21                (Deposition Exhibit No. 19,
                  Leave Request, produced and
22                marked for identification.)

23  BY MR. CROCENZI:

24       Q        I am showing you Exhibit 19.  Are these the two

25  Employee Leave Request forms that you completed relating to

1    your surgery on May 10th, 2007?

2        A    Yes.

3        Q    The second one says you were expected to return

4    to work on May 29th, 2007; is that right?

5        A    Yes.

6        Q    Prior to your surgery, did you ever meet with

7    Marcy Hoffman-Schlegel to discuss your leave from work?

8        A    Not that I recall, no.

9        Q    You never talked to her about the Family Medical

10   Leave Act or what would happen to you when you are off work

11   for this period of time that you expected to be from

12   May 10th to May 29th?

13       A    No.

14       Q    Were you expected to receive leave pay during the

15   time from May 10th to May 29th?

16       A    Yes.

17       Q    You don't recall if you were in negative leave

18   balance and you had leave time available to you?

19       A    No.  It wasn't much of an issue because

20   Dr. Hoffman -- leave was kind of not an issue because he said

21   I had a job for life and that was always his discussion when

22   -- you know, on everything that ever happened including when

23   they changed 401K plans and took my life insurance.  I was

24   uninsurable.  It really didn't mean too much.

25       Q    Did you talk to Dr. Hoffman before you left work

1    for the surgery on May 10th about you going out on leave?

2         A       Yeah. Yes.  I talked to him about that I put

3    leave slips in.

4         Q       What did he say?

5         A       He said we will see you when you come back.

6         Q       You never considered yourself to be out on Family

7    Medical Leave Act when you left work on May 10th for your

8    surgery; is that right?

9         A       No.

10        Q       That is not right?

11        A       No, I took leave for a surgery and it -- what

12   happened and --

13        Q       But I mean, when you left on May 10th, you had no

14   conception that you were -- this leave would be covered under

15   the Family Medical Leave Act?

16        A       It wasn't an issue.

17        Q       Now, you had complications from the surgery; is

18   that right?

19        A       Yes.

20        Q       You ended up being off work longer than you

21   anticipated; is that right?

22        A       Yes.

23        Q       At some point you had a conversation with

24   Dr. Hoffman regarding you being off work longer than expected;

25   is that right?

1      A     Yes.

2      Q     When was the first time that you had that

3 conversation with Dr. Hoffman and what was discussed?

4      A     When I went home from the hospital, I was

5 discharged from the hospital, shortly thereafter Dr. Hoffman

6 came to my house.  He said that, you know, I said -- we have

7 long term disability, we have -- he said, I don't want you

8 back until you are a hundred percent.  You know, you get your

9 full pay.  You know, with benefits, don't worry about it.  I

10 don't want you to worry about work.  I just want you to get

11 better.  Come back when you are -- I don't want you back until

12 you are a hundred percent.  That was the discussion.

13      Q     Do you remember when that happened?  You said a

14 few days after you got back?

15      A     Yeah.  I think I was in the hospital ten days, I

16 think.  So that would have been May 20th, shortly thereafter,

17 very shortly thereafter.

18      Q     Did you know at that point that you were going to

19 be off longer than you expected?  Is that why you had the

20 conversation with Dr. Hoffman about being off?

21      A     Well, he came and said -- I think he said to me,

22 obviously you will not be back when you said.  I said, I don't

23 think so.

24      Q     Did you give him any date when you might be back?

25 I know you weren't going to make the May 29th return date, but

1    did you give him any expectation?

2         A     No.  Other than I said I wanted to come back as

3    soon as possible.

4         Q     After your discussion with Dr. Hoffman, did you

5    follow up with Marcy at the Corporate Office regarding your

6    leave status?

7         A     No.  I talked to Dr. Hoffman, the owner of the

8    company.

9         Q     Did Dr. Hoffman ever mention the Family Medical

10   Leave Act to you during these discussions?

11        A     No.  His discussion then and always with me was,

12   you helped build this company.  You have a job for life.  Your

13   family will always be taken care of.

14             So there just wasn't a concern on my part.  You

15   know, it was like, you deserve it.  You get better.  You don't

16   worry about work.  You worry about getting better.  You know,

17   you have a job forever.  Okay.  Thank you.

18        Q     You did understand before you left on May 10th

19   that the company was subject to the Family Medical Leave Act;

20   is that right?

21        A     Do I know that staff had -- I mean, it was an

22   ongoing issue with Marcy as the HR Director.

23        Q     You knew the company was dealing with Family

24   Medical Leave Act issues?

25        A     Constantly.

1       Q       But it never crossed your mind that your time off

2   was covered by the Family Medical Leave Act because of the

3   statements Dr. Hoffman made to you?

4       A       Honestly, no, because that was his stance,

5   forever.  I mean, it was his stance.

6       Q       In your Complaint you allege that you first told

7   Dr. Hoffman you were ready to come back to work in July 2007.

8   Can you give me an exact date?

9       A       No.  Because I had ongoing talks with him about,

10  I wanted to come back, it would do me good, I wanted to get

11  back, get back, get back.  It was -- it was the theme from the

12  first time he came to my house.

13      Q       But the first time that you told him that you

14  thought you were ready to come back to work was sometime in

15  July 2007; is that right?

16      A       Honestly, I don't remember.  I told him that to

17  call -- he knows my doctor Peter Brier.  They worked together

18  at the State Correctional Institution in Camp Hill, you know,

19  early on.  So they knew each other personally.

20              Dr. Brier, I kept telling him, you know, my

21  employer doesn't want me back until I am a hundred percent.

22  Even my doctor would say, it will do you good to get back.  I

23  would say I agree.  Have Carl call me.  Every time I talked to

24  Dr. Hoffman I told him that.

25      Q       Did you ever sign a release, written release

1    allowing Dr. Hoffman and your physician to speak about your
2    condition?

3            A       No.

4            Q       I looked through your medical records and the
5    first release I see from your physician, Dr. Brier, was
6    September 20th, 2007.  Would you agree with me that that is
7    the first time he released you to return to work?

8            A       No.  It was an ongoing discussion with him.
9    Again, the best thing to do there is talk to Dr. Brier.

10           Q       So you are telling me that each time you saw
11   Dr. Brier beginning in July 2007, you told him that you were
12   ready to go back to work?

13           A       No.  Prior to that, before July.

14           Q       When was the first time you told your doctor that
15   you thought you were ready?

16           A       I don't know.  Look at my medical records.  When
17   I first came out of the hospital -- it's hard for me to
18   remember dates, but I saw him very regularly.

19           Q       Each time you are telling me --

20           A       There was a discussion about returning to work.
21   I wanted to return to work.

22           Q       Did he agree with you or did he tell you, no, I
23   don't think you should go back, Mr. Smith, give it more time?

24           A       No, he thought it -- he asked me what I did and I
25   explained to him and he said, well, Rick, that doesn't --

1      Q      Okay.

2      A      I don't know why.  I didn't talk to the attorney.

3      Q      But when you arrived at PrimeCare on

4   December 7th, you were still under the impression you were

5   coming there to be prepped for a deposition; is that right?

6      A      Yes, and to meet with Dr. Hoffman.

7      Q      Did you know why you were expected to meet with

8   Dr. Hoffman on December 7th?

9      A      Yes, it was about my return to work.

10     Q      Who told you that?

11     A      I mean, that is what my discussion with Mr. Lock

12  was.

13     Q      In addition to being prepped?

14     A      Yes.

15     Q      So Mr. Lock tells you the deposition is off,

16  don't worry about being prepped, and then you go meet with

17  Dr. Hoffman?

18     A      I don't know that that is how it went.  I think I

19  met with Dr. Hoffman and then Mr. Lock said, it's not

20  necessary to do the prep today.

21     Q      Okay.

22     A      That is the best I can recollect.

23     Q      Tell me what happened when you met with

24  Dr. Hoffman on December 7th.

25     A      Well, before I even got to sit down, he said, you

1    are out of the company.  You are retiring.  You are retiring

2    at almost half your salary, like a hundred thousand dollars a

3    year.  You will get that for like ten years.  Then it will be

4    reviewed.

5            Then before I even opened my mouth, I guess I had

6    a look of shock on my face.  It went from, a hundred thousand

7    dollars a year to $130,000 a year, plus a Christmas bonus.

8            Then I sat down and I said, why, and he said you

9    don't want to go into that.  I said, I do want to go into

10   that.  He said, well, we are not going into that.  You are out

11   of the company.  I said, what are you saying?  Is it in

12   writing?  There will not be anything in writing.  I said, it

13   has to be in writing.  He said, don't you trust me?

14      Q       Anything else discussed, any other terms?

15      A       That he wanted me off their health care plan,

16   which I was involved in that due to my position for years.  It

17   drove their rates up because of having somebody that had

18   serious medical problems on the company health care plan.

19           So he wanted me off of the health care plan.   So

20   I said, I will check.  I was flabbergasted.  I said, I will

21   check.  I never looked into that.

22           My wife has worked for Pinnacle Health.  We are

23   all from Harrisburg.  It's one of the biggest health care

24   providers in the area.  So we were always on PrimeCare's

25   health care plan.  It was never an issue.  So I said, I don't

1    know.  We will look into that.

2        Q      How did the meeting end?

3        A      He said -- you know, I am trying to think how it

4    went.  It was just like, leave, and -- I believe that was

5    Friday.  Monday was the corporate Christmas lunch for

6    corporate staff.  So he said, I will see you at the -- just go

7    home and we will see you at the Christmas luncheon.

8             So I saw him at the Christmas luncheon, and I

9    pulled up to the restaurant.  He was standing right at the

10   door.  I pulled up right in front of the door.  I got out of

11   the car.  I said, are you going back to the office after the

12   luncheon, and he went why.  I said, because I have a letter

13   for you.  I want to discuss it with you.  He was like, okay,

14   we will discuss that then.

