IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD C. SMITH, | : | No. 1:08-cv-1397 |
| Plaintiff | : | Civil Action – Law |
| | : | |
| vs. | : | |
| | : | |
| PRIMECARE MEDICAL, INC., | : | Chief Judge Kane |
| CARL A. HOFFMAN, JR., D.O., | : | |
| THERESA M. HOFFMAN, | : | |
| JOSHUA D. LOCK, | : | Jury Trial Demanded |
| MARCY HOFFMAN-SCHLEGEL, | : | |
| FRANK KOMYKOSKI, and | : | |
| KNIGHTS OF VON DUKE, LTD., | : | |
| Defendants | : | |

## **DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.  At all times relevant to the Complaint, the Plaintiff, Richard C. Smith (hereinafter "Smith"), was a Vice President of Operations for PrimeCare Medical, Inc. (hereinafter "PrimeCare"). (Compl., ¶32 – Doc. 1; Amended Answer – Doc. 26, ¶32.)

2.  During his employment with PrimeCare, Smith was an at-will employee. (Record Ex. C; Dr. Carl Hoffman Affidavit, ¶4, hereinafter "Hoffman").

3.  PrimeCare is a private, for-profit corporation with headquarters located at 3940 Locust Lane, Harrisburg, Dauphin County, Pa 17109. (Record Ex. C; Hoffman Affidavit, ¶2.)

4.  Dr. Carl Hoffman, Jr., D.O., CCHP, formed PrimeCare in 1986 and has served as President and Corporate Medical Director since its inception. (Record Ex. D; Hoffman Dep., p. 4, ls. 22-25 and p. 5, l. 1.)

5.  Dr. Hoffman is the sole shareholder of PrimeCare. (Record Ex. D; Hoffman Dep., p. 5, ls. 6-7.)

6.  Counties and authorities contract with PrimeCare to provide medical services for inmates and detainees in juvenile correctional facilities, jails, and prisons. PrimeCare is currently managing healthcare service contracts in 53 correctional facilities in 3 states, including New Hampshire, Pennsylvania, and West Virginia. (Record Ex. C; Hoffman Affidavit, ¶3.)

7.  Smith reported directly to Dr. Hoffman. Dr. Hoffman was his supervisor. No one else at PrimeCare supervised Smith's job duties. (Record Ex. C; Hoffman Affidavit, ¶5.)

8.  In recognition of Smith's service to PrimeCare, Dr. Hoffman allowed Smith to participate in purchasing 15,000 shares during the initial capitalization of the Knights of Von Duke, Ltd., which is a British Virgin Islands corporation. (Record Ex. D; Hoffman Dep., p. 11, ls. 12-24; Record Ex. E; Smith Dep., Ex. 1.)

9.  On August 18, 1999, Dr. Hoffman presented Smith with a Shareholder's Agreement regarding the Knights of Von Duke, Ltd. Smith signed

2

179688.1

the Shareholder's Agreement on August 18, 1999. (Record Ex. E; Smith Dep., p. 6, l. 10 – p. 7, l. 6; Smith Dep. Ex. 1.)

10. The Shareholder's Agreement included a Promissory Note executed by Smith indicating that Dr. Hoffman was lending Smith $15,000 to purchase the shares of stock. Smith had two years from August 18, 1999 to pay off the loan. Dr. Hoffman held the stock as collateral for the loan. (Record Ex. E; Smith Dep., p. 6, l. 10 – p. 7, l. 6; Smith Dep., Ex. 1.)

11. Smith did not receive any shares of stock in Knights of Von Duke, Ltd. (Record Ex. E; Smith Dep., p. 9, ls. 11-13.)

12. Smith did not make any payments pursuant to the Promissory Note executed on August 18, 1999. (Record Ex. E; Smith Dep., p. 8, ls. 9-11.)

13. Dr. Hoffman wrote a letter to Smith dated January 11, 2002 indicating that Smith had failed to make any payments of principal and interest on the Promissory Note that was due August 23, 2001. Dr. Hoffman then stated: "Since payment was not made at that time, I am, as holder of the Note, authorized to cause the transfer of the shares to me in satisfaction of the loan." (Record Ex. E; Smith Dep., Exs. 2 and 3; Smith Dep., p. 8.)

14. All bills regarding costs related to the treatment of infectious diseases are sent to the warden, superintendant, or administrator of the correctional facility. (Record Ex. E; Smith Dep., p. 24, ls. 1-4.)

15. Smith approved a policy regarding the use of the Release of Financial Responsibility form on April 1, 1998. (Record Ex. E; Smith Dep., p. 13, ls. 6-18; Smith Dep., Ex. 4.)

