IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD C. SMITH, | : | No. 1:08-CV-1397 |
| Plaintiff | : | |
| | : | |
| v. | : | Civil Action – Law |
| | : | |
| PRIME CARE MEDICAL, INC., | : | |
| CARL A. HOFFMAN, JR., D.O., | : | |
| THERESA M. HOFFMAN, | : | |
| JOSHUA D. LOCK, MARCY | : | Chief Judge Kane |
| HOFFMAN-SCHLEGEL, FRANK | : | |
| KOMYKOSKI, and KNIGHTS OF | : | |
| VON DUKE, LTD. | : | Jury Trial Demanded |
| Defendants | : | *Electronically Filed* |

# SWORN STATEMENT OF RICHARD C. SMITH

1.     My name is Richard C. Smith, and I am the Plaintiff in the above-captioned matter; I provide information in this sworn statement to support a Motion for Partial Summary Judgment in the above-captioned matter; I make this sworn statement under oath and subject to the penalties of law for false swearing.

2.     I received a Bachelor's Degree in 1976 from the Pennsylvania State University in Law Enforcement and Corrections.

3.     I received a Master of Science Degree in Health Services Administration, in 1998 from the University of St. Francis.

4.      I am a Certified Correctional Health Professional (CCHP) as recognized by the National Commission on Correctional Health Care.

5.      I was employed by the Pennsylvania Department of Corrections from May 1977 to January 1990, starting as a Corrections Officer and rising to the rank of Deputy Superintendent for Operations at the State Correctional Institution at Camp Hill before retiring in 1990.

6.      After retiring from the Department of Corrections, I was hired by Pennsylvania Institutional Health Services, Inc. ("PIHS") on or about March 30, 1990.

7.      In or about 1993, after PIHS changed its name to PCM, I was appointed PCM's Director of Operations.

8.      In my role as PCM's Director of Operations, I had responsibility for the day-to-day operations of PCM.

9.      Despite my title as Director of Operations, decision-making of all material company actions was actually controlled by PCM's President and owner, Carl A. Hoffman, D.O.

**PCM violations of the FMLA**

10.    On May 10, 2007, when I was still employed by PCM, I underwent gastric bypass surgery.

11.    I disclosed to PCM in advance of my surgery that I expected to require approximately three (3) weeks of absence for surgery and recovery.

12.    When I went on leave in May 2007, PCM did not advise me of my rights under the FMLA.

13.    When I went on leave in May 2007, PCM did not give me a written notice that it required a fitness for duty certification as a condition of my return to work.

14.    At no time before or after I went on leave in May 2007 did PCM give me any written notice that it imposed any pre-condition for my return to work.

15.    My surgery and post-surgery care resulted in complications that caused injuries to my lung, left shoulder, the nerves controlling fingers on my left hand, and wounds to both feet.

16.    I spent two days following my surgery in intensive care and was discharged to inpatient physical therapy and then discharged to my home, from which I received treatment from an outpatient Wound Clinic, Pinnacle Health's Frederickson Center, for approximately four months.

17.     Notwithstanding my injuries from the surgical complications, the physical requirements of my position as Vice President of Operations were minimal and unaffected by said injuries.

18.     At no time has PCM insisted verbally or in writing that the position of Vice President of Operations meet physical limitations.

19.     Notwithstanding my physical injuries from the complications of surgery, I could meet all mental and intellectual requirements of the position as Vice President of Operations at all times after surgery.

20.     Notwithstanding Paragraphs 17 through 19, PCM, through Carl Hoffman, required that I "be 100%" before I could return to work.

21.     After May 2007, Hoffman told me not to return to work until I was "100%," which I knew Hoffman meant "100% healed."

22.     During this period, I even asked Dr. Hoffman, a physician, to contact my personal physician, Dr. Peter Brier, to verify that I was able to return to work, but Dr. Hoffman declined to contact him.

23.     I was not 100% healed from the surgery, and continue to regard myself as not 100% healed from the surgery; I was nonetheless ready, willing and able to return to my position at PCM by July 2007.

4

24.     Beginning in or about July, 2007, I made requests to Hoffman asking to return to work, each of which Hoffman rebuffed by requiring that I first "be 100%" before I could return to PCM.