15               (Deposition Exhibit No. 20,
                 12/10/07 Letter, produced and
16               marked for identification.)

17   BY MR. CROCENZI:

18       Q      I am showing you Exhibit 20.  Is this the letter

19   that you gave Dr. Hoffman that Monday after the Christmas

20   luncheon?

21       A      Yes, that is the letter that I gave him.

22               (Deposition Exhibit No. 21,
                 1/14/08 Letter, produced and
23               marked for identification.)

24   BY MR. CROCENZI:

25       Q      I am showing you Exhibit 21.  You received this

1  letter from Marcy Hoffman-Schlegel; is that correct?

2      A      Yes.

3      Q      Were you getting pay stubs during the time you

4  were off work from May 10th, '07 until January 28th, 2008?

5      A      Yes.

6      Q      Isn't it true that pay stubs were showing your

7  negative leave balance accruing each time that you were paid?

8      A      Yes.

9      Q      Did you ever contact Marcy about the negative

10  leave balance accumulating?

11      A      No, and no disrespect to Marcy, but the president

12  of the company told me none of those things mattered.

13      Q      Did you talk to Dr. Hoffman about it?

14      A      I did and he said it didn't matter.  That is just

15  them playing -- keeping the books.

16      Q      When did you have that conversation with

17  Dr. Hoffman regarding the negative leave balance accumulating?

18      A      Early on.  I don't remember exactly when.

19      Q      Early on after your surgery?

20      A      After I got out of the hospital, yes, as best I

21  can remember.  I remember discussing it with him.

22              (Deposition Exhibit No. 22,
                1/23/08 Letter, produced and
23              marked for identification.)

24  BY MR. CROCENZI:

25      Q      I am showing you Exhibit 22.  Did you authorize

APEX Reporting Service

1    your attorney to write this letter to me regarding your

2    ability to return to work?

3         A       Yes.

4         Q       Did you obtain the note that was attached to the

5    letter from Dr. Brier, page 2 of the Exhibit?  It's a note

6    from Dr. Brier dated January 17th, '08.  Did you ask him for

7    that note?

8         A       Yes.

9         Q       Isn't it true that Mr. Fetterhof, William

10   Fetterhof contacted you for you to participate in his

11   investigation of your allegations of waste and wrongdoing?

12        A       Did Bill Fetterhof contact me?

13        Q       Yes.

14        A       I believe so.

15        Q       Isn't it true that you declined to meet with

16   Mr. Fetterhof?

17        A       He is the PrimeCare attorney or has been

18   affiliated with Mr. Lock and all of PrimeCare and many issues

19   involving licensure action.  Why would I respond to Bill

20   Fetterhof?

21        Q       The answer is no?

22        A       The answer is no.  It would be a prejudiced

23   review.

24        Q       Did you know prior to your departure on

25   March 14th, 2008 that PrimeCare had contacted Mr. Fetterhof to

1      A     It went to all of the people -- can I see it?

2      Q     Sure.  It's attached to your Complaint.

3 It's Exhibit 8 of your Complaint.

4      A     I will give it right back to you.

5           I do not have a noncompete agreement with

6 PrimeCare Medical or Dr. Hoffman.  You can see all of the

7 people on the email that this went to.  It's totally

8 inaccurate.  Number one, it says --

9      Q     That is not my question, Mr. Smith.  The question

10 was, how were you harmed by the email.

11           MR. CLARK:  He is telling you.

12           THE WITNESS:  I am trying to answer your

13 question.  It might not be the way you want me to answer it,

14 but I am trying to answer it.

15           The way I was harmed was, you asked the question

16 and I told you, I am in the correctional health care business.

17 Those people are all in the correctional health care business.

18 Okay.

19           The way I was harmed is, the email is not

20 accurate.  It's false.  It says that I am no longer associated

21 in any capacity with PrimeCare, that I walked off the job as

22 of March 14th, 2008.  That is not correct.  My stance is that

23 I was constructively discharged.  So if he wanted to be

24 accurate, that is what he could have said.

25           The second point and very important point is at

1  this point it should be considered that his interests are
2  adverse to ours.  My interests absolutely never have been
3  adverse to PrimeCare Medical.  I always tried to get them to
4  do the right thing, to protect the company and it's staff.
5          So that is totally inaccurate, and to say that
6  someone who is trying to get the company to follow the laws
7  and regulations and retain business and preserve their jobs is
8  that my interests are adverse to all of these people in the
9  correctional health care field is patently false.  So that is
10 my answer to your question.
11 BY MR. CROCENZI:
12     Q      That is not the answer to my question.  You told
13 me what you thought was false in the email.  My question to
14 you is, how were you harmed by these alleged --
15     A      The way I was harmed is, I now have my own
16 company that was formed in -- somewhere around May 2008, and
17 staff come in and out of the business.  These people all work
18 at -- it would take me quite some time to go through it, but
19 county medical contracts throughout the Commonwealth and all
20 over the country.
21          So to say things that are false to those kind of
22 medical staff that are in the field that I'm in is harmful,
23 and the damage I can't tell you yet.  You know, it will be
24 ongoing for some time.
25     Q      Have you not been able to get work through your

1    new company because of that email?

2         A      I don't know if that is the fact or not.

3         Q      Has anybody listed on that email contacted you

4    about the substance of the email?

5         A      Have they contacted me about the substance of

6    this email?

7         Q      Yes.

8         A      Yes.

9         Q      Which individuals on that email called you --

10        A      Well, obviously some that come to mind aren't

11   with PrimeCare anymore.   Barb Parker.   I can't remember her

12   name, but one of the women who PrimeCare let go and tried to

13   have arrested contacted me, you know, about this, and was

14   upset about this.

15               So we will see.   Like I said --

16        Q      You can recall two individuals that contacted you

17   about the email, and it sounds like both were sympathetic to

18   your version of events; is that right?

19        A      They were upset that the email was sent.

20        Q      They were on your side?

21        A      Yes.

22        Q      Okay,

23        A      But what I don't know, I don't know what has been

24   said out in the field to clients, to wardens, government

25   officials, et cetera, from all these people.   It's not just a

1    few people.  You can see how many people are involved.

2         Q      So as you sit here today you cannot quantify how

3    that email has affected you financially.

4         A      Not yet.

5         Q      Are you aware of anybody that repeated the

6    substance of that email that it affected your reputation?

7         A      No, I don't, at this time.

8         Q      Just so I am clear, you received your regular pay

9    and regular benefits during the time you were off work from

10   May 10th, '07 to January 28th, '08; is that right?

11        A      Yes.

12        Q      Mr. Smith, how else have you been harmed by the

13   actions of PrimeCare based on the allegations you have in your

14   Complaint?  What other damages, as we like to say in the legal

15   world, have you suffered because of the allegations you have

16   contained in your Complaint against PrimeCare and individuals?

17        A      I am trying to start my own company.  I do have

18   one contract, but it's a very, very small contract.

19               Although the economy of the US has tanked and

20   gone massively downhill on 401K's, immediately when I

21   separated from PrimeCare, the loans that I had from my 401K

22   became a distribution and there was a 10 percent tax penalty.

23               I don't know what -- being that my taxes haven't

24   been filed yet, I don't know what will happen there.  It was

25   30 some -- I want to say $33,000.

```
1                    C E R T I F I C A T E

2

3              I, Sharon L. Dougherty, a Notary Public for the

4    Commonwealth of Pennsylvania, do hereby certify:

5              That the witness named in the deposition, prior

6    to being examined, was by me first duly sworn or affirmed;

7              That said deposition was taken before me at the

8    time and place herein set forth, and was taken down by me in

9    stenotype and thereafter transcribed under my direction and

10   supervision;

11             That said deposition is a true record of the

12   testimony given by the witness and of all objections made at

13   the time of the examination.

14             I further certify that I am neither counsel for

15   nor related to any party to said action, nor in any way

16   interested in the outcome thereof.

17

18

19             _____

20             Sharon L. Dougherty

21

22

23

24

25
```

EXHIBITS

## SHAREHOLDERS' AGREEMENT

THIS SHAREHOLDERS' AGREEMENT (this "Agreement") is made and entered into as of this _____ day of _____, 1999, by and among Carl A. Hoffman, Jr. ("Hoffman"), Teresa M. Hoffman (with Her husband, collectively referred to as "Hoffman" or the "Hoffmans"), William E. Anderson, Jr. ("Anderson"), Richard C. Smith ("Smith") and The Knights of Von Duke, Limited, a British Virgin Islands Corporation (the "Company").

## W I T N E S S E T H:

WHEREAS, The Hoffmans, Anderson and Smith are sometimes hereinafter referred to, collectively, as the "Shareholders" and, individually, as a "Shareholder"; and

WHEREAS, the authorized capitalization of the Company currently consists of three hundred thousand (300,000) shares of common stock, $1.00 par value per share; and

WHEREAS, as the initial capitalization of the Company, the Company proposes to issue shares to the Shareholders, as hereinafter described; and

WHEREAS, Anderson and Smith desire to arrange for a loan to pay their respective subscriptions for the shares; and

WHEREAS, the Shareholders and the Company have determined that it is in their respective best interests to enter into this Agreement governing their respective rights and obligations with respect to the common stock of the Company.

NOW, THEREFORE, in consideration of the promises and the mutual covenants and agreements hereinafter set forth, the parties hereto, intending to be legally bound hereby, do hereby covenant and agree as follows:

1.   Stock Subject to Agreement.  This Agreement shall apply to any and all of the shares of capital stock of the Company which have been heretofore, or may hereafter be, issued by the Company or acquired by any Shareholder.  For the purposes of this Agreement, all of such capital stock, regardless of when issued or acquired, shall be referred to as "Stock".