16. Because of health conditions, Smith scheduled a gastric bypass surgery for May 10, 2007. (Compl., Doc. 1, ¶67; Defendants' Amended Answer, Doc. 26, ¶67.)

17. Smith had no leave time available to him as of May 10, 2007. (Record Ex. C; Hoffman Affidavit, ¶7.)

18. Smith completed employee leave requests indicating that he would be off work from May 10, 2007 through May 28, 2007 for his gastric bypass surgery. (Record Ex. E Smith Dep., p. 93, l. 24 – p. 94, l. 5; Smith Dep., Ex. 19.)

19. Smith never spoke with Dr. Hoffman or Marcy Hoffman-Schlegel, Jr. Vice President of Human Resources, about the FMLA prior to his surgery. (Record Ex. E; Smith Dep., p. 94, ls. 6-13, p. 97, ls. 9-17.)

20. Prior to May 10, 2007, Smith was aware that PrimeCare was subject to the FMLA in that PrimeCare dealt with FMLA issues constantly. (Record Ex. E; Smith Dep., p. 97, ls. 18-25.)

21. It never crossed Smith's mind that his medical leave of absence starting on May 10, 2007 was covered by the FMLA. (Record Ex. E; Smith Dep., p. 98, ls. 1-5.)

179688.1

22. According to Smith, the FMLA was not an issue when he took his medical leave of absence on May 10, 2007. (Record Ex. E; Smith Dep., p. 95, ls. 13-16.)

23. No one from PrimeCare advised Smith of his rights and obligations under the FMLA prior to his gastric bypass surgery on May 10, 2007. (Record Ex. D; Hoffman Dep., p. 69, ls. 12-16.)

24. Despite submitting a leave request through only May 28, 2007, Smith did not return to work until January 28, 2008.

25. Pursuant to Dr. Hoffman's direction, PrimeCare paid Smith his full salary and benefits while he was on a medical leave of absence from May 10, 2007 through January 28, 2008. (Record Ex. C Hoffman Affidavit, ¶8; Record Ex. D; Hoffman Dep., p. 69, ls. 16-25, p. 70, l. 1.)

26. Smith did not speak with Dr. Hoffman about any of his allegations of waste and wrongdoing while Smith was on his leave of absence from May 10, 2007 through January 28, 2008. (Record Ex. E; Smith Dep., p. 58, ls. 5-10.)

27. Smith and Dr. Hoffman met on December 7, 2007. During the meeting on December 7, 2007, Dr. Hoffman suggested to Smith that he become semi-retired, but continue to work as a consultant for PrimeCare and he would pay Smith more than $100,000 per year. There was no resolution between Smith and Dr. Hoffman at the conclusion of the meeting on December 7, 2007 regarding any

terms of Smith's role at PrimeCare and his financial/fringe benefit package. (Record Ex. E; Smith Dep., p. 103, l. 23 – p. 105, l. 14; Record Ex. D; Hoffman Dep., p. 82, l. 24 – p. 86, l. 20.)

28. After PrimeCare's Christmas luncheon on December 10, 2007, Smith gave Dr. Hoffman a letter dated December 10, 2007 regarding Smith's proposal about transitioning to a consultant position with PrimeCare. (Record Ex. E; Smith Dep., p. 105, ls. 18-20; Smith Dep., Ex. 20.)

29. Hoffman then authorized PrimeCare's attorneys to draft an agreement to be presented to Smith. (Record Ex. D; Hoffman Dep., p. 96, ls. 10-12.)

30. Josh Lock met with Smith at a local restaurant and handed him the proposed agreement on behalf of PrimeCare. No agreement was reached at the meeting. (Record Ex. F; Lock Dep., p. 163, l. 17 – p. 162, l. 16.)

31. Within a short time after the meeting at the local restaurant, Smith and Lock were speaking on the telephone regarding the consultant position when Smith told Lock that he had sufficient equity in a vacation home to finance any litigation against PrimeCare if he chose to pursue it. (Record Ex. F; Lock Dep., p. 164, l. 24 – p. 165, l. 12.)

32. On or prior to January 7, 2008, Smith retained a lawyer to represent him in his negotiations with Dr. Hoffman about Smith's role and financial package as a consultant for PrimeCare. (Compl., Doc. 1, ¶87.)

179688.1

33. Smith's attorney faxed a letter from Dr. Brier dated January 17, 2008 to counsel for PrimeCare on January 23, 2008. Dr. Brier's note indicated that Smith was cleared to return to work on September 20, 2007. (Record Ex. E; Smith Dep., p. 106, l. 25 – p. 107, l. 8; Smith Dep., Ex. 22.)