25.     On or about January 14, 2008, Defendants issued a letter addressed to me but delivered to my counsel advising me that I may return immediately to work in my position as Vice President of Operations for PrimeCare Medical, Inc., upon submission of a note from my physician.

26.     I returned to the PCM worksite on January 28, 2008.

27.     For all relevant times prior to my leave in May 2007, PCM's Vice President of Operations Frank Komykoski and I had an identical job title and job content.

28.     For all relevant times prior to my leave in May 2007, Komykoski and I reported directly to Dr. Hoffman.

29.     When I went on leave in May 2007, PCM had no written document that distinguished the content of my position from the content of Komykoski's position.

30.     When I returned to work on January 28, 2008, PCM did not restore me to the same job as before.

5

31.     When I returned to work on January 28, I was met by Joshua Lock, PCM's Vice President and General Counsel, and Theresa Hoffman, PCM's Executive Vice President.

32.     On January 28, Lock and Ms. Hoffman directed me to write down all my job duties prior to my leave and submit the same for review and that a decision as to my job duties would be made at a later date.

33.     On January 28, Lock and Ms. Hoffman prohibited me from having any company records or documents in my possession.

34.     On January 28, 2008, Lock and Ms. Hoffman directed that I give anything to be typed to Lock, who would decide whether it should be typed and by whom it would be typed, notwithstanding that I had a full time administrative assistant assigned to me prior to my taking leave.

35.     On January 28, Lock and Hoffman directed me that my company key fob was now programmed for entry to the PCM offices only for the hours of 7:45 AM to 4:45 PM, Monday through Friday, notwithstanding that my key fob was programmed for access 24-hours per day/ 7 days per week prior to my taking leave.

36.     On January 28, 2008, Lock required that I submit a letter from my physician identifying any narcotic medications, its dosage and duration, even though this was not a requirement of any drug or Prime Care policy; no other employees were asked to submit such a letter unless suspected of stealing medications.

37.     After my return on January 28, I was essentially assigned to a desk with no substantive work to perform.

**Knowledge of past PCM waste and wrongdoing**

38.     PCM is under contract to provide medical services at prisons/jails, including but not limited to the following Pennsylvania political subdivisions: County of Dauphin, County of Cumberland, County of Lancaster, County of York, and County of Berks, among others.

39.     PCM was awarded said contracts after submitting a technical and pricing proposal to the political subdivision in question.

40.     PCM prepared its technical and pricing proposals based in part on estimates of the hourly rates to pay professional service providers.

41.     PCM passed its hourly rates and personnel overhead costs onto the political subdivision through the pricing of the contract.

7

42.     Once PCM's technical and pricing proposal was accepted by the political subdivision, PCM then entered into a contract with the political subdivision.

43.     Pursuant to its contract with each political subdivision, PCM is required to provide contracted services and is therefore paid by the political subdivision.

44.     PCM has received funds from the Pennsylvania Counties of Dauphin, Cumberland, Lancaster, York, and Berks, among others.

45.     PCM's contracts with political subdivisions call for medical services to its prison that specify the specialty of services (e.g., psychiatric or dental) based on hours per a unit of time, such as 12 hours per week.

46.     In or about 1991, PCM (when operating under PIHS) was investigated by the Pennsylvania Inspector General on account of two contracts with the Pennsylvania Department of Corrections.

47.     The Inspector General concluded that PCM failed to provide contracted physician and psychiatric services for which the Department of Corrections had paid PCM.

48.     The Inspector General concluded, among other findings, that PCM provided 27 hours per week of psychiatric services to the Department of Corrections between June 1989 and October 1989, whereas the contract required 48 to 50 hours per week.

49.     I was not employed by PCM or PIHS when the Inspector General investigation occurred, but I knew of the allegations, both from my employment with the Department of Corrections and from my positions with PCM in or about 1993.

50.     For all relevant time, PCM had contracts with the West Virginia Division of Juvenile Services (WVDJS) and West Virginia Regional Jail Authority (WVRJA) to provide services at their facilities.

51.     In or about 2005 I learned that PCM was to be assessed by the West Virginia Division of Juvenile Services (WVDJS) for physician services that were contractually required but not provided by PCM in its contract with WVDJS.