2.   Subscription for Stock.  The Shareholders hereby subscribe to purchase the following shares of common stock of the Company:

2



DEPOSITION EXHIBIT

/

S. Dougherty

5/5/09

| | | |
|---|---|---|
| Carl A. Hoffman | 135,000 | shares for $135,000 |
| Teresa M. Hoffman | 135,000 | shares for $135,000 |
| William E. Anderson | 15,000 | shares for $ 15,000 |
| Richard C. Smith | 15,000 | shares for $ 15,000 |

The purchase price shall be paid in full, in cash or cash equivalents, on or before the Company commences business.

3.   <u>Loans to Certain Shareholders</u>.   Carl A. Hoffman, Jr. agrees to loan Anderson and Smith the sum of $15,000 each, which shall be used to pay the purchase price for the shares of Stock. A form of Promissory Note is attached to this Agreement. The loan shall be secured with an assignment of the shares of Stock to Carl A. Hoffman, Jr..

4.   <u>Preservation of Preemptive Rights</u>.   Unless otherwise agreed to in writing, the Shareholders and the Company hereby agree that any shares of Stock that may hereafter be issued shall first be offered for sale to the Shareholders pro rata in accordance with each Shareholder's respective shareholdings in the Company immediately prior to the issuance thereof.

5.   <u>Transfer Restrictions on Stock</u>.   Except as otherwise provided in this Agreement, no Shareholder shall sell, assign, transfer, mortgage, pledge, encumber or otherwise dispose of (whether or not for value) any of his Stock (such sale, assignment, transfer, mortgage, pledge, encumbrance or other disposition being hereinafter referred to as a "Transfer"). In no event shall any Transfer be made unless and until the applicable Shareholder has (i) complied with all federal and state securities laws applicable to such Transfer and (ii) delivered to the Company an opinion of counsel experienced in securities matters satisfactory to the Company that the Transfer is in accordance with all applicable federal and state securities laws. Any purported Transfer of Stock, except in accordance with the provisions of this Agreement, shall be null and void. No Transfer of Stock otherwise made in accordance with the provisions of this Agreement shall be effective unless and until such transferee shall have executed and delivered to the Company a "Joinder" provision, substantially in the form attached as <u>Exhibit A</u> hereto, whereby such transferee agrees to be bound by the provisions of this Agreement. Upon the execution and delivery to the Company of such Joinder, the term "Shareholder" as used in this Agreement shall be deemed to include the transferee executing such instrument.

6.   <u>Legend on Stock Certificates</u>.   Each certificate evidencing shares of Stock (including, without limitation, the Stock purchased by the Shareholders prior to the date hereof) and each certificate issued in exchange for or upon the transfer of any Stock during the term of this Agreement shall be endorsed with a legend in substantially the following form:

"THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE
SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS

OF ANY STATE AND MAY BE TRANSFERRED ONLY IF REGISTERED
UNDER SUCH APPLICABLE ACTS OR UPON DELIVERY TO The
KNIGHTS OF VON DUKE OF AN OPINION OF COUNSEL REASONABLY
SATISFACTORY TO The KNIGHTS OF VON DUKE AND ITS COUNSEL
THAT SUCH TRANSFER IS EXEMPT FROM SUCH REGISTRATION.

THESE SECURITIES ARE SUBJECT TO THE TERMS AND CONDITIONS
OF A SHAREHOLDERS' AGREEMENT DATED AS OF _____,
1999, BY AND AMONG The KNIGHTS OF VON DUKE. AND THE
SHAREHOLDERS OF The KNIGHTS OF VON DUKE, AS IT MAY BE
AMENDED FROM TIME TO TIME.  A COPY OF SUCH AGREEMENT IS
ON FILE AT THE REGISTERED OFFICE OF The KNIGHTS OF VON
DUKE.  THE SALE, TRANSFER OR OTHER DISPOSITION OF
SUCH SECURITIES IS SUBJECT TO THE TERMS OF SUCH
AGREEMENT AND SUCH SECURITIES ARE TRANSFERABLE ONLY
UPON PROOF OF COMPLIANCE THEREWITH."

       7.    <u>Permitted Transfers</u>.  Notwithstanding anything to the contrary in this
Agreement (including, without limitation, the provisions of Section 4 herein), any Shareholder
may transfer all or any portion of the Stock then owned by him to or for the benefit of one or
more members of such Shareholder's immediate family or to any trust the beneficiary of which is
any Shareholder and/or any member or members of such Shareholder's immediate family,
whereupon the transferee of such a Transfer or the trustee of such trust, as the case may be,
shall thereafter be a Shareholder under this Agreement; provided, however, that such Transfer
shall be in accordance with the provisions of Section 5 herein and provided, further, that the
Stock shall continue to be subject to Section 9 hereof upon the death or voluntary termination of
employment of any Shareholder regardless of who or which is the record owner of the Stock at
such time.  For purposes hereof, the term "immediate family," as applied to any Shareholder,
means the spouse, the children and grandchildren of such Shareholder, and the spouse of any
child of such Shareholder.

8.    <u>Rights of First and Second Refusal</u>.  In the event a Shareholder desires to sell or assign all or part of his Stock during his lifetime, such Shareholder shall have obtained a written bona fide offer from the proposed assignee or purchaser (containing all of the pertinent terms and conditions of the proposed sale or assignment), furnished a copy of that offer to the Company and to the other Shareholders, and given the Company and the other Shareholders a right of refusal to purchase those shares of the Company's Stock or a portion thereof for a purchase price per share and under other terms and conditions at least as favorable as those contained in the proposed purchaser's offer.  The other Shareholders will have thirty (30) days within which to exercise his/her/their right of first refusal after the delivery of the said notice, and he/she/they may exercise the right of first refusal by delivering a written notice of exercise to the offering Shareholder at any time within that thirty (30) day period.  Except as may be otherwise expressly provided in the pertinent bona fide offer, or as may be otherwise provided by the express written agreement of the Company, a closing will be held at the principal place of business of the Company at 10:00 a.m. on the thirtieth (30th) day following the delivery of the bona fide offer.  If there are more than two (2) Shareholders in the Company at the time of the delivery of a copy of the bona fide offer under this subsection, and more than one (1) of them wants to exercise their right of first refusal, all of the remaining Shareholders who may wish to do so will have the right to purchase a pro rata share of the Company's shares to be sold pursuant to this Section 8 in accordance with their ownership interest in the Company at that time.  If the right of first refusal provided in this Section 8 is not effectively exercised in accordance with the terms hereof with respect to all of the Stock of the offering Shareholder, the Company, for an additional period of thirty (30) days following the thirty (30) day period of the other Shareholders, will have the second right and option to acquire all or a portion of such Stock for the price per share and upon the same terms as specified in the foregoing notice by delivering a written notice of exercise to the offering Shareholder.  If the other Shareholders and the Company both decline to exercise their rights of refusal with respect to any or all of the Stock of the offering Shareholder, such offering Shareholder will be free to sell or otherwise dispose of such Stock to the bona fide offeror under the terms and conditions as had been specified in the pertinent offer at any time within the period of sixty (60) days following the expiration of the sixty (60) day period provided in this section8 for the exercise of the rights of first and second refusal.

9.    <u>Redemption of Stock by the Company</u>.  (a)  Upon the death of any Shareholder or the voluntary termination of employment of any Shareholder with the Company (collectively, the "Withdrawing Shareholder"), the Company may redeem any or all of the shares of Stock then or formerly owned by the Withdrawing Shareholder.  The purchase price of any shares of Stock redeemed by the Company hereunder shall be the appraised fair market value of said shares.  The appraised fair market value shall be determined by either the outside accountant of the Company or a qualified independent appraiser, as determined by the Shareholders (including the personal representative of any Withdrawing Shareholder) or, if they cannot agree, by a qualified independent appraiser selected by the outside accountants of the Company.  The purchase price shall be payable in equal annual payments over five (5) years and

bearing interest at the minimum rate to avoid imputation of interest under the Internal Revenue Code.

(b)  Notwithstanding subsection (a) above, any Withdrawing Shareholder may transfer any of his Stock to a member(s) of his immediate family who is then currently employed by the Company, in which case the Company shall not redeem said Stock and the transferee of said Stock shall become bound by the terms of this Agreement.

(c)  A closing will be held on or before the ninetieth (90th) day following the death or voluntary termination of employment of a Withdrawing Shareholder with respect to any Stock redeemed by the Company pursuant to this Section 9.  The Withdrawing Shareholder irrevocably constitutes and appoints the Secretary of the Company as his attorney-in-fact with full power and authority to take any and all necessary or appropriate actions to effect the transfer of his or his successor's shares of Stock on the books of the Company in accordance with the applicable provisions of this Section 9.  If the Company owes any indebtedness to the Withdrawing Shareholder at the time of the closing under this Section 9, the Company will also be obligated to pay the indebtedness in full at the time of the closing.  If a Withdrawing Shareholder has executed or otherwise has assumed any personal guarantee(s) with respect to any obligation of the Company, the Company will be required to (1) grant to the Shareholder-guarantor satisfactory releases or indemnities and to hold him harmless from his obligations under said personal guarantee(s) and (2) use its best efforts to obtain for the Shareholder-guarantor a release from liability in connection with said personal guarantee(s) from any third party creditor.