34. Smith conceded that it was hard for him to remember dates when he spoke to Dr. Brier about returning to work, so he deferred to Dr. Brier's medical records pertaining to when he was released to return to work. (Record Ex. E; Smith Dep., p. 99, ls. 4-18.)

35. Smith's treating physician, Dr. Peter N. Brier, first released Smith to return to work on September 20, 2007. (Record Ex. E; Smith Dep., p. 107, ls. 4-8; Smith Dep., Ex. 22.)

36. Even though Dr. Brier indicates in his letter of January 17, 2008 that Smith had been cleared to work on September 20, 2007, PrimeCare had no knowledge of such a release until Smith's attorney faxed Dr. Brier's letter to PrimeCare's attorney on January 23, 2008. (Record Ex. C; Hoffman Affidavit, ¶9.)

37. Smith returned to work at PrimeCare on January 28, 2008 at approximately 8:00 a.m. He immediately met with Josh Lock and Theresa Hoffman at his newly-assigned office. (Record Ex. E; Smith Dep., p. 68, ls. 17-23.)

179688.1

38. At the beginning of the meeting, Lock and Theresa Hoffman shared various instructions regarding Smith's new office and work procedures. (Compl., Doc. 1, ¶91(a) – (m); Defendants' Amended Answer, Doc. 26, ¶91(a) – (m).)

39. After Lock and Theresa Hoffman had shared their instructions with Smith, Smith gave them a letter dated January 28, 2008 addressed to Dr. Hoffman in a sealed envelope. (Record Ex. E; Smith Dep., p. 68, l. 24 – p. 71, l. 14; Smith Dep, Ex. 5; Record Ex. G; Theresa Hoffman Dep., p. 75, ls. 8-14, p. 87, ls. 5-12.)

40. After Dr. Hoffman received Smith's letter of January 28, 2008, PrimeCare hired an independent investigator to conduct an investigation into Smith's allegations of waste and wrongdoing. (Record Exb. D; Hoffman Depo., p. 116, l.22, p. 117, l.8.)

41. After Dr. Hoffman received Smith's January 28, 2008 letter, Smith was permitted to discuss business during the vice president's meetings, but he was not given any work assignments and was not representing PrimeCare. (Record Ex. D; Hoffman, Dep., p. 110, ls. 7-11, p. 116, ls. 8-11; p. 115, ls. 6-11.)

42. Smith was aware that PrimeCare had initiated an investigation into his allegations contained in his letter of January 28, 2008 as early as February 20, 2008. (Record Ex. E; Smith Dep., Ex. 9, p. 3.)

43. Smith wrote a letter to Dr. Hoffman dated March 13, 2008, which Smith delivered to Dr. Hoffman on March 13, 2008. The letter contained Smith's

179688.1

allegations of additional waste and wrongdoing. (Record Ex. E; Smith Dep., p. 78, ls. 4-7; Smith Dep., Ex. 15; Compl., Doc. 1, ¶94 and Defendants' Amended Answer, Doc. 26, ¶94.)

44. The first time Smith ever advised Dr. Hoffman of the allegations of waste and wrongdoing contained in the March 13, 2008 letter was when Smith delivered the March 13, 2008 letter to Dr. Hoffman. (Record Ex. E; Smith Dep., p. 78, ls. 14-18.)

45. Smith hand-delivered a letter dated March 14, 2008 to Dr. Hoffman and then left the building. (Record Ex. E; Smith Dep., p. 82, ls. 1-3, p. 83, ls. 10-11; Smith Dep., Ex. 16.)

46. No one at PrimeCare ever told Smith that his employment was terminated and not to show up for work on and after March 14, 2008. (Record Ex. E; Smith Dep., p. 83, ls. 16-18.)

47. In addition to the allegations of waste and wrongdoing contained in the letters of January 28, 2008 and March 13, 2008, Smith alleges he made verbal reports of waste and wrongdoing to Dr. Hoffman at some point prior to his medical leave of May 10, 2007. (Compl., Doc. 1, ¶¶55-64.)

48. Dr. Hoffman never threatened Smith with any retaliation when Smith allegedly made the verbal reports of waste and wrongdoing to Dr. Hoffman prior to

179688.1

May 10, 2007. There was no threat of any reprisal against Smith. There were no threats or intimidation. (Record Ex. E; Smith Dep., p. 33, ls. 4-15, p. 57, ls. 3-7.)

49. Dr. Hoffman never prohibited Smith from contacting any governmental official regarding any allegation of waste or wrongdoing. (Record Ex. C; Hoffman Affidavit, ¶10.)

50. Dr. Hoffman paid Smith a base salary of $129,562 and bonuses totaling $14,647.61 in 2006. (Record Ex. C; Hoffman Affidavit, ¶6.)