52.     I had maintained little if any contact with PCM's operations in West Virginia since about 2000.

53.     Because of my limited contact with West Virginia operations, I requested more information about the assessment by WVDJS, and whether it

affected PCM's other operations in West Virginia, namely with the West Virginia Regional Jail Authority (WVRJA).

54.    I demanded of Dr. Hoffman that the problem be corrected and asked for a report by month of the difference between physician hours contracted for and physician services provided to WVDJS and WVRJA.

55.    PCM employee Frank Komykoski assembled research of physician hours contracted for and provided to WVDJS and WVRJA.

56.    I saw Komykoski's finished report (the "WV Deficiency Report"), which was in paper form and consisted of approximately 20 pages.

57.    The WV Deficiency Report appalled me.

58.    The WV Deficiency Report showed that PCM was providing substantially fewer physician hours at both the WVDJS and WVRJA contracts than was required by PCM's respective contracts with each.

59.    The WV Deficiency Report also showed that PCM used Physician Assistants and Nurse Practitioners as primary providers at WVDJS and WVRJA and provided very little physician time on site.

60.    I last possessed the WV Deficiency Report prior to my taking leave in May 2007; the document was among company records in my possession in my

10

former PCM office, but PCM removed this document and all other company records from my custody as of my return from leave in January 2008.

61.     In Plaintiff's Request for Production of Documents to PrimeCare Medical, Inc., I included a request for the following documents:

> "39.  All documents, including but not limited to any and all research and/or reports prepared in whole or in part by Defendant Komykoski and/or other PCM staff that compared the hours of physicians and/or physician assistants and/or nurse practitioners as required in PCM contracts with West Virginia Division of Juvenile Services and West Virginia Regional Jail Authority against the actual hours provided by physicians and/or physician assistants and/or nurse practitioners."

62.     The WV Deficiency Report prepared by Komykoski referred to in Paragraph 56, above, should have been produced but was not; instead, PCM produced a sanitized one page report, a true and correct copy of which is attached to this Affidavit as Exhibit 1.

63.     The document attached Exhibit 1 is not the WV Deficiency Report.

64.     After I reviewed the WV Deficiency Report, I strongly urged Hoffman to staff WV operations in accordance with the contract and to reimburse WVRJA for the shortfall.

**PCM waste and wrongdoing at Dauphin County**

65.     PCM's contract with Dauphin County for the period of 1997 through 2003 required that PCM provide 12 hours per week of psychiatric care at Dauphin County Prison.

66.     PCM's contract with Dauphin County for the period of 2004 through 2008 required that PCM provide an increase to 20 hours per week of psychiatric care at Dauphin County Prison.

67.     Beginning sometime around 2004, I was raising concerns to Hoffman that PCM was providing less than the contracted-for 20 hours per week at Dauphin County Prison, and I continued to raise said concerns with Dr. Hoffman through the taking of my leave in May 2007.

68.     Prior to my taking leave in May 2007, I raised concerns to Dr. Hoffman that PCM was deriving revenue from Dauphin County for psychiatric services that were being paid by the hour but not being provided, similar to the previous citation by the Pennsylvania Inspector General and the WVDJS, and similar to the shortages identified in the WV Deficiency Report.

69.     During the period 2004 through at least March 14, 2008, PCM engaged Enos Martin, M.D., as the psychiatrist principally providing psychiatric services by PCM at Dauphin County Prison

70.     For the period 2004 through 2008, Dr. Martin reported the time he provided psychiatric services to Dauphin County Prison on time sheets submitted to PCM for review by Theresa Hoffman and/or Dr. Carl Hoffman.

71.     Through discovery, PCM produced Dr. Martin's time sheets for the calendar years 2004 through 2008; a true and correct copy of the same (the "DCP Time Sheets") are appended to this Affidavit as Exhibits 2-4.

72.     Pages 1 through 10 of Exhibit 2 include a summary of the DCP Time Sheets, listing the bates number referenced, date of week ending, daily hours, total hours, and total shortfall.

73.     The DCP Time Sheets show that during the period of 2004 through 2008 there were only four weeks where PCM provided 20 or more hours of psychiatric services to Dauphin County Prison; and that during the same period of time [2004 through 2008] there were at least 205 weeks where PCM provided fewer than 20 hours of psychiatric services to Dauphin County Prision.