10.    Representations and Warranties of the Company.  The Company hereby represents and warrants to the Shareholders that:

(a)  the Company when organized, will be a duly organized, validly existing and in good standing under the laws of the British Virgin Islands;

(b)  the execution and delivery of this Agreement and the performance by the Company of its obligations under this Agreement are within the Company's powers and have been duly authorized by all necessary action, require no necessary governmental and regulatory approval, and do not and will not contravene or conflict with any provision of law or of any of organizational documents (including, without limitation, the articles of incorporation and bylaws) of the Company or of any agreement, indenture or other document binding upon the Company or to which its property is subject;

(c)  the authorized capital of the Company on the date hereof is as set forth in the recitals hereto and, other than as disclosed herein, no capital Stock of the Company has ever been issued; and

44048

6

(d)  this Agreement, when duly executed on behalf of the Company by an authorized officer thereof and when duly executed by each other party thereto, shall be binding upon the Company and enforceable against the Company in accordance with its terms, except as such enforceability may be affected or limited by applicable bankruptcy, insolvency, reorganization or moratorium or other similar laws relating to creditors' rights generally, or by general equitable principles.

11.    Covenants of the Company.  The Company hereby covenants and agrees with the Shareholders that the Company shall not permit the Transfer of any Stock to be registered on its books unless it has reasonable grounds to believe and does believe that such Transfer is not in violation of this Agreement.

12.    Representations and Covenants of the Shareholders.

Each Shareholder represents and warrants to the Company and to each other Shareholder that:

(a)    he acquired the Stock owned by him, for his own account with the intention of holding such securities for purposes of investment and that he has no intention of selling such securities in a public distribution in violation of federal securities laws or any applicable state securities laws of any state (collectively, the "Securities Laws");

(b)    they will not transfer any of the Stock in violation of any applicable Securities Laws.  In accordance herewith, each Shareholder acknowledges and agrees that no Transfer shall be accomplished unless the Company shall have first received an opinion of counsel from the transferring Shareholder, satisfactory in form and substance to counsel for the Company, to the effect that the proposed Transfer will not be in violation of any applicable Securities Laws;

(c)    this Agreement, when duly executed by each other Shareholder and the Company, shall be binding upon such Shareholder and enforceable against such Shareholder in accordance with its terms, except as the enforceability hereof may be affected or limited by applicable bankruptcy, insolvency, reorganization or moratorium or other similar laws relating to creditors' rights generally, or by general equitable principles; and

(d)    except as provided in this Agreement, such Shareholder has not been granted by the Company or any other person any preemptive rights with respect to any issuances of the Stock of the Company.

13.    Pledge of Stock to Secure Financing.  Each Shareholder hereby agrees that, from time to time during the term of this Agreement and upon the request of the Board of Directors of the Company, to pledge, but only together with each other Shareholder, his Stock to any entity providing financing to the Company; provided, however, that under no circumstances will any such financing be on a recourse basis to any Shareholder unless all of the Shareholders agree to the contrary in writing.

14.    Termination.  This Agreement shall terminate and cease to be effective at such time as:

(a)  no more than one (1) Shareholder owns any Stock;

(b)  the Stock or any portion thereof is initially offered for sale by the Company to the public pursuant to an underwritten offering registered under Section 5 of the Securities Act of 1933, as amended; or

44048

8

(c)  all of the Shareholders agree.

15.    Essence of Agreement; Arbitration.

(a)  The parties hereto agree that in the event that any of the provisions of this Agreement are violated, a remedy at law will not be adequate, and upon application to any court of competent jurisdiction, the applying parties, upon appropriate showing, will be entitled to a decree requiring specific performance or any other equitable remedy deemed appropriate by such court.. The provisions of this Section 15 shall be in addition to, and not in lieu or limitation of, any other remedies.

(b)  Any controversy or claim directly or indirectly arising under this Agreement shall be submitted to and resolved by a committee of three (3) arbitrators, one (1) appointed by the Company, one (1) appointed by the Shareholder(s) whom alleges said controversy (or, if none, the Shareholder(s) against whom such controversy is alleged), and one (1) appointed by the other two (2) so appointed.  The party instituting such arbitration shall give notice to that effect to the other party, which notice shall specify the arbitrator appointed by such party. Within twenty (20) days after the giving of such notice, the other party shall give notice specifying the arbitrator appointed by such party and, promptly thereafter, the two (2) arbitrators so appointed shall meet and designate the third arbitrator.  The arbitration proceeding will commence promptly thereafter and the arbitrators shall abide by the then current commercial arbitration rules of the American Arbitration Association.  The determination of the arbitrators shall be conclusive upon the parties to the arbitration.  The parties agree to act in compliance therewith and judgment upon the same may be entered in any court having jurisdiction thereof. The arbitrators shall give written notice to the parties to the arbitration stating the determination of the arbitrators and shall furnish to each party to the arbitration a signed copy of such determination.  Each party shall bear his own expenses of the arbitration proceeding.

16.    US Taxpayer Matters.  Each Shareholder hereby acknowledges that the Shareholders have agreed and shall elect to have the Company treated, for federal and state income tax purposes, as a US taxpayer corporation by filing a Election pursuant to Internal Revenue Code Section 954(d).  Each Shareholder hereby agrees to deliver to the Company a written consent to the Company's treatment as an US taxpayer corporation, if necessary, and will provide to the Company, immediately upon the Company's request, such properly signed consents or other documents as, in the opinion of the Board of Directors of the Company, may be necessary or useful in maintaining the Company's status as a US taxpayer corporation, and each Shareholder covenants that he will do nothing to interfere with the Company's maintaining its status as a US taxpayer corporation.

44048

17.     Dispute Resolution.  The Shareholders agree that at all times hereafter the Corporation shall have two (2) members of its Board of Directors, which members shall consist of Chadwick and Bannerman.  Each of the Shareholders hereby agrees that any deadlock in a vote of the Board of Directors of the Corporation (other than a vote directly or indirectly related to this Agreement which shall be governed by Section 13(b) hereof) shall be conclusively decided by a neutral third party mutually agreeable to the two (2) directors or, if no third party can be mutually agreed upon, by a majority of a three (3) person committee of which one (1) member shall be selected by each director within thirty (30) days of the deadlock with the third member being selected by the other two (2) committee members within thirty (30) days after their selection.

18.     General Provisions.

(a)  Benefits and Binding Effect.  This Agreement shall be binding upon and shall inure to the benefit of each of the parties and of his respective heirs, personal representatives, successors and assigns.

(b)  Severability.  The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

(c)  Governing Law.  This Agreement, and its validity, construction, administration and all rights hereunder, shall be governed by the laws of the Commonwealth of Pennsylvania, without giving effect to its conflicts of laws provisions.

(d)  Notices.  Any and all consents, notices and designations pursuant to this Agreement, unless otherwise specified, may be mailed to any Shareholder who is a party hereto or the Company as the case may be, at such address as may be designated by the Shareholder or the Company in writing and delivered in accordance with this section.  Any such notice shall be effective upon mailing, first class mail, postage prepaid.

(e)  Counterparts.  This Agreement may be executed and delivered in any number of counterparts, all of which, when so executed and delivered, shall have the force and effect of an original, but all of such counterparts, together, shall constitute one and the same instrument.

(f)  Captions.  The captions utilized in this Agreement are intended for the purposes of convenience alone and shall not in any way limit or affect the interpretation of the provisions hereof.

(g)  Entire Agreement.  This Agreement embodies the entire agreement and understanding between the parties, superseding and terminating all prior agreements and understandings relating to the subject matter hereof.

44048

10

IN WITNESS WHEREOF, each of the parties hereto has duly executed this Agreement the day and year first above written.

The Knights of Von Duke, Limited

By: _Richard C. Smith_
     , Secretary

By: _Carl A Hoffman_ (President)
     , President

_Carl A. Hoffman_
Carl A. Hoffman, Jr.

_Theresa M. Hoffman_
Teresa M. Hoffman

_William E. Anderson_
William E. Anderson

_Richard C. Smith_
Richard C. Smith

44048

11

EXHIBIT A

JOINDER OF TRANSFEREE

The undersigned, pursuant to Section 5 of the Shareholders' Agreement, dated as of _____, 1999, by and among The Knights of Von Duke Limited and its shareholders (the "Shareholders' Agreement"), and intending to be legally bound hereby, joins in and agrees to be bound by all of the terms and provisions of the Shareholders' Agreement as if the undersigned had been an original party thereto, and, in that connection, the term "Shareholder" as used in the Shareholders' Agreement shall be deemed to include the undersigned.

IN WITNESS WHEREOF, the undersigned has duly executed this Joinder on the _____ day of _____, _____.

_____

Address:

_____
_____
_____

EXHIBIT B

## **Promissory Note**

For value received, _____ hereby promises to pay to Carl A. Hoffman, Jr. (herein referred to as the "Holder") or his assigns, within two years of the date hereof, the sum of Fifteen Thousand ($ 15,000.00 ) Dollars, with interest thereon at the rate of Eight per cent (8%) per annum, payable quarterly on the tenth day of each calendar quarter. The principal sum of this note will be payable at the principal residence of the Holder (or at such other place as may be designated in writing by the Holder).

As collateral for this obligation, both principal and interest, the undersigned hereby assigns, transfers, conveys and hypothecates the shares of Stock represented by Certificate No. _____ of The Knights of Von Duke, Limited, a British Virgin Islands corporation.

Failure to pay the principal or interest on this Promissory Note, within five (5) days of the date when due shall constitute a default and the Holder shall then be authorized to transfer the shares of Stock in satisfaction of the obligations of the maker under this Promissory Note. This is a Non-Recourse obligation of the Maker hereof.

IN WITNESS WHEREOF, the Undersigned, has executed this Note this the _18th_ day of _August_, 1999.

_Richard C. Smith_

CARL A. HOFFMAN, JR., D.O.
3940 LOCUST LANE
HARRISBURG, PA 17109

545-8754

January 11, 2002

Richard C. Smith, M.S.
366 Equus Drive
Camp Hill, PA  17011-8357

RE: **Knights of Von Duke, Ltd. Stock**

Dear Mr. Richard C. Smith.:

This letter is provided as notice to you that your interest in the shares of stock of Knights of Von Duke, Ltd., has been transferred to the undersigned in satisfaction of the promissory note that you signed August 18, 1999.