51. Dr. Hoffman paid Smith a base salary of $129,624 and the following bonuses in 2007: March 16, 2007 - $20,000; June 28, 2007 - $12,789.36; December 21, 2007 - $14,564.14. (Record Ex. C; Hoffman Affidavit, ¶6.)

52. Any nurse vacancies at the Dauphin County Prison were either filled by Tom Toolan, the Health Services Administrator at the Dauphin County Prison for PrimeCare, or PrimeCare personnel from other facilities. (Record Ex. H - Toolan Affidavit, ¶8; Record Ex. N - DeRose Affidavit ¶9)

53. Warden DeRose of the Dauphin County Prison was aware of PrimeCare's difficulties keeping medical staff positions filled, which included the nurse supervisor position. Staffing was always a topic at the monthly prison staff meetings that included senior staff of Dauphin County Prison and PrimeCare. Staffing was also discussed at the quarterly meetings between prison officials and

179688.1

PrimeCare regarding PrimeCare's services at the prison. (Record Ex. N; DeRose Affidavit, ¶9).

54. Warden DeRose was fully aware of PrimeCare's staffing issues and certainly never considered PrimeCare to be acting in a fraudulent manner or wasting Dauphin County resources. (Record Ex. N; DeRose Affidavit, ¶10).

55. Pursuant to the 2004-2008 contract with Dauphin County, PrimeCare was to provide 20 hours of psychiatric service to Dauphin County Prison. (Record Ex. D; Hoffman Dep., p. 51, ls. 10-15.)

56. Smith signed off and approved psychiatrists' schedules, which required Dr. Enos Martin to work 10 hours per week at Dauphin County Prison. (Record Ex. C; Hoffman Affidavit, ¶11).

57. Periodically in 2006 and 2007, Dr. Martin inquired of Smith about his hours at Dauphin County Prison. Smith responded that Dr. Martin was doing a good job and not to worry about the hours. (Record Ex. I; Dr. Martin Affidavit, ¶6.)

58. Smith told Dr. Martin that he should work approximately 12 hours per week at the Dauphin County Prison. (Record Ex. I; Dr. Martin Affidavit, ¶3.)

59. Dr. Martin did not bill his on-call hours spent providing services to facilities, including Dauphin County Prison, to PrimeCare as a separate charge. (Record Ex. I; Dr. Martin Affidavit, ¶8.)

179688.1

60. Warden DeRose works non-traditional hours at the Dauphin County Prison. He saw Dr. Martin on weekends and holidays at the prison in addition to his regularly scheduled hours at the prison, which convinced Warden DeRose that Dr. Martin was providing the number of hours required by the contract. Warden DeRose never had any problem with Dr. Martin's hours or work performance. (Record Ex. N; DeRose Affidavit, ¶5).

61. Dr. Erik Von Kiel was on site at the Lancaster County Prison two days per week starting November 1, 2007 when Lancaster County awarded a contract to PrimeCare. (Record Ex. J; Dr. Von Kiel Affidavit, ¶2.)

62. In addition to the times on site, Dr. Von Kiel was available 7 days a week, 24 hours per day to take any calls from Rodney Hostetter, a physician assistant. (Record Ex. J; Dr. Von Kiel Affidavit, ¶4.)

63. In addition to Dr. Von Kiel, Dr. Drue Wagner and Dr. William Young also provided physician services at Lancaster County Prison. (Record Ex. K; Komykoski Affidavit, ¶3.)

64. Warden Guarini received quarterly staffing reports from PrimeCare, and he was satisfied with PrimeCare's staffing at the Lancaster County Prison. (Record Ex. K - Komykoski Affidavit, ¶¶4, 5; Record Ex. L - Guarini Affidavit, ¶¶6, 9.)

179688.1

65. Francis Komykoski, Vice President of Operations for PrimeCare, sent an email dated April 25, 2008. (Record Ex. M; Komykoski Dep., p. 122, l. 22 – p. 123, l. 5; Komykoski Dep., Ex. 4.)

66. Smith could not determine whether Komykoski's email of April 25, 2008 prevented his new company from getting any work. (Record Ex. E; Smith Dep., p. 111, l. 25 – p. 112, l. 2.)

                                                   Respectfully submitted,

Date:  September 1, 2009        By:  /s/ Michael J. Crocenzi
                                                Goldberg Katzman, P.C.
                                                320 Market Street, P.O. Box 1268
                                                Harrisburg, PA  17108-1268
                                                (717) 234-4161
                                                Attorney Pa. I.D. #66255
                                                *Attorneys for Defendants*

179688.1