74.     PCM pays Dr. Martin based on the number of hours he reports to PCM.

75.     PCM prepared its technical and pricing proposal to Dauphin County for the 2004 to 2008 contract based in part on its estimate of PCM's cost to pay 20 hours per week of psychiatric services at Dauphin County Prison.

76.     After I returned from leave in January 2008, I specifically advised Dr. Carl Hoffman in writing that PCM was not providing the 20 hours per week of psychiatric services specified for Dauphin County Prison.

77.     After I warned Dr. Hoffman in writing that PCM was not providing the 20 hour per week of psychiatric services specified for Dauphin County Prison, Dr. Hoffman announced that PCM would provide 20 hours per week of psychiatric services at Dauphin County Prison.

78.     From my review of the DCP Time Sheets, Dr. Hoffman's purported announcement was not followed, as Dr. Martin's time sheets prove that PCM provided fewer than 20 hours per week of psychiatric services in 205 weeks between calendar years 2004 and 2008.

79.     PCM accepted funds from Dauphin County from 2004 through 2008 as if PCM was providing 20 hours per week of psychiatric services at Dauphin County Prison during this period of time, even though there were at least 205 weeks in said period where PCM did not.

14

80.    PCM was unjustly enriched by the difference between revenue derived from Dauphin County for the total amount of psychiatric service time contracted and the actual psychiatric service time that PCM provided.

81.    For the Dauphin County contract covering 2004-2008 PCM prepared its technical and pricing proposal for psychiatric services based on payments of approximately $200 per hour.

82.    For the Dauphin County contract covering 2004-2008, PCM derived unjust enrichment for psychiatric service time contracted for but not provided.

83.    For each year from 2004 through 2008 the total number of hours difference in the weeks where PCM failed to provide 20 hours or more of psychiatric time at Dauphin County Prison is as follows:

| Year | Shortage (in hours) |
|------|---------------------|
| 2004 | 397.25 |
| 2005 | 459.00 |
| 2006 | 416.00 |
| 2007 | 449.50 |

| 2008 | 160.00 |
|------|--------|
| **Total** | **1,881.75** |

84.     Because PCM's contract with Dauphin County included a technical and pricing proposal that called for payments of approximately $200 per hour for psychiatric services based on 20 hours of such services per week, PCM was unjustly enriched in the amount of approximately $375,000 during the period of 2004 through 2008 for the 1,881.75 hours contracted for but not provided.

**PCM waste and wrongdoing at Lancaster County**

85.     PCM's contract with Lancaster County for the period of November 2007 through October 2010 requires 24 hours per week staffing from a Medical Director/Physician at the Lancaster County Prison.

86.     PCM provided such services to Lancaster County through Eric VonKiel, D.O.

87.     Through discovery, PCM produced Dr. VonKiel's time sheets for November 2007 through 2008; a true and correct copy of the same (the "LCP Time Sheets") are appended to this Affidavit as Exhibit 5.

88.     Pages 1 and 2 of Exhibit 5 include a weekly summary of the LCP Time Sheets, listing hours reported by Dr. VonKiel per day, the total hours for the week, and the shortfall for the week (representing the difference between the 24 hours per week required and the actual hours provided).

89.     The LCP Time Sheets show records for 50 weeks between November 2007 and November 2008; four (4) weeks in this time period were not produced by PCM.

90.     Of the 50 weeks produced in the LCP Time Sheets, Dr. VonKiel provided less than 24 hours to LCP each week.

91.     The LCP Time Sheets show a total shortfall of at least 618 hours of physician time during this period.

92.     For each of said 50 weeks, PCM accepted funds from Lancaster County as if PCM was providing 24 hours per week of physician time at Lancaster County Prison during this period of time.

93.     PCM was unjustly enriched by the difference between revenue derived from Lancaster County for the total amount of physician service time contracted and the actual physician service time that PCM provided.

**PCM waste and wrongdoing with the Infectious Disease Cap**

94.     Beginning in or about 1999, I was aware of new provisions added to PCM contracts with political subdivisions relating to payment for treatment of patients with infectious diseases.

95.     PCM began to propose a separate cap for each inmate who had an infectious disease and any bills that exceeded that amount would be billed separately back to the County (the "ID Cap"); the practice prior to an ID Cap considered all expenses part of an overall cap per inmate.