Payment of principal and interest on the note was due to be paid on August 23, 2001. Since payment was not made at that time I am, as holder of the note, authorized to cause the transfer of the shares to me in satisfaction of the loan.

If you have any questions regarding this matter, please feel free to call me.

Sincerely,

Carl A. Hoffman, Jr., D.O., CCHP

CAHjr/smu

DEPOSITION
EXHIBIT 2
S. Dougherty  5/5/09

## INTERNATIONAL BUSINESS COMPANY

### Share Certificate

Certificate Number  ***3***    Number of Shares    ***15,000***

## KNIGHTS OF VON DUKE LIMITED

(Incorporated under the International Business Companies Act (CAP 291) of the British Virgin Islands)

Authorised Capital U.S. $5,000,000.00 divided into 5,000,000 Shares of par value U.S.$1.00 each.

THIS IS TO CERTIFY THAT Richard L. Smith is the registered holder of ***15,000*** shares of US$1.00 fully paid numbered ***270,001*** to ***285,000*** in the above named company subject to the Memorandum and Articles of Association of the said Company and to the terms and condition endorsed hereon.

Given under the Common Seal of the Company

this 10th day of September 1999

Peter Unwin
Director

Rod Gilbert
Director

DEPOSITION
EXHIBIT
3
S. Dougherty
5/5/09

# SHARE TRANSFER

I/We .....Richard C. Smith.............................................................................................

of (postal address) .366.Equus.Drive,.Camp.Hill,.Pennsylvania.17011.............

in consideration of the sum of U.S. $..Enforcement.of.Debt...............................................

paid or to be paid to me/us

by .Carl.A..Hoffman,.Jr.,.DO,.CCHP........................................................

of (postal address) 1617.Berkshire.Lane,.Harrisburg,.Pennsylvania.17112...............

DO HEREBY TRANSFER

TO .Carl A. Hoffman, Jr., DO, CCHP.............................................

the shares numbered .Certificate.No..3.(voided.certificate/issued.new.certificate)

standing in my/our name in the books of the above Company

TO HOLD unto the said

Carl.A..Hoffman,.Jr.,.DO,.CCHP............................................................................

his/her/their heirs executors administrators and assigns/its successors and assigns
subject to the several conditions on which I/we held the same on the execution hereof

AND I/we the said
 Carl A. Hoffman, Jr., DO, CCHP.............................................................................

do hereby agree to take the said shares subject to the same conditions

AS WITNESS our hands the    11th day of   January      xxxx 2002

Transferor/s (if shares are held jointly, all          Transferee/s
joint shareholders must sign here)

.............................................                .............................................

.............................................                .............................................

.............................................                .............................................

Witness                                                Witness



**PRIMECARE**
**MEDICAL +**

The Choice for Quality Contract Services.
A Division of PIHS, Inc.

## ALL CONTRACT FACILITIES

Page 1 of 1

Policy Name: <u>Release of Financial Responsibility</u>

Number: <u>F(C,J,P,4)74.01</u>

Effective Date: <u>4/1/98</u>

Approvals: CH _Carla Hoff po scup_

RS _Brind C._

Reference: <u>N/A</u>

WA _William_

---

I.   **PURPOSE:** The purpose of this policy is to insure that inmates are properly advised of the need to be financially responsible.

II.  **SCOPE:** This policy is applicable to all PrimeCare Medical contract sites.

III. **POLICY:** In the case of a pre-existing condition, it is necessary to have the inmate sign a "Release of Financial Responsibility" form. (Pre-existing condition is defined as a condition that existed prior to confinement and is ongoing) A "Release of Financial Responsibility" must be signed only on one occasion and not every time treatment is administered. "Release of Financial Responsibility" should not be confused with "Informed Consent" (ML64.01) which needs to be signed anytime an invasive procedure is performed.

The form is attached and the directions for completing it are self explanatory except for the section regarding "condition". (This section should contain the specifics of the accident, illness, etc. See attached example).

PrimeCare Medical would like to emphasize that treatment for life threatening conditions or conditions that would adversely effect the inmate's current and/or further health will <u>never</u> be denied even if the inmate refuses to sign the "Release of Financial Responsibility".

IV   **EFFECTIVE DATE:** This policy is effective immediately and supersedes <u>all</u> previous policies or related policies on this subject.

DEPOSITION
EXHIBIT
4
S. Dougherty
5/5/09

# PRIMECARE MEDICAL, INC.

## RELEASE OF FINANCIAL RESPONSIBILITY

Date/Time:_____

Inmate/Patient Name/Number:_____

Date of Birth:_____

Social Security #:_____


This is to certify that I, _____currently in custody at the

(Institution) _____am requesting (Service/Treatment) __

_____pursuant to my treatment provider's recommendation.

I acknowledge that this service/treatment is elective or cosmetic in nature or is otherwise <u>NOT</u>

required to be provided by institution/PrimeCare Medical contractual agreement.  I therefore

<u>RELEASE</u> PrimeCare Medical, Inc., its staff, the Institution and its staff and administrator(s)

from all financial responsibility and I assume personal responsibility for the payment for such

service/treatment(s).  I understand that PrimeCare Medical, Inc. will schedule the treatment but is

not responsible for payment.  I also release the aforementioned parties from any financial debts

that may occur from this service/treatment.

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

Inmate/Patient Signature:_____

Medical Department Representative:_____

Institution Representative:_____

Witness: _____

January 28, 2008

Carl A. Hoffman, Jr., D.O., CCHP
President/Corporate Medical Director
PrimeCare Medical, Inc.
3940 Locust Lane
Harrisburg, PA  17109

Dear Dr. Hoffman:

  The purpose of this correspondence is to alert you and PrimeCare Medical, Inc. (hereinafter referred to as "the Corporation") as to likely waste and wrongdoing in regard to the Corporation's business practices in medical contracts with several counties in the Commonwealth of Pennsylvania and in the Division of Juvenile Services and Regional Jails in the State of West Virginia.

## County Medical Contracts, Commonwealth of Pennsylvania

### Dauphin County Prison, Harrisburg, PA

  It has been a routine practice of the Corporation to leave positions vacant and thereby under-fill contractually-required staffing minimums in our county contracts.  As a result, the Corporation gains revenue for contractually-mandated services that it does not provide. Examples of this practice in Dauphin County include required nursing positions left vacant, a required Nurse Supervisor position left vacant and ten (10) hours per week of Psychiatric care that the Corporation has knowingly failed to provide. All of these items are specifically required by the Dauphin County contract.  The Psychiatry hours alone result in revenue for unprovided services amounting to approximately $104,000 per year.  This practice has contributed to the following gross margin at the Dauphin County Prison in 2006:

| YEAR | GROSS REVENUE | GROSS MARGIN | GROSS MARGIN % OF REVENUE |
|------|---------------|--------------|---------------------------|
| 2006 | $3,000,000 | $915,000 | 30% |

Note:  The Corporation (PrimeCare Medical, Inc. presently and Pennsylvania Institutional Health Services formerly) has been retained by Dauphin County for nineteen (19) years.

  This practice could be regarded as substantial abuse, misuse, destruction or loss of funds or resources owing to Dauphin County.

  I discussed the unprovided psychiatric hours with Dr. Enos Martin at great length. I had asked him if he would provide the hours not covered.  I continually asked you to give authority to provide the required services and you continually denied my requests. These types of decisions rest solely with you given the fact that you personally supervise and manage this contract.

  These types of business practices compromise the integrity of the Corporation and diminish the public's confidence in its ability to provide reputable service.  The substantial gross margin realized by the Corporation on this contract adds to the



DEPOSITION
EXHIBIT
5
S. Dougherty

appearance that the Corporation is intentionally billing Dauphin County for unprovided services and committing a fraud on the County.

<u>Lancaster County Prison, Lancaster, PA</u>

      Lancaster County is a relatively new contract for the Corporation. The situation currently occurring is an example of steadily deteriorating operations by the Corporation as shortcuts are made to improve profits while jeopardizing patient care.

      This contract requires on-site physician services. It is currently being run on-site by Rod Hostetter, a Physician Assistant with relatively little experience in correctional medicine. He is to be supervised by Dr. Eric Von Kiel the Assistant Corporate Medical Director, who is spread dangerously thin at several facilities. He is rarely on-site to supervise Mr. Hostetter. This is a violation of the Medical Practice Act since his work must be reviewed regularly by the supervising Physician. It would also be a violation of express or implied warranties in the Corporation's contract with the County. Regardless, the Corporation continues to accept revenue from Lancaster County as if the contract were being fully performed. Instead, the Corporation is knowingly implementing shortcuts that leave patient care severely compromised.

      I continually questioned you concerning the Corporation's increased use of mid-level practitioners (physician assistants and nurse practitioners). The Corporation was using these practitioners to reduce costs and increase profits, even though its contract required professional services from an M.D. or D.O. No credit was offered to the state or county agencies for the reduced overhead of these providers. The Corporation was also engaging in questionable practices regarding compliance with regulations.