96.     After the ID Cap went into effect, my contact person at Berks County Prison, Robert Nichols, complained to me when he found that it was being used to bill for infectious diseases other than HIV.

97.     After the ID Cap went into effect. Nichols complained to me when he found that the ID Cap was being used to bill for over-the-counter medications, such as Tylenol, that were administered to inmates with infectious disease.

98.     I advised Dr. Hoffman of Mr. Nichols' complaints, that PCM was interpreting the ID Cap liberally to pass expenses back to the County that would previously have been borne by PCM.

99.     Dr. Hoffman purported to agree to apply the ID Cap with Berks County less liberally.

100.   The ID Cap language in PCM's agreement with Berks County is the same in all material respects to the language in effect with other political subdivisions where PCM employs an ID Cap.

101.   After Nichols retired from Berks County Prison in or about 2005, he became employed by PCM as Director of Mental Health.

102.   I had reason to believe that after Nichols left the employ of Berks County, PCM would resume a liberal application of the ID Cap language and aggressively pass expenses back to that and all other political subdivisions.

103.   My reason to believe that the ID Cap was improperly billed is verified by reports from Penney McKinley, a former Regional Coordinator for PCM at its operation at Rockingham County, New Hampshire who confirmed that PCM applied the ID Cap so as to pass costs to the political subdivision for reasons other than the treatment of infectious diseases.

**Written Notice to PCM of Waste and Wrongdoing**

104.   I gave Dr. Carl Hoffman written notice on or about January 28, 2008, that PCM was committing waste and wrongdoing in its contracts with political subdivisions; a true and correct copy of the letter (the "Letter") is attached as Exhibit 6 and incorporated by reference herein.

105.   I delivered the Letter to Dr. Hoffman, as PCM's President, with a good faith intention of correcting waste and wrongdoing in the corporation and in preserving PCM's integrity with political subdivisions.

106.   On January 28, 2008 and for a reasonable time thereafter, I provided the information in the Letter only to persons with a need to know in the hope that the information therein would remain confidential and be corrected internally by PCM.

107.   Beginning on January 28, 2008, PCM, through Defendants Hoffman, Joshua Lock, Theresa Hoffman, and Marcy Hoffman-Schlegel engaged in acts of retaliation and discrimination for my Letter.

**Acts of Retaliation for submitting the Letter**

108.   After I submitted the Letter, all Defendants no longer authorized me to access company records.

109.   After I submitted the Letter, all Defendants no longer authorized me to contact wardens.

110.   After I submitted the Letter, all Defendants no longer authorized me to access company contracts.

111.   After I submitted the Letter, all Defendants no longer authorized me to access staffing reports.

112.   After I submitted the Letter, I received no more work assignments from my immediate superior, Dr. Hoffman.

113.   On January 28, 2008, my car was lawfully parked in a handicapped space with a handicapped placard; Joshua Lock, PCM's General Counsel, nonetheless directed me to move my "f_____ car."

114.   After January 28, 2008, I received no work assignments and sat at my desk with essentially no work to do

115.   On or about February 25, 2008, after I submitted the Letter, I received a written reprimand from Marcy Hoffman-Schlegel for having removed documents from PCM's offices, even though, as Vice President for Operations I was always authorized complete access to company records; a true and correct copy of her letter is attached as Exhibit 7 and incorporated by reference herein.

116.   I submitted a letter to Dr. Hoffman dated March 13, 2007 asking to be returned immediately to all job duties I held in 2007; a true and correct copy of the letter (the "Second Letter") is attached as Exhibit 8 and incorporated by reference herein.

117.   After I submitted the Second Letter to Hoffman, Hoffman refused to return me to my former duties.

**Constructive Discharge**

118.   As of March 13, 2008, when Dr. Hoffman made clear that I was not returning to my former duties, I recognized that PCM was denying my return to the duties of his position as Vice President of Operations and withholding any substantive work assignments.

119.   I additionally recognized that all Defendants were treating me as an outsider, and treated me with scorn and hostility.

120.   By March 14, 2008, I reasonably concluded that the intolerable working conditions I faced at PCM were not going to improve, and I advised Dr. Hoffman of the same in writing; a true and correct copy is attached as Exhibit 9 and incorporated by reference herein.

September 1, 2009
Dated

Richard C. Smith
Richard C. Smith

22