### West Virginia Division of Juvenile Services/West Virginia Regional Jail Authority

      The Corporation was cited in 2006 by the West Virginia Division of Juvenile Services for its failure to provide the "contractually required on-site services for physicians". This prompted my request to corporate operations staff to review not only the Division of Juvenile Services contracts but also the West Virginia Regional Jail contract. Widespread deficiencies were discovered at nearly all facilities in physician hours on-site. I argued continually in public meetings attended by you and the Corporation's Vice-Presidents and Officers and in meetings that included all corporate office managers as well as private meetings with you that the Corporation needed to make correction of these severe deficiencies a "top priority". I pointed out that failure to provide these basic services undermines the public trust in the corporation and could result in legal actions against the Corporation and cancellation of the Regional Jail contract. These unethical practices yielded the following approximate windfall gross margins at the following West Virginia Regional Jails and Juvenile facilities in 2006:

2

West Virginia Regional Jails

| Facility (Jail) | Revenues | Gross Margin | Gross Margin % of Revenues |
|---|---|---|---|
| Southern Regional | $ 1,500,000 | $ 400,000 | 26% |
| South Central Regional | 2,000,000 | 500,000 | 25% |
| Northern Regional | 2,000,000 | 650,000 | 32% |
| North Central Regional | 1,800,000 | 460,000 | 25% |
| Western Regional | 1,600,000 | 500,000 | 31% |
| Eastern Regional | 1,000,000 | 130,000 | 13% |
| Central Regional | 875,000 | 270,000 | 30% |
| Potomac Highlands | 750,000 | 130,000 | 17% |
| Tygart Valley Regional | 1,000,000 | (10,000) | (.01%) |
| Southwestern Regional | 925,000 | ( 6,000) | (.006%) |
| TOTALS: | $13,450,000 | $3,024,000 | 22% |

Note: The Corporation (PrimeCare Medical, Inc. presently and Pennsylvania Institutional Health Services formerly) has held these contracts since 1993 (14 years).

West Virginia Division of Juvenile Services:

| Facility (Jail) | Revenues | Gross Margin | Gross Margin % of Revenues |
|---|---|---|---|
| Industrial Home for Youth | $ 835,000 | $ 420,000 | 50% |
| Davis Juvenile Center | 410,000 | 250,000 | 60% |
| Donald R. Koon Juvenile Center | 200,000 | 30,000 | 15% |
| Chick Backbee Juvenile Center | 150,000 | (2,500) | (.01%) |
| Tiger Morton Juvenile Center | 150,000 | (26,500) | (17%) |
| North Central Juvenile Center | 150,000 | 8,000 | .05% |
| Southern Juvenile Detention Ctr. | 150,000 | 14,000 | .09% |
| Gene Spodaro Juvenile Center | 155,000 | 18,000 | 11% |
| Robert Shell Juvenile Center | 150,000 | (10,500) | (.07%) |
| Vicki Douglas Juvenile Center | 70,000 | (8,500) | (.12%) |
| TOTALS: | $2,420,000 | 692,000 | 28% |

     Many of the West Virginia Juvenile and Adult facilities are overcrowded and operating above the capacities cited in the original contracts. When this occurs the Corporation receives additional revenues as a per diem or per day/per inmate amount for this overage. The Corporation is expected to increase all services (nurse, physician, physician assistant and nurse practitioner hours) accordingly with these funds. At the time of the review by corporate operations staff the Corporation was nowhere close to fulfilling its obligations for base services let alone the additional hours required due to overcrowding.

     As I continually reminded you these practices are especially egregious considering the level of profits the Corporation was reaping. The Corporation (previously known as Pennsylvania Institutional Health Services, Inc.) founded by you has a history of failure to provide services required by contracts dating back to 1989.

When I was hired in March, 1990, the Corporation was embroiled in an investigation by the Pennsylvania Office of the Inspector General at the request of the Pennsylvania Department of Corrections for failure to provide contractually required physician services and on-site physician specialist services.  At that time, you attempted to include physician on-call time in the required hours.  I pointed out to you that this was not previously accepted in the early 1990's investigation in Pennsylvania and would not be accepted by the West Virginia corrections systems.  Despite my caution, you continued to direct managers in West Virginia to log and document these hours on the provider time records.

As I brought these issues to your attention over the years, my level of authority and access to information lessened at each site where issues arose.  You reassigned me from activities that provided direct contact with facilities and clients/wardens and from decision-making processes to duties in the corporate office.  Other Vice-Presidents, who did not possess my level of correctional expertise, were given oversight of these contracts.

The Dauphin County prison has never been bid since the Corporation was awarded the contract in 1988 – 19 years ago.  The West Virginia Regional Jails have been continuously awarded to the Corporation since 1993 – 14 years ago and the West Virginia Division of Juvenile Services were awarded to the Corporation at their inception several years ago.

The investigation at SCI-Camp Hill along with other events led to the cancellation of Camp Hill and four (4) other large Pennsylvania state prison medical contracts which devastated the Corporation and resulted in the loss of approximately 72% of the Corporation's business.  The types of business practices discussed in this correspondence involves 35 to 40% (including the Dauphin county Prison) of the Corporation's current business. All the Corporation's contracts could be in jeopardy when these practices are discovered by the various state and county agencies.

I also pointed out to you that the correctional medical industry is considered professional services which entail the awarding of contracts based on the Corporation's reputation, integrity, character and business practices.  The situation in Dauphin County is similar to those found in Berks, Franklin and other Pennsylvania county facilities.

As an officer of the Corporation, I believe it is my obligation to recommend that these transactions be independently audited and appropriate corrective action taken.

Sincerely,

*Richard C. Smith, MS, CCHP*

Richard C. Smith, MS, CCHP
Vice President for Operations

Cc:  Joshua Lock, Esq.,
      Vice President of Legal Affairs and Human Resources
      Frank P. Clark, Esq.



## PrimeCare
### MEDICAL, INC.
The Choice for Quality Correctional Healthcare

February 20, 2008

Richard C. Smith, M.S., CCHP
Hand - Delivered



DEPOSITION
EXHIBIT
9
S. Dougherty   5/5/09

**RE:    Job Duties**

Dear Mr. Smith:

On January 28, 2008, upon your return to work, you were asked to provide a
description of the work which you were performing when you left for surgery.  In
response, you have submitted all enumeration of your job duties which, in essence,
consisted of the following:

1. Regular meetings with Francis J. Komykoski, Todd W. Haskins, and Joshua
   D. Lock, "to discuss problematic issues" and "give direction on resolution
   of these issues";

2. Attend Vice Presidents meetings and "give comments and direction on
   issues effecting the legal and efficient operation of the Company";

3. Be available, "to give direction on issues relating to Labor Relations in
   Corrections";

4. "Advise Clinical and Operations staff...on issues where there are conflicts
   between prison operations/security staff and PrimeCare Medical staff";

5. "Review all Requests for Proposals that the corporation decides to pursue,"
   and:

   A. Detail technical proposal requirements of the RFPs such as due
      dates, format, required documentation, staffing, shipping and
      labeling, bonding as needed;

   B. Brief all departments on information needed to prepare or, in the
      case of contract renewals, update proposals;

   C. "Calculate DRAFT pricing and meet with President and Vice
      Presidents to finalize pricing";

   D. "Attend pre-bid conferences where necessary... to and in the
      preparation of the Technical and Pricing Proposal";

6.      Contracts:

        A.      Prepare all primary Contracts between PrimeCare Medical, Inc. and clients…";

        B.      Prepare all contracts for subcontractors";

7.      "Give Direction" on resolution of "problematic situations";

8.      "Field and make required calls to prospective clients and make presentations to obtain or solidify new or existing business";

9.      "Coordinate all issues regarding Performance Bonds";

10.      "Advise the Officers and Managers…on any and all issues that have a significant impact on the Company's integrity, reputation and continued viability."

11.      Review and analyze corporate financial data;

12.      Review and revise (as needed) corporate policy;

13.      Attend various professional meetings and conferences;

14.      "Other Management Duties as Required."

With respect to the duties which you enumerated, we would like you to immediately resume the following responsibilities in the manner described:

No. 1 -      As needed by PrimeCare Medical Vice-Presidents Francis J. Komykoski, Todd W. Haskins and Joshua D. Lock;

No. 2 -      PrimeCare Medical meetings of Vice-Presidents will occur, schedule permitting, at 9 AM each Monday. Please come prepared to report on work done during the preceding week;

No. 3 -      Subject to written approval of PrimeCare Medical President and upon request by the PrimeCare Medical employee primarily responsible for this function;

No. 4 -      See No. 3;

No. 5 -      Financial information will not be shared until completion of the internal investigation into allegations contained in your letter of January 28, 2008; thus, 5 – A.-B.-C. are also contingent upon completion of this internal investigation. Attendance at pre-bid conferences will be at the direction of PrimeCare Medical President only;

No. 6 -      See No. 5;

No. 7 -      See No. 3;

No. 8 -      Deferred until completion of internal investigation of allegations contained in your letter of January 28, 2008;

No. 9 -      See Item 8;

No. 10 -   As indicated.  Address all such advice to PrimeCare Medical President,
Executive Vice President and Vice President, Joshua D. Lock;

No. 11 -   See Item 8;

No. 12 -   Subject to written approval of PrimeCare Medical President and
PrimeCare Medical Vice-President of Operations, Francis J.
Komykoski;

No. 13 -   See Item 8;

No. 14 -   Subject to written approval of PrimeCare Medical President.

To the extent that resumption of some of the duties which you described is limited,
a review thereof is deferred until completion of the internal investigation into the
allegations in your January 28, 2008 letter.

Sincerely,

Carl A. Hoffman, Jr., D.O.,CCHP
President and Corporate Medical Director

CC:   Theresa Marie Hoffman, Executive Vice President
Joshua D. Lock, Esq., Vice President and Corporate Counsel

March 13, 2008

Carl A. Hoffman, Jr., DO, CCHP
President, Corporate Medical Director
PrimeCare Medical, Inc.
3940 Locust Lane
Harrisburg, PA  17109

RE:  Waste and Wrongdoing, York and Berks County Prisons; Previous Job Status and Duties

Dear Dr. Hoffman:

I previously made good faith reports that the company has caused waste and wrongdoing in regard to several contracts with Pennsylvania government entities. I made these reports verbally, and documented the same in writing on January 28, 2008. I continue to find more waste and wrongdoing.

It recently came to my attention that the company has failed to provide to at least two more counties the full complement of psychiatric services required under contracts between the company and the counties. In or about October 2007, the staff psychiatrist assigned to the York County Prison (YCP) terminated employment. The company, however, was contractually obligated to provide a minimum of 20 hours per week psychiatric coverage to YCP. In the absence of the terminated psychiatrist, another psychiatrist was shifted to provide some hours at YCP. The second psychiatrist's hours, however, did not satisfy the company's minimum contractual coverage with YCP; the remaining gap of minimum coverage at YCP that the company should have filled (such as by engaging a *locum tenens* psychiatrist) was instead left uncovered, in violation of the company's contractual obligation.

Furthermore, a psychiatrist shifted to cover some of the YCP obligation had been assigned at the Berks County Prison (BCP), where the company was also contractually obligated to provide minimum coverage of psychiatric services. Shifting the psychiatrist from BCP to YCP also left a coverage gap at the BCP; the company did not engage a *locum tenens* psychiatrist to fill the remaining gap of minimum coverage at BCP.

The YCP population includes a large contingent housed under York County's contracts with the U.S. Marshall's Service and U.S. Immigrations and Customs Enforcement (ICE). The BCP population includes a contingent housed under Berks County's contract with the U.S. Immigrations and Customs Enforcement (ICE).

The company's actions constitute waste and wrongdoing under its contracts with the respective counties. Furthermore, the company's actions also place both counties in likely breach of their obligations under federal contracts with the respective government entities. Again, I urge the company to conduct an independent audit of its transactions with the YCP and the BCP. I also urge the company to make a disclosure to the respective counties with a financial correction of the same. I am attempting earnestly to see that the company prospectively commits to honoring these contracts in all ways. Not correcting these issues will jeopardize the company's integrity,



DEPOSITION
EXHIBIT
15
S. Dougherty
5/5/09

which will adversely impact the company's business and ultimately affect the job security of our employees.

Further, I reiterate my request to be returned immediately to all job duties I formerly held in 2007.

Sincerely,

Richard C. Smith, MS, CCHP

Vice President for Operations

Cc: File

*Copy*

March 14, 2004

Carl A. Hoffman, Jr., DO, CCHP
President and Corporate Medical Director
PrimeCare Medical, Inc.
3940 Locust Lane
Harrisburg, PA 17109

Dear Dr. Hoffman:

I hereby give you notice that I regard myself as constructively discharged from employment with PrimeCare Medical, Inc. effective today, Friday March 14, 2008. I have attempted to resolve the intolerable work conditions that the company has imposed on me. My efforts to do so are unavailing. This letter is not intended to document every instance of intolerable conditions directed at me. I will provide a more detailed listing of the same as warranted. Nonetheless, I have experienced the following:

I took a medical leave beginning in May 2007. Despite the fact that I was physically able to return to my duties as Vice President of Operations, you specifically mandated that I stay off work "until I was 100%."

I persisted with you over several months that I was physically able to perform the essential functions of my position and thus resume my duties. Your response in December 2007 was to propose an employment agreement that obligated me to vacate the company headquarters and accept employment terminable at will under a title of consultant, and forfeit my health benefits.

I refused to accept those terms. After you advised me in writing to provide a doctor's return-to-work notice, I provided the same and returned on January 28, 2008. The company should have returned me to my former position, but did not. My former position entailed substantial day-to-day responsibility for the company's operations. Upon my return, I was essentially removed from duties that required decision-making or the exercise of judgment or discretion. The company assigned me almost no substantive duties. The company banned me from contacting client representatives and/or employees/subcontractors at all PrimeCare Medical contract sites. The employee who directly reported to me was no longer assigned to me. My office was moved, from a private workspace that reflected the prestige and responsibility of my position as Vice President of Operations, to a significantly smaller space near the reception desk containing Spartan furnishings.

The company unreasonably changed my working conditions to create an intolerable working climate to compel my leaving. The intolerable working conditions constitute retaliation and discrimination in violation of the law.

DEPOSITION EXHIBIT 16

S. Dougherty   5/5/09

This constitutes retaliation and discrimination, among other reasons, because I persisted in returning to my position, and I challenged the company's unreasonable and illegal requirement that I "be 100%" before I returned from my leave.

Another reason is because I insisted on exercising my rights under the Family and Medical Leave Act to return to my former position.

Another is because I made a good faith report of waste and wrongdoing in regard to contracts between the company and several Pennsylvania government entities. I documented these reports verbally and in writing. I submitted a detailed written report on January 28, 2008. I continue to make more good faith reports of waste and wrongdoing, most recently only yesterday, March 13, 2008. In the time since the detailed written report, the company has taken no steps to correct all waste or wrongdoing. The company has by all appearances ignored my reports and vilified me for alerting the company of lapses in its contractual obligations.

The company has denied my several requests to return to my former duties, including my renewed request of yesterday, March 13, 2008.

For the above reasons, I am leaving the employ of the company involuntarily, effective immediately. Kindly see that my final pay be direct deposited to my account.

Sincerely,

Richard C. Smith, MS, CCHP

Cc: File

**PrimeCare Medical, Inc.**                                   **EMPLOYEE LEAVE REQUEST**

| EMPLOYEE (PRINT NAME) | DATE OF REQUEST | FACILITY |
|---|---|---|
| Richard C. Smith | April 30 2007 | Corporate |

LEAVE DATES AND TIME REQUESTED
FROM May 10 2007 TIME 0900 AM PM        TOTAL # HOURS REQUESTED        # DAYS 2
TO May 11 2007 TIME 5:00 AM PM          16
RETURN ON May 14 2007 0900 AM PM        Gastric Bypass Surgery

☒ WITH PAY    ☐ WITHOUT PAY    ☐ BEREAVEMENT    ☐ JURY DUTY

EMPLOYEE SIGNATURE
*Richard C. Smith*

EMPLOYEE NOTIFIED: ☐ YES ☐ NO
VIA: _____ ON: _____
BY: _____
CORP. NOTIFIED: ☐ FAX ☐ MAIL ☐ PHONE

IMMEDIATE SUPERVISOR  ☒ APPROVED ☐ DISAPPROVED  DATE 30 APR 07
REASON: _____

CORP. USE ONLY:
DATE REC'D: _____ VIA _____
BY: _____

CONTRACT ADMINISTRATOR  ☐ APPROVED ☐ DISAPPROVED  DATE: _____
REASON: _____

VERIFIED PAYROLL DEPT.        DATE

Form 9033

---

**PrimeCare Medical, Inc.**                                   **EMPLOYEE LEAVE REQUEST**

| EMPLOYEE (PRINT NAME) | DATE OF REQUEST | FACILITY |
|---|---|---|
| Richard C. Smith | April 30, 2007 | Corporate |

LEAVE DATES AND TIME REQUESTED
FROM May 14 2007 TIME 9:00 AM PM        TOTAL # HOURS REQUESTED        # DAYS 11
May 28  TO May 26 2007 TIME 5:00 AM PM   88
RETURN ON May 29 2007 9:00 AM PM        Recovery from Surgery

☒ WITH PAY    ☐ WITHOUT PAY    ☐ BEREAVEMENT    ☐ JURY DUTY

EMPLOYEE SIGNATURE
*Richard C. Smith*

EMPLOYEE NOTIFIED: ☐ YES ☐ NO
VIA: _____ ON: _____
BY: _____
CORP. NOTIFIED: ☐ FAX ☐ MAIL ☐ PHONE

IMMEDIATE SUPERVISOR  ☒ APPROVED ☐ DISAPPROVED  DATE 30 APR 07
REASON: _____

CORP. USE ONLY:
DATE REC'D: _____ VIA _____
BY: _____

CONTRACT ADMINISTRATOR  ☐ APPROVED ☐ DISAPPROVED  DATE: _____
REASON: _____

VERIFIED PAYROLL DEPT.        DATE

Form 9033

DEPOSITION
EXHIBIT
19
S. Dougherty
6/5/09

To:   Carl A. Hoffman Jr., D.O., CCHP
      President, PrimeCare Medical Inc.
      3940 Locust Lane
      Harrisburg, PA 17109

From: Richard C. Smith
      366 Equus Drive
      Camp Hill, PA 17011

Date: 10 December 2007

RE:   Retirement

Dear Dr. Hoffman,

I spent the weekend reviewing my retirement from PrimeCare Medical Inc. with my
family. Since complete retirement at this time was not anticipated, I raise the following
issues/concerns with proposed solutions, along with an outline of the results of our
discussions on Friday 7 December 2007.

**Initial Discussion Results:**

- Payment of $120,000 per year for ten (10) years with a discussion after this period
  of an increase or decrease of this amount continuing forward based on the
  performance of the company at that time.

- Payment of an annual Christmas bonus each year to include payment of the bonus
  for 2007 on 10 December 2007 but no later than Friday 21 December 2007.

- Payment of $34,801.02 to PSECU to satisfy the loan on a 2007 Ford Freestyle
  SEL.

- Payment of an amount (approximately $8,000) necessary to satisfy a loan by the
  company to Richard C. Smith for the purchase of a 2004 Ford Expedition.

- We agreed that you would research if it were legal for me to continue as an
  employee as opposed to a contractor due to the following issues:

  > 1. 401(k) Participation would cease, creating negative tax consequences
  > for me.

  > 2. Life Insurance would be lost as I am not insurable by becoming a
  > contractor. I would lose my $100,000 company policy that is currently in
  > effect. I also lost a $72,000 policy previously surrendered by the
  > Company due to the transfer of the 401(k) plan to American Funds.

  > 3. Long Term Disability would be discontinued and since I am not
  > insurable would be impossible for me to replace.

DEPOSITION
EXHIBIT
20
S. Dougherty
5/5/09

4. <u>Health Care Insurance</u> would be moved to Pinnacle Health for my wife Teresa and I. The cost on Friday was unknown, although the Company pays in excess of $10,000 annually for our health coverage.

- <u>Pursuit of Professional Employment</u>. We agreed at the 7 December 2007 meeting that I was free to work in Corrections, Correctional Health Care, Operations and Treatment, etc. We agreed that I would always respect PrimeCare Medical, Inc. and would expect the same in return from PrimeCare Medical, Inc. for me or any business pursuit I choose.

**Additional Issues/Concerns Researched:**

- <u>401(k) Loans.</u> This is not an issue if I remain an employee. However, if I become a contractor, my 401(k) loans of $35,256.53 are immediately due and payable by 31 December 2007 (with a ninety (90) day grace period to 31 March 2008) or they are considered a taxable distribution in 2007 with a 10% penalty (see attached).

- <u>Health Care Insurance</u> is possible for us with Pinnacle Health. The open enrollment period is November 2008. To make the change effective 1 January 2008, there must be a Major Life Event which must be explained in writing by my employer (the current entity supplying coverage). The cost to me should be approximately $4,971.00 per year.

- <u>Palm Treo 650 Cell Phone</u> which is currently owned by PrimeCare Medical, Inc.

- <u>Penn State Football Tickets</u> if you still want the four (4) tickets we must pay by March 2008. The cost is $2,179.33. Please do not feel obligated as we can use the tickets if you don't want them.

- <u>Employee or Contractor</u>. We need something in writing for scenarios that arise (i.e. employment and income verification for credit applications and other situations)

**Proposed Resolution of All Issues:**

- <u>Base Annual Compensation of $120,000.00 per year for ten (10) years.</u> After this period, a discussion of an increase or decrease of this amount continuing forward will take place based on the performance of the company at that time.

- <u>Annual Christmas Bonus</u>. Pay $15,000.00 per year to be added to Base Annual Compensation and paid with annual compensation bi-weekly or monthly (Annual Total Compensation plus Bonus = $135,000.00).

- <u>Health Care Coverage.</u> Whether an employee or contractor, we will move coverage to Pinnacle Health. This will result in a savings of over $5,000.00 per year to PrimeCare Medical, Inc. and the removal of me with my previous negative

claim experience from the employee pool.  PrimeCare will pay an additional $4,971.00 to be added to annual compensation bi-weekly or monthly (Annual Total Compensation plus Bonus and Health Care Costs = $139,971.00).

- 2007 Ford Freestyle SEL – Pay current loan balance of $34,801.02 on 1 January 2008.

- 2004 Ford Expedition loan outstanding (approximately $8,000.00).  Consider this loan paid in full as of 1 January 2008.

- 401(k) Loans.  No action necessary if employee status is maintained.  If I become a contractor, PrimeCare Medical, Inc. shall consider a one time lump sum payment of loans ($35,256.53) between 1 January 2008 and 31 March 2008 due to the following:

  1. Significant tax implications for 2007/2008 if loans are considered a taxable distribution.

  2. 10% tax penalty of $3,525.65 if considered a taxable distribution.

  3. Loss of future retirement investment income.

- Life Insurance  If I remain an employee please realize when considering this proposal the loss of the $72,000 policy could prove devastating to my family in the future.  If I become a contractor both policies are lost to my family.  I ask that you consider an increase in annual compensation or one time lump sum payment in a "reasonable" amount to be discussed prior to finalizing this agreement.

- Payroll Taxes.  If I remain an employee, no action is necessary.  However, as a contractor I will have to pay the employer portion of Medicare and Social Security (approximately $8,000 annually).  If I do become a contractor I ask that this amount be added to my Base Annual Compensation.

- Employee or Contractor Documentation.  Regardless whether I remain an employee or contractor, PrimeCare Medical Inc. will provide any necessary documents to show proof of employment, previous health coverage, and income that are requested by any potential creditors, insurers, etc.

- Palm Treo 650.  Permit me to retain the Palm Treo 650 cell phone (not service, just the phone itself).

- Pursuit of Professional Employment.  Per the above-referenced agreement reached at the 7 December 2007 meeting, I am free to work in Corrections, Correctional Health Care, Operations and Treatment, etc.  We agreed that I would always respect PrimeCare Medical, Inc. and would expect the same in return from PrimeCare Medical, Inc. for me or any business pursuit I choose.

-   <u>Termination of the Agreement/Sale of the Company</u>.  Most importantly you
    promised to always provide for me and my family.  On Friday 7 December 2007
    you stated "if you die in three (3) years this agreement is off."  This clearly
    contradicts your continual promises to provide for <u>both</u> me <u>and my family</u>.  I
    propose that the agreement continue for ten (10) years in the event of my death,
    with payment to my wife or heirs.  If I live beyond ten (10) years, this agreement
    will be reviewed as covered above.  Should the ownership of the company change
    at any time I shall be paid $1,000,000 from the sale as promised on Friday,
    December 7, 2007 and on several prior occasions.

In the eighteen (18) years I worked for you I did my best to make sugar out of
lemonade in dealing with Jack Branyan, Jeff Snell, Bill Anderson, John Kerr, Terry
Henry and others too numerous to mention.  I have always put the company and at
times your family first in my day to day life.  I tried to teach everyone you brought in
to the company my end of the business and attempted to make all these people
accepted and successful while they and I were being undermined by the inept staff
listed above.

Unlike most other people I have constantly tried to improve myself as a person,
leader, and employee with regard to education and health issues.

I certainly didn't build this company myself, but was a key member of a small team
of people that took it from a small start up company through the war with the State
and Licensure Board to what it is today.  I have been a loyal, supportive and
dedicated employee and have been proud of what we have accomplished.  I want to
step away with a positive feeling, live in retirement comfortably with little disruption
to my family as I deserve.  I am hopeful that all the years, good times and traumatic
times will be considered as your make your decision on the critical issue at hand.

It was my intent to return to employment several months ago full time and continue
my employment and career.  As you explained at our 7 December 2007 meeting it is
your decision for me to become a Contractor, leave the company effective 1 January
2008 and only be involved in company issues if called and requested by the company.

It is requested that this issue be resolved by Friday 14 December 2007 so that both
you as well as myself and my family may have final resolution to this issue and end
any uncertainty that currently exists.


Sincerely,

*Richard C. Smith*

Richard C. Smith


Enclosure(s)

# CLARK & KREVSKY, LLC

FRANK P. CLARK
FPC@Clark-Krevskylaw.com

SOLOMON Z. KREVSKY
SZK@Clark-Krevskylaw.com

P. O. Box 1254
CAMP HILL, PA 17001-1254

———

(717) 731-8600
FAX (717) 731-4764

www.Clark-Krevskylaw.com

STREET ADDRESS:

20 ERFORD ROAD, STE 300A
LEMOYNE, PENNSYLVANIA 17043

January 23, 2008

BY EMAIL AND FACSIMILE TO 234-6808
Michael J. Crocenzi
GOLDBERG KATZMAN
320 E. Market St.
Harrisburg, PA 17101

RE:   Smith, Richard C.--PrimeCare Medical, Inc.

Dear Mike:

Enclosed please find the Return to Work notice from Rick Smith's doctor. He has been ready, willing and able for some time to return to work. Kindly advise me when PrimeCare Medical will accept Mr. Smith to resume his position of Vice-President of Operations.

Sincerely,

FRANK P. CLARK

Enclosure
cc:   Richard C. Smith

DEPOSITION
EXHIBIT
22
S. Dougherty   5/5/09

# EMPLOYMENT LAW · EDUCATION LAW · LITIGATION

01/23/2008  16:31    717-731-4764          KREVSKY LW/CLARK LW                    PAGE  03/03

# INTERNISTS
## of Central Pa. LTD.

Peter M. Brier, M.D.
Michael L. Gluck, M.D.
James A. Tyndall, M.D.
Ira J. Packman, M.D.
Richard Schreiber, M.D.
Michael A. Pachuck, M.D.
Chris J. Denis, M.D.

Dominic Mirarchi, D.O.
Wendy Schacren, M.D.
Patrick RebManny, M.D.
V. Martha Kapoor, M.D.
Shubha R. Acharya, M.D.
Ancaal Biswanathan, M.D.
Alan J. Sweeney, M.D.

Roxana Vargas, M.D.
Harry S. Sahi, M.D.
Dean L. Lehman, PA-C
Vinayshree Kumar, PA-C
Jody Searight, PA-C
Brent W. Calhoon, PA-C
Lisa M. Fittenger, PA-C

HARRISVIEW PROFESSIONAL CENTER • 108 LOWTHER ST. • LEMOYNE, PA 17043 • (717) 774-1366 FAX (717) 774-4232

January 17, 2008

Dear MR. Smith,

January 17, 2008

To Whom It May Concern:

Richard C. Smith is my patient. Patient had gastric bypass in
May 2007. Since that time his weight has gone from 315 pounds to
203 pounds.  The patient was cleared to return to work on
September 20, 2007 as is documented in my notes. The patient has
told every appointment since that time that he is being paid
full salary by his employer and could not return to work until
he was "100%".  I offered to talk to his employer, Dr. Hoffman,
however I never received a call.  The patient has been seen
monthly since his gastric bypass surgery. He has definitely
improved. His mind is good. He physically is able to return to
work and I instructed him on that point since September 20,
2007.  His medical condition is currently stable with mild
residual problems. His medications are not a problem. He was
converted from atrial fibrillation to sinus rhythm. He remains
stable at this time. I have discussed this with Mr. Smith on
multiple occasions. Currently his vital signs are stable. His
physical exam is essentially within normal limits with a few
minor abnormalities such as venous stasis and mild edema.

Please contact me with any questions.

Sincerely,

Peter M. Brier, M.D./H2 Trans

Sincerely,